**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.**

KAREEM BRITT and
MONIQUE LAURENCE,
on behalf of themselves and
all others similarly situated,

               Plaintiffs,

vs.

IEC CORPORATION d/b/a
INTERNATIONAL EDUCATION
CORPORATION and
IEC US HOLDINGS, INC.
d/b/a FLORIDA CAREER COLLEGE,

               Defendants.

_____/

**CLASS-ACTION COMPLAINT**

Plaintiffs Kareem Britt and Monique Laurence, on behalf of themselves and all others similarly situated, bring this action against Defendant IEC Corporation d/b/a International Education Corporation ("IEC") and Defendant IEC US Holdings, Inc. d/b/a Florida Career College ("FCC").

**PRELIMINARY STATEMENT**

1.     FCC is a private, for-profit vocational school that operates multiple campuses in Florida and Texas that purport to offer career training to students. In reality, FCC is a sham.

2.     As detailed herein, through the commission of numerous acts and omissions in connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendants have substantially damaged their own students and enriched themselves in the process.

3.      At the direction of and in conjunction with its parent IEC, FCC employs high pressure sales tactics to enroll as many students as possible in order to profit from their federal student loans and grants without providing the experience or career opportunities it promises. This scheme operates to the substantial detriment of students looking for career training as a way to improve their financial prospects.

4.      Nearly every aspect of the business is structured to maximize profit from federal student loans and grants while disadvantaging students. FCC invests only limited resources into the educational programs; makes promises to prospective students that it does not intend to fulfill; and targets Black people.

5.      For years, this strategy has paid off. Defendants' unfair and deceptive practices allowed them to maximize enrollment and profit off the backs of students while the students were left worse off than if they had never attended.

6.      FCC offers diplomas, certificates, and associate degrees in various fields.

7.      But students who graduate from FCC are unable to find employment in their field of study, or, if they do find employment, do not earn enough to pay their loans after covering their basic needs.

8.      Defendants design their predatory practices to reach students in vulnerable economic situations, preying on students seeking to navigate economic uncertainty, and leaving them saddled with debt they cannot pay and no meaningful career prospects.

9.      According to the most recent 2015 Gainful Employment data from the Department of Education, almost all FCC programs evaluated failed the metric measuring whether graduates' earnings are sufficient to pay their loans after covering their basic needs.

10.     According to College Scorecard data measured in 2016 and 2017, the median earnings for students were low. For example, for students who attended the FCC Lauderdale Lakes and Orlando campuses in 2014-2015 and 2015-2016, their median earnings ranged only between $12,800 and $24,500.

11.     IEC and FCC train recruiters in uniform unfair, deceptive, and predatory policies and practices to exert pressure on prospective students to enroll during the admissions enrollment process.

12.     Through these recruitment policies and practices, including the pressure put on employees to enroll students, Defendants create a culture that demands, and even encourages, employees to resort to dishonesty in order to enroll prospective students.

13.     FCC overvalues its education and uses misrepresentations and omissions to induce prospective students to enroll.

14.     FCC promises prospective students that it will provide them training for a new career, job placement assistance, adequate equipment, and hands-on experience, but FCC fails to deliver on these promises.

15.     FCC fails to tell prospective students about its placement rates and the low median earnings for those who complete FCC programs.

16.     FCC advertises itself as providing students a gateway to a new career and a better future. Instead, FCC is a gateway to years of debt.

17.     FCC's tuition is significantly more expensive than nearby public and community colleges that offer programs in the same or similar fields.

18.     FCC forces students to take out large amounts of federal student loans to pay for FCC's inflated tuition.

19.     In 2017-2018, 87 percent of FCC's revenue, $75,295,192, came from federal funds authorized by Title IV of the Higher Education Act.

20.     While Defendants continue to profit off students, students are crippled by debt they cannot pay back.

21.     As measured by College Scorecard in 2016 and 2017, 77 percent of students who had taken out federal student loans to pay for FCC, and who left the school in 2013 and 2014, were unable to pay even one dollar of their loans within three years of leaving.

22.     FCC targets prospective students by obtaining contact information from job search websites like Indeed, Monster, and Career Builder.

23.     Defendants' misconduct is even more egregious because it targets Black people with its predatory product.

24.     FCC targets Black people by directing its advertising to them on certain media and in certain locations.

25.     The success of FCC's racial-targeting is clear from its enrollment statistics.

26.     In Fall 2018, enrollment at every FCC campus except one was predominantly Black.

27.     With the exception of FCC Lauderdale Lakes, all FCC campuses are located in majority White and Latinx communities, not majority Black communities.

28.     Plaintiffs, on behalf of themselves and others similarly situated, seek to hold FCC accountable for violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*., Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, and also for negligence and breach of contract.

4

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331

and 15 U.S.C. § 1691e(f). It has supplemental jurisdiction over Plaintiffs' state law claims under

28 U.S.C. § 1367.

30.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the

events and omissions giving rise to the claims occurred in this District.

## PARTIES

31.     Plaintiff Kareem Britt is a resident of Miramar, Florida. He enrolled in the Heating,

Ventilation and Air Condition ("HVAC") program at FCC's Lauderdale Lakes campus in 2018.

He completed his program in 2019. Mr. Britt is Black.

32.     Plaintiff Monique Laurence is a resident of Bradenton, Florida. She enrolled in the

Medical Assistant program at FCC's Orlando campus in 2017 and graduated with her diploma in

2018. Ms. Laurence is Latina and White.

33.     Defendant IEC Corporation d/b/a International Education Corporation ("IEC") is

incorporated in Delaware and has it principal place of business in California. IEC is the parent

company of various for-profit colleges, including FCC, UEI College, United Education Institute

College, and U.S. Colleges.

34.     IEC US Holdings, Inc., is a wholly owned subsidiary of IEC, is incorporated in

Florida and has its principal place of business in California. IEC US Holdings, Inc. does business

as FCC. FCC is a for-profit college that operates in Florida and Texas, with campuses in Boynton

Beach, Hialeah, Houston, Jacksonville, Lauderdale Lakes, Margate, Miami, Orlando, Pembroke

Pines, Tampa, West Palm Beach. FCC's main campus is located at 1321 S.W. 107th Avenue, Suite

201B, Miami, FL, 33174.

## STATUTORY BACKGROUND

### Equal Credit Opportunity Act

35.     Congress enacted the Equal Credit Opportunity Act (ECOA) in 1974. ECOA makes it unlawful for a creditor to discriminate against an applicant during any aspect of a credit transaction "on the basis of race." 15 U.S.C. § 1691(a).

36.     ECOA defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e).

37.     An applicant is defined as "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b).

38.     ECOA provides redress to individuals who are denied credit on the basis of membership in a protected category.

39.     ECOA also protects against "reverse redlining," which occurs when a creditor specifically targets and extends credit to a protected class for a predatory product.

40.     Predatory products include products that are financed by debt and disadvantage the borrower and/or prevent the borrower from repaying the loan.

### Title VI of the Civil Rights Act of 1964

41.     Congress enacted Title VI of the Civil Rights Act of 1964 (Title VI) in 1964. Title VI makes it unlawful for recipients of federal financial assistance under any federal program or activity to exclude, deny, or discriminate against a person "on the ground of race, color, or national origin." 42 U.S.C. § 2000d.

42.     The definition of "program or activity" under Title VI includes "a college, university, or other postsecondary institution, or a public system of higher education" or "an entire corporation, partnership, or other private organization, or an entire sole proprietorship—if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 42 U.S.C. § 2000d-4a.

43.     Federal agencies, including the Department of Education, are "empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract." 42 U.S.C. § 2000d-1.

44.     Title VI provides redress to individuals who are excluded or discriminated against because of their membership in a protected class by an entity that receives financial assistance from the federal government; including when assistance is extended, rather than denied.

45.     Reverse redlining violates Title VI.

## FACTUAL BACKGROUND

*I.     IEC's and FCC's Corporate Structure and Business Model*

46.     IEC holds itself out as a premier national provider of post-secondary career education offering programs in high-demand areas such as healthcare, trades, business, technology, transportation, and criminal justice.

47.     IEC's subsidiaries are for-profit colleges including UEI College, United Education Institute, U.S. Colleges, and FCC, which IEC purchased in 2014.

48.     IEC exercises direct control over its subsidiaries—including over FCC. Indeed, IEC manages FCC and its other subsidiaries across all areas, including accounting, human resources,

marketing, policies and procedures, compliance, campus operations, public relations, and governmental affairs.

49.     IEC's and FCC's controlling management is one and the same.

50.     IEC's President and CEO is Fardad Fateri. FCC's President is also Mr. Fateri.

51.     Mr. Fateri has a well-documented history of involvement with for-profit colleges that have engaged in predatory practices. Mr. Fateri is an Elected Commissioner and member of the Board of Directors of the Accrediting Council for Independent Colleges and Schools ("ACICS"), which, had its recognition as an accreditor revoked in 2016 by the Department of Education. ACICS has a poor reputation and ties to predatory schools, including FCC. Previously, Mr. Fateri was the President of DeVry University and the Chief Academic Officer at Corinthian Colleges, two for-profit colleges that have been subject to numerous lawsuits and investigations.

52.     As an agent of both IEC and FCC, Mr. Fateri directly manages FCC, and has implemented predatory practices from other for-profit colleges in FCC, such as boiler-room-style pressure tactics and misrepresentations to profit.

53.     FCC consists of eleven campuses; ten in Florida and one in Texas.

54.     FCC claims to "help students reach their goals" and to be a place where students "can get career training and skills that will help [them] create a future [they] can be proud of . . . . [f]rom finding the right career path to finding the right employer after [they] graduate, Florida Career College is committed to being [their] partner and helping [them] reach [their] goals."

55.     Indeed, FCC embeds its false promises in its misleading name: "Florida Career College."

56.     FCC offers diplomas, certificates, and associate degrees in various fields including: Business Office Administration, Patient Care Technician, Pharmacy Technician, Health Services

Administration, Medical Assistant Technician, Medical Front Office and Billing, Dental Assistant, Heating Ventilation and Air Condition, Information Technology, Computer Network Technician, Nursing, and Cosmetology.

57.     FCC's business model is simple: (1) it makes unsupported promises to provide high-value career training; (2) it uses high-pressure sales tactics and unfair, misleading, and false statements and omissions to induce individuals to enroll and borrow thousands of dollars in federal student loans; (3) it fails to disclose that the vast majority of graduates cannot afford to pay back their student loans; (4) it allocates funds in favor of profit and advertising to create future profit instead of on instruction; and (5) it uses advertising and recruitment tactics to target Black people whom it believes are particularly susceptible to its predatory product.

58.     FCC relies almost exclusively on revenue from federal student loans and grants to finance its profitable business.

59.     In 2017-2018, 87 percent of FCC's revenue, $75,295,192, came from federal funds authorized by Title IV of the Higher Education Act (Title IV federal funds).[1]

60.     FCC structures its business to enroll as many students as possible in an effort to maximize revenue from federal student loans and grants while simultaneously limiting expenditures on educational services.

## II.     *FCC Sells a Predatory Product*

61.     FCC purports to sell prospective students an experience that will lead to a career. In reality, FCC sells a predatory product. Prospective students do not receive the experience or

---

[1] In order to maintain eligibility under the 90/10 Revenue Percentage requirements, for-profit colleges, such as FCC, may receive no more than 90 percent of their annual revenue from Title IV programs. 20 U.S.C. § 1094(a)(24); 34 C.F.R § 668.14(b)(16). Title IV federal funds include both federal student loans and federal Pell Grants.

career opportunities FCC promises, and are instead left with loans they are unable to pay.

62.     Although students take out thousands of dollars in federal student loans, which then are paid directly to FCC, FCC uses those dollars to profit rather than to provide the experience or job placement opportunities it promised to them.

63.     FCC's meager per-student education expenditures underscore its predatory business model.

64.     Per FCC's 2020 Course Catalog, FCC's programs cost between $18,450 and $51,925, depending on the program. The majority of FCC's programs are nine-month programs.

65.     In Fall 2018, according to Department of Education data from Integrated Postsecondary Education Data System (IPEDS), FCC spent only $2,952 on instructional expenses per student at FCC Hialeah for the year; $3,032 at FCC West Palm Beach; and $4,483 at FCC Lauderdale Lakes. These numbers represent only about four to eighteen percent of the tuition for each program.

66.     This is in stark contrast to instructional expenses per student at nearby public and community colleges for programs geared toward similar credentials. For example, in Fall 2018, Florida International University spent an average of $7,008 per student; Orange Technical College's Orlando Campus spent $7,762; and Sheridan Technical College spent $6,530.

67.     The instructional expenses per semester per student at Orange Technical College and Sheridan Technical College are more than students pay for their whole program at the schools. For Florida International University, the instructional expense is more than two semesters of tuition.

68.     FCC spends less on instruction than its public and private nonprofit counterparts. For example, in 2016-2017, private 4-year nonprofit institutions spent $18,500 and public 4-year

institutions spent $12,700, as for the respective 2-year institutions spent $6,900 and $6,300, according to data from the National Center for Education Statistics.

69.     To be eligible for Title IV federal funding, schools must provide educational programs that "lead to gainful employment in a recognized occupation." The principal measure of whether programs lead to gainful employment is the ratio of debt to income that a program's typical student has upon graduating the program.

70.     The debt to discretionary income ratio is intended to measure whether graduates' earnings are sufficient to pay their loans after covering their basic needs.

71.     In the most recent 2015 Gainful Employment data from the Department of Education, only one of the seventeen programs evaluated passed the debt to discretionary income metric. Of the seventeen programs evaluated, the median annual earnings of students who were able to graduate and find employment ranged from $8,983 to $32,871.

72.     The table below lists the students' mean and median annual earnings for each program and whether the program failed or passed the debt to discretionary income metric.

| PROGRAM | MEAN ANNUAL EARNINGS | MEDIAN ANNUAL EARNINGS | DEBT TO EARNINGS - DISCRETIONARY INCOME RATIO |
|---|---|---|---|
| COSMETOLOGY/COSMETOLOGIST, GENERAL. | $12,953 | $10,818 | FAIL |
| HEALTH SERVICES ADMINISTRATION. | $20,846 | $22,824 | FAIL |
| AESTHETICIAN/ESTHETICIAN AND SKIN CARE SPECIALIST. | $10,728 | $8,983 | FAIL |
| HEATING, VENTILATION, AIR CONDITIONING AND REFRIGERATION ENGINEERING TECHNOLOGY/TECHNICIAN. | $20,940 | $17,803 | FAIL |
| COMPUTER ENGINEERING TECHNOLOGY/TECHNICIAN. | $23,940 | $23,269 | FAIL |
| COMPUTER TECHNOLOGY/COMPUTER SYSTEMS TECHNOLOGY. | $21,029 | $16,328 | FAIL |

| | | | |
|---|---|---|---|
| COMPUTER INSTALLATION AND REPAIR TECHNOLOGY/TECHNICIAN. | $17,247 | $16,072 | FAIL |
| HEALTH INFORMATION/MEDICAL RECORDS TECHNOLOGY/TECHNICIAN. | $23,219 | $25,498 | FAIL |
| MEDICAL INSURANCE SPECIALIST/MEDICAL BILLER. | $18,829 | $19,162 | FAIL |
| MEDICAL ADMINISTRATIVE/EXECUTIVE ASSISTANT AND MEDICAL SECRETARY. | $19,521 | $20,894 | FAIL |
| MEDICAL/CLINICAL ASSISTANT. | $16,654 | $16,224 | FAIL |
| MASSAGE THERAPY/THERAPEUTIC MASSAGE. | $19,225 | $17,909 | FAIL |
| REGISTERED NURSING/REGISTERED NURSE. | $37,378 | $32,871 | PASS |
| NURSING ASSISTANT/AIDE AND PATIENT CARE ASSISTANT/AIDE. | $15,313 | $14,330 | FAIL |
| BUSINESS ADMINISTRATION AND MANAGEMENT, GENERAL. | $23,413 | $22,331 | FAIL |
| BUSINESS ADMINISTRATION AND MANAGEMENT, GENERAL. | $27,604 | $27,937 | FAIL |
| MANAGEMENT INFORMATION SYSTEMS, GENERAL. | $26,347 | $28,202 | FAIL |

73.     Even for the one FCC program that was able to pass the debt to discretionary income metric, registered nursing, FCC fails its students by failing to prepare them for their licensure exam. According to the Florida Center for Nursing, in 2018, 60 of the 88 FCC students who took the National Council Licensure Examination failed (a 68 percent *failing* rate).

74.     FCC students fared poorly on the registered nursing licensure exam compared to students from other schools. Florida's Registered Nurse (RN) *passage* rate for 2018 was 68 percent while FCC's was 32 percent.

75.     Other public and community colleges located near FCC campuses had better outcomes than FCC. For example, at William T. McFatter Technical College, all programs evaluated under the debt to discretionary income metric for Gainful Employment passed; at

Broward College, all programs evaluated passed; and at Miami Dade College, all programs evaluated passed.

76.     According to the College Scorecard, as measured in 2016 and 2017, for students who attended FCC's Lauderdale Lakes and Orlando campuses in 2014-2015 and 2015-2016, their median earnings ranged between $12,800 and $24,500.

77.     The table below lists students' median earnings for each program at the campuses.

| PROGRAM – LAUDERDALE LAKES | MEDIAN EARNINGS |
|---|---|
| ALLIED HEALTH AND MEDICAL ASSISTING SERVICES | $18,500 |
| ENVIRONMENTAL CONTROL TECHNOLOGIES/TECHNICIANS | $24,500 |
| COSMETOLOGY AND RELATED PERSON GROOMING SERVICES | $12,800 |
| PRACTICAL NURSING, VOCATIONAL NURSING AND NURSING ASSISTANTS | $14,800 |
| COMPUTER ENGINEERING TECHNOLOGIES/TECHNICIANS | $19,700 |
| PUBLIC HEALTH | $23,300 |
| COMPUTER AND INFORMATION SCIENCES, GENERAL | $20,900 |
| **PROGRAM – ORLANDO** | **MEDIAN EARNINGS** |
| ALLIED HEALTH AND MEDICAL ASSISTING SERVICES | $18,500 |
| ENVIRONMENTAL CONTROL TECHNOLOGIES/TECHNICIANS | $24,500 |
| HEALTH AND MEDICAL ADMINISTRATIVE SERVICES | $21,400 |
| COSMETOLOGY AND RELATED PERSON GROOMING SERVICES | $12,800 |
| ALLIED HEALTH DIAGNOSTIC, INTERVENTION, AND TREATMENT PROFESSIONS | $20,000 |

| PRACTICAL NURSING, VOCATIONAL NURSING AND NURSING ASSISTANTS | $14,800 |
|---|---|
| COMPUTER ENGINEERING TECHNOLOGIES/TECHNICIANS | $19,700 |
| PUBLIC HEALTH | $23,300 |
| COMPUTER AND INFORMATION SCIENCES, GENERAL | $20,900 |

a.  *FCC Students are Encumbered by Student Debt*

78.     FCC's business strategy coupled with its predatory product is detrimental to students.

79.     FCC students are encumbered by student debt, which affects nearly every aspect of their lives, including their credit and thus their ability to provide for themselves and their families, secure stable housing, purchase a home, or take out additional student loans to further their education.

80.     Student debt is the economic engine that drives FCC's sham product. In the 2017-2018 year, FCC relied on federal student loans and grants for 87 percent, or $75,295,192, of its revenue.

81.     As measured by College Scorecard in 2016 and 2017, 77 percent of the students who had taken out federal student loans to pay for FCC, and who left the school in 2013 and 2014, were unable to pay even one dollar of their loans within three years of leaving.

**III.     FCC Uses High Pressure Predatory Tactics to Induce Individuals to Borrow Student Loans to Pay for High-Cost, Low-Value Programs**

82.     FCC trains Admissions Representatives, or "recruiters," using uniform policies, procedures, and practices that employ high-pressure tactics to sell its predatory product.

83.     FCC requires recruiters to call 100-150 people per day and enroll three to five prospective students per week.

14

84.     FCC surveils and monitors recruiters' activities to ensure they are employing the FCC-mandated high-pressure sales tactics.

85.     For example, at FCC Tampa in 2019, recruiters' calls were recorded by management. At FCC Houston in 2018, management placed trackers on recruiters' phones so management could review how many calls they made during the day.

86.     FCC management puts intense pressure on recruiters who struggle to meet their enrollment quotas.

87.     FCC management, including IEC staff, holds weekly telephonic meetings with recruiters, called "Opportunity Calls" or "Accountability Meetings."

88.     At these weekly meetings, FCC praised well-performing recruiters, while recruiters who failed to meet their enrollment quotas are publicly chastised.

89.     Recruiters who do not make their enrollment quotas are fired.

90.     FCC's high-pressure predatory practices created a climate of fear where its employees routinely suffered breakdowns. For example, in 2017-2018, the Career Services Director at the West Palm Beach campus took Career Services Representatives to a specific field called the "Crying Field" when they were overwhelmed by the pressure to perform. There was also a specific closet called the "Crying Closet."

91.     FCC pressures its campuses to perform, and accordingly, recruiters pressured prospective students to enroll. FCC's pressure campaign induced students to enroll and ultimately take out federal student loans to attend.

92.     FCC and IEC have strategically developed an environment that encourages recruiters to do whatever is necessary to enroll students. In fact, FCC permit its recruiters to engage in schemes to increase enrollment, as further described below.

93.     For example, a recruiter from the Tampa campus, in or around 2018, deceived prospective students by telling them that they were coming in for a job interview, even though they were coming in to be recruited to enroll. FCC management knew of this recruiter's tactics and allowed her to continue because she got results.

94.     Similarly, in or around 2018-2019, FCC in Tampa created a script that contained numerous false statements. FCC instructed recruiters to say that a committee decides admission into the school and that class was starting that month, so the prospective students needed to move quickly to take advantage of the opportunity. But FCC does not have a committee to decide admission; this was a tactic used to get students to enroll quickly.

95.     As yet another example, FCC instructed recruiters at FCC Orlando to tell prospective students programs were full, even if they were not. FCC convinced prospective students to enroll in a different program that was starting sooner so the school could meet its enrollment quota.

96.     FCC's recruitment efforts follow a distinct and common pattern that FCC teaches to all FCC campus recruiters. FCC management provides recruiters with "lead sheets," which are lists with names of prospective students, their contact information, and the source of the information. FCC trains recruiters on the initial phone contact.

97.     The information from these lead sheets is derived from various means including the purchase of contact information from job search websites like Indeed, Monster, and Career Builder.

98.     FCC instructs recruiters to call prospective students multiple times a day.

99.     Recruiters sometimes call prospective students three or four times an hour or contact them via text message.

100.    FCC contracts with auto-dialer companies, which get prospective students on the phone and then transfer them to FCC recruiters.

101.    Once a recruiter gets a prospective student on the phone, their objective is to get the student to come to an FCC campus for an "interview" and a tour.

102.    Once a prospective student comes to campus, the recruiter's goal is to get them to enroll.

103.    FCC trains recruiters to convince students to enroll by highlighting the students' individual struggles and presenting FCC as the answer to those struggles. FCC trains recruiters to play on students' emotions and their social and economic circumstances.

104.    FCC's recruiters follow a script and a handbook that provides statements and rebuttals to various objections that a prospective student might raise.

105.    The recruitment process flows through a set of pre-planned stages that FCC has designed to effect maximum pressure and, therefore, maximum enrollment.

106.    The recruiter first brings the prospective student to the Admissions Office to conduct an "interview," which is really a high-pressure sales pitch. During the "interview," the recruiter asks about the student's background, education, goals, and motivation. Then, the recruiter goes over a PowerPoint presentation about the school.

107.    Afterward, the recruiter takes the student on a tour. The tour includes a visit to the Career Services Department where Career Services Representatives tell the prospective students that enrolling in FCC will result in a job.

108.    The recruiter then shows the prospective student the facilities including different classes and equipment.

109.    Throughout the entire enrollment and tour process, FCC creates a false image of the school to induce students to enroll. FCC makes false representations about the students' experiences, including what equipment and tools are available, and how the school improves students' lives.

110.    The final stage involves recruiters giving prospective students the Enrollment Agreement to complete and sign. Then, recruiters send the now-enrolled student to the Financial Aid Department. FCC and IEC fail to disclose to prospective students the truth about FCC's job placement statistics or the low rate of students who are able to repay their student loans.

111.    A "Financial Aid Advisor" then helps the prospective student fill out the Free Application for Federal Student Aid (FAFSA), which is required in order to receive federal financial aid. "Financial Aid Advisors" provide the prospective student with additional private loan documents or a retail installment contract with the school.

112.    FCC supplemented its Enrollment Agreement in May 2019 to state:

(1)    We agree not to use any predispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.

(2)    We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide

18

whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.

113.    FCC's "Financial Aid Advisors" rush through this process, and purposely do not adequately explain to students what type of aid is available to them, the type of aid they are applying for, or the ramifications to students if they are unable to repay the loans.

114.    FCC's misrepresentations, material omissions, and high-pressure tactics continue even after a student has enrolled and signed up for federal student loans.

115.    FCC has a policy and practice of tracking students for their first few weeks to make sure they come to class. The goal is to keep the students enrolled long enough so the school can keep their student loan money.

116.    For example, in or around 2017, the FCC Jacksonville Admissions Director demanded recruiters ensure that students were enrolled for a certain minimum number of days so that FCC could keep their student loan money.

117.    Upon information and belief, FCC continues to employ heavy-handed tactics to coerce students to enroll or stay enrolled solely so they can keep their student loan money, such as repeatedly calling students and going to students' homes in-person to pressure them into attending and/or returning to class.

118.    After FCC collects all the students' tuition money, students are left alone unless they owe monthly payments on their private loans or installment contracts.

119.    Tuition at FCC is significantly higher than at other public and community colleges.

120.    Depending on the program, FCC's tuition ranges between $18,450 to $51,925. For example, its Medical Assistant program costs $21,500, its Information Technology program costs $39,950, and its Nursing program costs $51,925.

121.     Other public and community colleges with campuses near FCC campuses, and with programs geared toward similar credentials, cost significantly less. For example, Sheridan Technical College is 5 miles away from FCC Pembroke Pines; for the 2019-2020 school year its Medical Assisting program costs $5,199, its Computer Systems & Information Technology program costs $3,063, and its Practical Nursing program costs $5,708. Likewise, Erwin Technical College is located 8 miles away from FCC Tampa; for the 2019-2020 school year its Medical Assisting program costs $4,257, its Computer Systems & Information Technology program costs $4,446, and its Practical Nursing program costs $5,731.

**IV.     *FCC Induces Students to Enroll Using False Promises and Fraudulent Tactics.***

   *a. FCC Misrepresents Information Regarding Guaranteed Employment and Omits Information Regarding Job Placement Rates.*

122.     FCC overvalues its education and misrepresents its product in order to get students to enroll. It advertises itself as providing students a gateway to a new career and a better future, but it is actually only a gateway to years of debt.

123.     FCC misleads students to believe it will find them employment. Recruiters tell students the Career Services Department guarantees them employment, and recruiters pressure the Career Services Representatives to tell students they will find them a job.

124.     FCC fails to disclose FCC's job placement rates.

125.     FCC does not fulfill its promise of employment to prospective students.

126.     FCC's ongoing misrepresentations and omissions about its job placement efforts and rates were made possible, in part, by ACICS' lax guidelines regarding job placement. As long as a job included certain keywords or responsibilities for the field, it counted as an adequate job placement for ACICS' purposes. FCC knew about this "keyword loophole" and routinely exploited

20

it, in addition to employing a number of other schemes across all FCC campuses to inflate its job placement rates, as described below.

127.    For example, in 2017-2018, FCC directed Career Services Representatives at FCC Boynton Beach to tell employers to include certain language in job descriptions that would allow a job to count as an infield placement.

128.    In yet another ploy, FCC Career Services Representatives also encouraged employers to split full-time positions into two part-time positions so the representative could have two placements. They told employers it would save them money, because employers would not have to provide FCC students with employment benefits.

129.    Upon information and belief, FCC employees continue to influence employers to split full-time positions into part-time positions and change job descriptions in order to falsely inflate their job placement numbers.

130.    In 2017-2018, FCC's Executive Director directed Career Services Representatives at FCC West Palm Beach to persuade graduates to falsify employment waiver documents so the school's placement numbers appeared higher than they actually were. Career Services Representatives coerced graduates who were unemployed to say they could not work, did not want to work, started their own business, or that they only came to school for professional development, even if it was not true. They told the graduates that if they did not lie, the school would lose its accreditation and their degree would become worthless.

131.    Upon information and belief, FCC continues to falsify employment waiver documents.

132.    In 2017, Career Services Representatives at FCC West Palm Beach placed students in temporary jobs at staffing companies. The temporary positions lasted just long enough so that

FCC could count the students as employed for job placement purposes.

133.    Upon information and belief, FCC continues to place students in temporary jobs at staffing companies to influence its job placement rates.

**V.      FCC Breached its Contract with Students**

134.    The Course Catalog constitutes a contract.

135.    The Course Catalog provides information about FCC's policies, procedures, objectives, course information, and services.

136.    FCC's Course Catalog states that its various programs provide hands-on experience, FCC has "well-equipped classrooms, computer labs, clinical settings, medical labs, []resource centers," and job placement assistance.

137.    But, FCC did not fulfill its promises to students. Examples of FCC's breaches include the following: Students routinely watched YouTube videos in class in place of actual instruction; classroom supplies were expired or nonexistent; FCC provided job postings for irrelevant jobs like meat packing jobs in warehouses; and instructors taught as many as three classes at once, effectively leaving students with no instructor.

138.    FCC's misrepresentations, omissions, and failures line FCC's pockets while harming students. Each member of the proposed class and subclass were deceived into paying for an experience that they never received. Whether it be FCC's failure to provide competent instructors, equipment, training, experience, job placement, each and every student who enrolled in FCC during the class period(s) was harmed by FCC's placing profit over education. FCC's actions have deeply and negatively affected the trajectory of these students lives.

139.    Indeed, had FCC disclosed the true nature of the experience they provided or disclosed the truth about its job placement statistics or the low rate of students who are able to

repay their student loans, the members of the proposed class or subclass would not have enrolled in FCC or would not have agreed to pay what they did in tuition.

## VI.    *FCC Targets Black People*

140.    In addition to selling a predatory product using high-pressure tactics, FCC targets its product to Black people through advertisements designed specifically to attract Black people. FCC does this by using Black models and distributing the advertisements on certain media and in certain locations. Black students who enrolled at FCC did so after their exposure to advertisements from FCC.

141.    FCC targets Black prospective students on social media platforms like Facebook and Instagram, where it is possible to target advertisements to people with specific interests, or in specific locations, including, for example, people located in a specific geographic area interested in "African Americans" and/or "African American Culture."

142.    The following are examples of FCC advertisements that were active on Facebook and Instagram:









143.    FCC has advertised on radio stations focusing on stations that play Hip-Hop and R&B music like 99 Jamz, 93.3 The Beat, Power 106.1, and x102.3.

144.    FCC has advertised on certain public buses, bus benches, and bus stops in order to target people of color.

145.    FCC conducted outreach at local schools with a high percentage of Black students. For example, FCC recruited at Boyd H. Anderson High School in Lauderdale Lakes, where 89 percent of the student population for the 2017-2018 school year consisted of Black students. Likewise, FCC recruited at Plantation High School in Plantation, which has 71 percent Black students.

146.    FCC had billboards in Pine Hill, Florida where 71.7 percent of the residents are Black.

147.    FCC has advertised during daytime television on television shows like Jerry Springer, Maury, the Montel Williams Show, and Dr. Phil—tactics used by Corinthian Colleges (a now defunct for-profit college).

148.    FCC sends out advertisements in the mail in order to target Black people.

149.    FCC has advertised at malls like the Boynton Beach Mall, Westland Mall, Lauderhill Mall, Pembroke Lakes Mall, Wellington Green Mall, and Orange Park Mall.

150.    FCC's Corporate Marketing Team at IEC works with lead generator companies; IEC specifies the type of students they want and the companies provide leads based on their specifications.

151.    FCC distributes the leads providing better performing campuses the best leads.

152.    Upon information and belief, FCC continues to use these recruitment and advertising tactics to target Black people for its predatory product.

153.     FCC's racial targeting is successful. As a result of its marketing, advertising, and recruitment tactics, FCC's student population is disproportionately Black.

154.     FCC's student population demographics for Fall 2018 show that every FCC campus, except for one, is predominantly Black.

155.     The overall population of the United States is 12.7 percent Black.

| School | %Blck | %Ltx | %Wht | Nearest Cities | %Blck | %Ltx | %Wht |
|---|---|---|---|---|---|---|---|
| FCC - Pembroke Pines | 52 | 24 | 4 | Pembroke Pines, FL | 21.7 | 43.1 | 65.5 |
| FCC - Boynton Beach | 60 | 23 | 13 | Boynton Beach, FL | 31.7 | 15.8 | 62.4 |
| FCC - Hialeah | 55 | 43 | 1 | Hialeah City, FL | 2.5 | 96.1 | 92.6 |
| FCC - Houston, TX | 64 | 27 | 5 | Houston, TX | 23.4 | 44.8 | 59.3 |
| FCC - Jacksonville | 63 | 11 | 14 | Jacksonville, FL | 31 | 9.6 | 58.7 |
| FCC - Lauderdale Lakes | 87 | 7 | 2 | Lauderdale Lakes, FL | 84.9 | 4.5 | 11.2 |
| FCC - Margate | 70 | 22 | 7 | Margate, FL | 28.6 | 26.3 | 60.8 |
| FCC - Miami | 26 | 68 | 4 | Miami, FL | 17.7 | 72.5 | 75.2 |
| FCC - Orlando | 38 | 30 | 7 | Orlando, FL | 25.4 | 31.1 | 60.7 |
| FCC - Tampa | 30 | 28 | 8 | Tampa, FL | 24.2 | 25.7 | 64.9 |
| FCC - West Palm Beach | 58 | 25 | 11 | West Palm Beach, FL | 34.3 | 24 | 57.8 |

156.     In 2016, the overall student population in higher education across the United States was 13 percent Black for public and nonprofit institutions.

157.     With the exception of FCC Lauderdale Lakes, all FCC campuses are located in majority White and Latinx communities, not majority Black communities.

158.    As of Fall 2018, every FCC campus has a larger percentage of Black students than the percentage of Black residents of the city it is located in. FCC is disproportionately composed of Black students.

159.    The chart above exhibits this using the schools' Fall 2018 data from College Navigator and 2015-2018 American Community Survey Census data.[2]

160.    Nearby public and community colleges that are geared toward similar credentials at significantly lower costs, have lower percentages of Black students. Sixteen public community and public colleges surrounding FCC campuses all have a lower percentage of Black students than FCC's campuses.

161.    For example, Palm Beach State College (PBSC) is located 13 miles away from FCC Boynton Beach. PBSC's student population is 26 percent Black while FCC Boynton Beach's student population is 60 percent Black.

162.    Similarly, Florida State College at Jacksonville (FSCJ) is located 17 miles away from FCC Jacksonville. FSCJ's student population is 27 percent Black. FCC Jacksonville is 63 percent Black.

163.    FCC targets Black people for its predatory product; discriminating against students on the basis of race by inducing them to purchase a worthless product by taking on debt they cannot repay.

---

[2] Data for the Black and White populations are taken from the census categories "Total Population" and "One Race" while data for the Latinx populations are taken from the "Hispanic or Latino and Race" and "Hispanic or Latino (any race) categories."

## FACTS CONCERNING NAMED PLAINTIFFS

### *Kareem Britt*

164.    In August 2018, after seeing an FCC advertisement on Facebook, Mr. Britt decided to look into FCC.

165.    At the time, he was a cook working two jobs barely making enough to support himself and his family. He needed a change and FCC's advertisement made it seem like FCC could help him make that change.

166.    The advertisement said: "Are you tired of working minimum wage jobs? Eating ramen noodles? Are you ready to step up to steak? HVAC degrees make $16 to $23/hr."

167.    He clicked on the Facebook advertisement and it prompted him to call FCC.

168.    He called the number and spoke to a recruiter named Lisa.

169.    She told him that FCC has great programs, people who attend FCC become successful, and attending FCC could change his life. Lisa's statements and the information in the FCC Facebook advertisement convinced him to come in for an "interview."

170.    On August 22, 2018, Mr. Britt met with Lisa for his "interview." Consistent with her FCC recruitment training, Lisa told Mr. Britt that an FCC education could change his life. She spoke about his future, and he found it motivational.

171.    Mr. Britt inquired about job placement and was told that the Career Services Department provided job placement, but FCC failed to disclose its job placement rates.

172.    After his "interview," Mr. Britt was given a tour of FCC. The recruiter showed him the HVAC classroom with all the various tools and equipment. Mr. Britt was impressed.

173.    Based on the representations and omissions, Mr. Britt agreed to enroll in the HVAC program and signed an Enrollment Agreement.

28

174.    Mr. Britt then met with a "Financial Aid Advisor" named Keith. Keith told him the cost of the program ($20,400).

175.    Consistent with his role in FCC's scheme, Keith pressured Mr. Britt to take out loans to finance his education at FCC.

176.    Keith told Mr. Britt he would qualify for a $6,000 federal Pell Grant and he would receive a "scholarship loan" from the school for $3,000.

177.    Mr. Britt initially thought he was taking out only one loan with the school for $3,000. He would later find out after he completed his program that he also had federal loans; one for $6,000 and another for $3,500.

178.    Keith helped Mr. Britt fill out his financial aid and student loan paperwork.

179.    Afterward, Keith told him he would have to pay $75 a month for his student loans while he was enrolled in the school.

180.    In addition, Mr. Britt later learned while taking classes that FCC's representations about the quality of instruction and students' access to tools, machinery, and other learning devices were false. Mr. Britt's access to tools, machinery, and other learning devices were at best limited, and at worse, nonexistent.

181.    Mr. Britt's instructors did not have enough experience or knowledge to teach his classes.

182.    Mr. Britt found out after he enrolled that FCC did not have the requisite equipment. They were supposed to have tanks, torches, vacuum pumps, AC units, units to take apart, safety glasses, and hard hats, but they did not have these materials.

183.    Lisa told Mr. Britt that each student would receive his own tool kit as part of the tuition, but he never received his own tool kit. In fact, there was only one bag of tools for the whole class of 27 students.

184.    FCC did not prepare Mr. Britt for the necessary HVAC or OSHA certification tests.

185.    In November 2019, Mr. Britt sought help from FCC's Career Services Department to find employment. An FCC Career Services Representative found him two temporary positions, but each lasted only two weeks.

186.    Upon information and belief, FCC used Mr. Britt's temporary positions to bolster its job placement rates, but failed to tell Mr. Britt that FCC's job placement rates are illusory.

187.    Despite the strong emphasis FCC placed on careers and employment during the recruitment and interview phase, FCC career services provided Mr. Britt no other help with employment except resume assistance and posting it on ZipRecruiter. FCC never sent Mr. Britt on any interviews or provided him with a list of employers to contact. Mr. Britt tried to find employment on his own. He posted his resume on Indeed and ZipRecruiter, but he did not receive any calls or interviews.

188.    Mr. Britt currently works as a cook in a hotel, which is similar to the position he had before and during his attendance at FCC. He does not work in the HVAC field.

189.    FCC's career services is a sham, and FCC's promises of employment are made for the sole purpose of inducing enrollment.

190.    At no time before enrolling at FCC was Mr. Britt told the truth about the quality of the HVAC program or the actual employment information. FCC had this information but did not disclose it.

191.    Mr. Britt completed his coursework, but because he eventually fell behind on his loan payments, FCC refused to provide him his diploma.

192.    While attending FCC, Mr. Britt observed that a majority of the students were Black or Latinx.

193.    FCC misled Mr. Britt and induced him to enroll in FCC by false promises. He did not receive what FCC promised.

### *Monique Laurence*

194.    Ms. Laurence was previously a Nurse's Aid for 24 years in New York. When she moved to Florida in December 2016, she did not have a Florida nursing license.

195.    Ms. Laurence placed her resume on job sites like Indeed and ZipRecruiter hoping to find a new position in Florida.

196.    Ms. Laurence received a call from a recruiter suggesting she might need additional training. The recruiter transferred her to an FCC recruiter.

197.    Upon information and belief, the recruiter received Ms. Laurence's phone number from Indeed or ZipRecruiter.

198.    After the initial call from the recruiter, Ms. Laurence continued to receive phone calls once or twice a week for a month from FCC recruiters asking her to come in to talk about their programs. She also received emails from FCC recruiters.

199.    In or around May 2017, after countless FCC recruitment calls and emails, Ms. Laurence went to FCC Orlando to meet with a recruiter. According to FCC's policies and practices, the FCC recruiter pressured Ms. Laurence to enroll.

200.    The recruiter told Ms. Laurence that FCC provided lifelong job placement, but failed to provide Ms. Laurence with the actual job placement rates.

31

201.    Ms. Laurence experienced FCC's trademark "hard sell" techniques. The recruiter told Ms. Laurence that FCC would provide an opportunity for a lifelong career and that it was better to have a career than a job. The recruiter told Ms. Laurence that she should invest in her career and invest in her future.

202.    The recruiter promised Ms. Laurence that she would make great money and that she would even learn how to do x-rays.

203.    Ms. Laurence was particularly interested in learning about x-rays. She thought this new specialty would make her marketable to employers.

204.    After the "interview," Ms. Laurence left to think about whether she should enroll at FCC. FCC trains recruiters to continue to pressure potential students to enroll if the potential student, like Ms. Laurence, does not enroll on the spot.

205.    After receiving numerous calls from FCC, Ms. Laurence went back to visit FCC a week later. She met with the same recruiter. The recruiter repeated what she had told Ms. Laurence during their first meeting.

206.    The recruiter then took Ms. Laurence on a tour. He showed her classrooms and labs. In one of the classrooms, students were practicing injections on a simulated arm. The recruiter introduced Ms. Laurence to some instructors, who welcomed her and told her it was a great school and a good program. The recruiter also showed Ms. Laurence the room where he said she would learn how to take x-rays.

207.    Based on these representations, Ms. Laurence signed the Enrollment Agreement and enrolled in the Medical Assistant program at FCC Orlando.

208.    After signing the Enrollment Agreement, and as the next step in the FCC enrollment scheme, the recruiter walked Ms. Laurence to the Financial Aid Department.

209.    The "Financial Aid Advisor" said she would try to get the most grants and scholarships for Ms. Laurence. The "Advisor" handed Ms. Laurence several documents and did not give Ms. Laurence enough time to review them. The "Advisor" instructed Ms. Laurence to sign the documents, knowing that Ms. Laurence did not have time to review them.

210.    Ms. Laurence filled out the FAFSA on the school's computer and the "Advisor" input the amount of federal loan money she should request.

211.    Ms. Laurence financed her education through federal student aid. She received a Federal Pell Grant for $3,170 and federal loans for $9,500. She also paid around $8,000 out of pocket.

212.    FCC did not follow through on its promises to Ms. Laurence.

213.    For example, without notice, FCC discontinued the x-ray portion of the Medical Assistant program.

214.    The school did not provide adequate equipment. Students would run out of needles when doing injections. Some of the equipment did not work, including the projector, the EKG machine, and the blood pressure cups.

215.    FCC did not prepare Ms. Laurence for the medical assistant certification exam.

216.    FCC employees pulled Ms. Laurence out of class two or three times to extract payments or finalize financial aid paperwork.

217.    These disruptions were embarrassing, and induced Ms. Laurence to pay $8,000 to the school for the remainder of her tuition so she would not be harassed during class about her monthly payments.

218.    Ms. Laurence's dreams of being a medical assistant never actualized. She never worked a single day as a medical assistant. FCC never provided Ms. Laurence with adequate job

placement assistance. The assistance FCC provided simply included resume assistance, which they posted on an unknown employment website. Ms. Laurence obtained only one job offer for a temporary position for only three hours a day. Otherwise she received no interviews and no job leads.

219.    Even after FCC failed to help Ms. Laurence, she continued to look for a job on her own, but was unable to find employment in her field. She was forced to take a position as a Home Care Aid to provide for herself.

## CLASS ACTION ALLEGATIONS

220.    In accordance with Federal Rule of Civil Procedure 23, Plaintiffs Kareem Britt and Monique Laurence bring this action on behalf of themselves and all other individuals similarly situated as members of the following classes:

**All FCC Class**

All persons who enrolled at any FCC campus in Florida within the last four years.

**Race Discrimination Subclass**

All Black students who enrolled at any FCC campus in Florida within the last five years.

221.    Plaintiffs expressly reserve the right to amend the definitions of the Class and Subclass based on subsequently-discovered information, and reserve the right to establish additional subclasses where appropriate, at the time of filing a motion for class certification.

222.    Plaintiffs seek certification under Rule 23(b)(3) on the basis that all members of the class have been injured, in the same way, as a result of Defendants' conduct. The common questions predominate over any individual questions, and a class action is superior to alternative methods for efficient adjudication of the controversy as the class is so numerous that joinder of all members is impracticable.

**Numerosity of the Class: Fed. R. Civ. P. 23(a)(1)**

223.    The proposed Class and Subclass are so numerous that joinder of all members is impracticable. Between 2014 and 2018 alone, approximately 38,717 students attended FCC and of those students, approximately 19,955 were Black.

**Existence of Common Questions or Law and Fact: Fed. R. Civ. P. 23(b)(3)**

224.    Common questions of law and fact exist as to all members of the Class and Subclass and predominate over questions affecting individual members, because all members enrolled in FCC because of the same or similar representations, entered into the same or similar written contracts, and had the same or similar experiences. The questions of law and fact are common to the Class and Subclass include, but are not limited to:

   a.   Whether Defendants induced class members to enroll at FCC by making false representations or by failing to disclose material facts;

   b.   Whether Defendants engaged in unfair or deceptive acts or practices in the course of conducting business;

   c.   Whether Defendants breached their contractual obligations to the class;

   d.   Whether Defendants intentionally targeted Black people for the purpose of extending credit for a predatory product by engaging in reverse redlining in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*., Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., and Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*; and

   e.   Whether Defendants acts, policies, and practices, by engaging in reverse redlining, disparately impacted Black people in violation of the Equal Credit Opportunity Act,

15 U.S.C. § 1691 *et seq.*, and Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*

**Typicality of Claims or Defenses Fed. R. Civ. P. 23(a)(3)**

225.     Plaintiffs' claims are typical of the claims of the proposed Class. Plaintiffs attended FCC and were subject to the same or similar representations, entered into the same or similar written contracts with Defendants as the other class members, received the same poor delivery of services, and were all injured by Defendants through their misconduct. They all face similar harm as a result of FCC's vacant promises and omissions.

226.     Plaintiff Kareem Britt's claims are typical of the claims of the proposed Subclass. Plaintiff attended FCC and was subject to the same or similar targeting and treatment as the class members, entered into the same or similar written contracts with Defendants as the other class members, and was similarly injured by Defendants through their misconduct; all face similar harm because the school targeted Black people.

**Adequate Representation: Fed. R. Civ. P. 23(a)(4)**

227.     Plaintiffs are adequate representatives of the Class and Subclass because their interests align with the interests of the class and do not conflict. Plaintiffs and class members will rely on the same or similar evidence to establish Defendants' liability. Plaintiffs desire to hold Defendants accountable for their misconduct, they assert the same claims as the class, and they will dutifully represent the class.

228.     Plaintiffs retained competent and experienced counsel who will vigorously fight on their behalf. Plaintiffs are represented by attorneys from Gelber Schachter & Greenberg, P.A, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., and the Legal Services Center of Harvard

Law School. Plaintiffs' representation have knowledge of and familiarity with applicable laws pertinent to this litigation and experience litigating large and complex class actions.

**Superiority of a Class Action and Predominance of Common Questions: Fed. R. Civ. P. 23(b)(3)**

229.    A class action is superior to other alternative methods for the fair and efficient adjudication of this litigation. All class members were injured and are entitled to recovery from Defendants for the same reason; therefore, litigating as a class would provide for a simpler and controlled method to address the issues at once instead of numerous individual actions which could lead to different determinations and inconsistencies. The Class and Subclass are manageable because all class members were subjected to the same or similar treatment by Defendants such that similar relief is appropriate to the classes as a whole.

230.    In the alternative to the "All FCC Class" proposed above, Plaintiffs seek to represent classes of their respective programs; Plaintiff Kareem Britt as a representative for the All HVAC Program Class defined below and Plaintiff Monique Laurence as a representative for the All Medical Assistant Program Class defined below.

**All HVAC Program Class**

All persons who enrolled in the HVAC program at any FCC campus in Florida within the last four years.

**All Medical Assistant Program Class**

All persons who enrolled in the Medical Assistant program at any FCC campus in Florida within the last four years.

231.    The Subclass would remain the same as noted above, or in the alternative, be defined as all Black students enrolled at the HVAC program and the Medical Assistant Program at any FCC campus in Florida within the last five years.

## CAUSES OF ACTION

**COUNT I – Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.***

**(All FCC Class against FCC and IEC)**

232.   Plaintiffs Kareem Britt and Monique Laurence repeat and re-allege paragraphs 1 through 231 as if fully set forth herein.

233.   At all material times, Defendants were engaged in "trade or commerce" within the meaning of §§ 501.204(1) and 501.203(8).

234.   In connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendants committed "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," § 501.204(1), when they, among other things:

   a.   violated Fla. Stat. § 1005.04(1)(c) by failing to "refrain from promising or implying guaranteed job placement, market availability, or salary;"

   b.   violated regulations pertaining to "ethical practices and procedures in the recruitment of students" by using job search websites to recruit students, Fla. Admin. Code r. 6E-2.004(5)(b)(2), and false representations to induce students to enroll, Fla. Admin. Code r. 6E-2.004(5)(b)(3);

   c.   misrepresented their services, facilities, curriculum, and equipment in violation of 16 C.F.R. § 254.4, a provision of 16 C.F.R. § 254, the Federal Trade Commission's Guides for Private Vocational and Distance Education Schools;

   d.   stated they would provide class members job placement, but failed to disclose job placement rates and the low rate of FCC students who are able

to repay their student loans, and otherwise failed to disclose material facts; and

e.  stated that students would be provided employment placement and post-graduation employment placement, but failed to provide them with employment placement.

235.  Each of these violations caused Plaintiffs and class members damages.

### COUNT II – Breach of Contract

### (All FCC Class against FCC)

236.  Plaintiffs Kareem Britt and Monique Laurence repeat and re-allege paragraphs 1 through 231 as if fully set forth herein.

237.  Each Plaintiff entered into an Enrollment Agreement with FCC.

238.  FCC supplemented its Enrollment Agreement in May 2019 to state:

(3)     We agree not to use any predispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.

(4)     We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.

239.    FCC's Course Catalog is a contract. Fla. Admin. Code r. 6E-2.004(11)(b)(2).

240.    The Course Catalog describes FCC's programs as "designed to prepare graduates for entry-level positions." It also states that its programs include hands-on experience, "well-equipped classrooms, computer labs, clinical settings, medical labs, and resource centers," and job placement assistance.

241.    In connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendant FCC breached these various promises by failing to provide them.

242.    Defendant FCC's breaches were material.

243.    As a result of these actions, Defendant FCC caused Plaintiffs and class members damages.

## COUNT  III – Negligence

## (All FCC Class against FCC and IEC)

244.    Plaintiffs Kareem Britt and Monique Laurence repeat and re-allege paragraphs 1 through 231 as if fully set forth herein.

245.    Defendants had a duty to refrain from promising or implying guaranteed job placement, market availability, or salary, in violation of Fla. Stat. § 1005.04(1)(c).

246.    In connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendants breached their duty.

247.    Defendants' breach caused harm to Plaintiffs.

**COUNT IV – Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* – *Disparate Impact***

**(Racial Discrimination Subclass against FCC and IEC)**

248.     Plaintiff Kareem Britt repeats and re-alleges paragraphs 1 through 231 as if fully set forth herein.

249.     Plaintiff Kareem Britt is qualified to take out federal student loans and grants.

250.     Defendants cause students to apply for and take out credit in the form of student loans.

251.     Defendants are "creditors" within the meaning of 15 U.S.C. § 1691a(e) due to their participation in arranging the extension, renewal, or continuation of student loans.

252.     Plaintiff Kareem Britt is an "applicant" because he applied for an extension, renewal, and/or continuation of student loans within the meaning of 15 U.S.C. § 1691a(b).

253.     In connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendants' acts, policies, and practices disparately impacted Black people with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a). By targeting Black people with their predatory product, the Defendants engaged in reverse redlining violating 15 U.S.C. § 1691(a).

254.     As a result of these actions, Defendants caused Plaintiff Kareem Britt and class members damages.

**COUNT V  – Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*— *Disparate Treatment***

**(Racial Discrimination Subclass against FCC and IEC)**

255.     Plaintiff Kareem Britt repeats and re-alleges paragraphs 1 through 231 as if fully set forth herein.

41

256.    Defendants cause students to apply for and take out credit in the form of student loans.

257.    Defendants are "creditors" within the meaning of 15 U.S.C. § 1691a(e) due to their participation in arranging the extension, renewal, or continuation of student loans.

258.    Plaintiff Kareem Britt is an "applicant" because he applied for an extension, renewal, and/or continuation of student loans within the meaning of 15 U.S.C. § 1691a(b).

259.    In connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendants' acts, policies, and practices in relation to these credit transactions intentionally discriminate against Black people. By targeting Black people with their predatory product, the Defendants engaged in reverse redlining violating 15 U.S.C. § 1691(a).

260.    As a result of these actions, Defendants caused Plaintiff Kareem Britt and class members damages.

**COUNT VI – Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***

**(Racial Discrimination Subclass against FCC and IEC)**

261.    Plaintiff Kareem Britt repeats and re-alleges paragraphs 1 through 231 as if fully set forth herein.

262.    Defendants, as recipients of federal financial aid, receive "Federal financial assistance" within the meaning of 42 U.S.C. § 2000d.

263.    Defendants have not complied with Title VI of the Civil Rights of 1964, 42 U.S.C. § 2000d.

264.    In connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendants' acts, policies, and practices

intentionally discriminated against Black people. By targeting Black people with their predatory product, Defendants engaged in reverse redlining violating 42 U.S.C. § 2000d.

265.   As a result of these actions, Defendants caused Plaintiff Kareem Britt and class members damages.

## COUNT VII – Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*

### (Racial Discrimination Subclass against FCC and IEC)

266.   Plaintiff Kareem Britt repeat and re-allege paragraphs 1 through 231 as if fully set forth herein.

267.   At all material times, Defendants were engaged in "trade or commerce" within the meaning of §§ 501.204(1) and 501.203(8).

268.   In connection with the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Defendants committed "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," § 501.204(1), by engaging in a predatory scheme to target Black people using high pressure tactics for their predatory product in violation of reverse redlining.

269.   As a result of these actions, Defendants caused Plaintiff Kareem Britt and class members damages.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court enter a judgment against Defendants, joint and severally, and in favor of Plaintiffs and the Class and Subclass, and award the following relief:

a.   An order certifying this case as a class action under Fed. R. Civ. P. 23;

b.  Actual damages, compensatory damages, both economic and non-economic, to all members of the Class and Subclasses for an amount as determined by a jury that would completely compensate all members of the Class and Subclasses, to the extent possible, for their injuries caused by the conduct of Defendants;

c.  Punitive damages to all members of the Class and Subclasses for an amount as determined by a jury that would punish Defendants for their conduct alleged and deter similar misconduct in the future;

d.  Costs and attorneys' fees pursuant to 15 U.S.C. § 1691e(d), 42 U.S.C. § 1988(b), and Fla. Stat. § 501.2105;

e.  A declaration that the foregoing acts, policies, and practices of Defendants violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*., Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*; and breached Defendants' contracts with class members; therefore, due to this breach all class members are absolved from paying monies due under the contracts.

f.  A declaration that, based on the acts and omissions by Defendants in relation to the making of federal student loans for enrollment at FCC or for the provision of educational services by FCC, Plaintiffs have established a defense to repayment of their federal student loans and a right to recover amounts previously collected on the loans.

g.  An Order enjoining Defendants and their directors, officers, agents, and employees from engaging in the conduct described herein, and directing Defendants and their directors, officers, agents, and employees to take all

affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future; and

h.  Such other and further relief that may be just and proper.

## <u>JURY TRIAL DEMANDED</u>

270.   Plaintiffs request trial by jury as to all issues in this case.

Dated: April 20, 2020                    Respectfully Submitted,

*/s/Adam M. Schachter*
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@gsgpa.com
BRIAN W. TOTH
Florida Bar No. 57708
btoth@gsgpa.com
ANDREW J. FULLER
Florida Bar No. 1021164
afuller@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com


TOBY MERRILL
(*pro hac vice* application forthcoming)
tomerrill@law.harvard.edu
EILEEN CONNOR
(*pro hac vice* application forthcoming)
econnor@law.harvard.edu
EMMANUELLE VERDIEU
(*pro hac vice* application forthcoming)
everdieu@law.harvard.edu
MARGARET O'GRADY
(*pro hac vice* application forthcoming)
mogrady@law.harvard.edu
LEGAL SERVICES CENTER OF HARVARD
LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Telephone: (617) 390-2576


ZACHARY S. BOWER
Florida Bar No. 17506
zbower@carellabyrne.com
Security Building
117 NE 1st Avenue
Miami, FL 33132-2125
Telephone: (973) 994-1700

CAROLINE F. BARTLETT
(*pro hac vice* application forthcoming)
cbartlett@carellabyrne.com
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
& AGNELLO P.C.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
Telephone: (973) 994-1700