**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-60814-cv-ALTMAN/HUNT**

KAREEM BRITT et al.,

      Plaintiffs,

v.

IEC CORPORATION d/b/a INTERNATIONAL
EDUCATIONCORPORATION and
IEC US HOLDINGS, INC. d/b/a FLORIDA
CAREER COLLEGE,

      Defendants.

_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO COMPEL OR, IN THE ALTERNATIVE, TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

THE MOTION TO COMPEL ARBITRATION SHOULD BE DENIED .............................. 3

I.     Brief Factual Background on Arbitration ................................................... 3

II.    Argument .................................................................................................. 5

    A.    The Court Should Reject Defendants' Arguments Regarding the New Regulations as Untimely and Waived. ........................................ 5

       1.    Defendants Improperly Argued the New Regulations. .............................. 5

       2.    Defendants' Arguments Regarding the New Regulations Have Been Waived. ................................................................................ 7

    B.    The New Regulations Do Not Apply to this Lawsuit. ................................. 8

    C.    Plaintiffs' Claims Are Not Subject to Arbitration. ...................................... 10

       1.    The Supplement Is Enforceable Because It Modified the Parties' Contracts. ......... 11

       2.    The Supplement Also Precludes Arbitration Based on Waiver. ............................ 12

THE MOTION TO DISMISS SHOULD BE DENIED ......................................................... 14

I.     Plaintiff Henry's Counts I, III, IV and VII are Not Time Barred ............................. 14

II.    Plaintiffs' Revised FDUTPA Claim (Count I) Is Well-Pleaded. ............................... 15

    A.    The Integration Clause Does Not Bar FDUTPA Allegations Premised on Omissions or Unfair Trade Practices. .............................. 16

    B.    Plaintiffs Plausibly Allege that Defendants Are Liable Under FDUTPA for Omissions and Unfair Trade Practices. ............................ 17

       1.    Defendants' New FDUTPA Arguments Are Barred by Rule 12(g)(2) .................. 17

       2.    Plaintiffs Plausibly Plead that Defendants Have Engaged in Unfair or Deceptive Omissions in Violation of FDUTPA. ............................ 17

       3.    Subparts (d) and (f) of Paragraph 267 Plausibly Plead that Defendants Have Engaged in Unfair or Deceptive Trade Practices. .................... 20

       4.    Subparts (g) and (h) of Paragraph 267 Allege Unfair or Deceptive Trade Practices, Not Educational Malpractice. .............................. 21

III.    Plaintiffs' Title VI Claim (Count VI) is Properly Pleaded. ........................................ 22

IV.    Plaintiffs' ECOA Claims (Counts IV and V) Are Not Subject to Dismissal.............. 25

V.    The Racial Discrimination FDUTPA Claim (Count VII) Is Also Well-Pleaded........ 28

VI.    Plaintiffs Properly Plead Their Claim for Injunctive Relief. ..................................... 28

VII.    Defendants' Argument that Plaintiffs' Claims Should Be Dismissed "With Prejudice" Under the Doctrine of Futility Lacks Merit and is Premature ................. 29

CONCLUSION.................................................................................................................... 30

## INTRODUCTION

On November 16, 2020, the Eleventh Circuit issued *Young v. Grand Canyon Univ., Inc.*, 918 F.3d 814 (11th Cir. 2020). This opinion vanquished all available arbitration arguments for Defendants in this case. In fact, Defendants' own prior motion to compel arbitration, which was filed while the *Grand Canyon* appeal was pending, expressly acknowledged that the Eleventh Circuit's decision would likely be dispositive here. ECF No. 24 at 11. And it was.

But, rather than accept the lawful consequence of the Eleventh Circuit's decision, Defendants decided to abandon their prior arguments in favor of arbitration, and instead advance new, never-before-seen arguments that have absolutely no merit. Defendants first unveiled these new arguments—*without any prior notice to Plaintiffs or the Court*—at the December 3, 2020 hearing on their prior motion to compel arbitration. The Court rightly refused to hear the arguments, describing Defendants' efforts as "sandbagg[ing]" and "absurd." See Transcript of December 3, 2020 Hearing (attached as Exhibit 1) at 8:10-8:21. Defendants pressed the issue because they contended the arguments were "jurisdictional" and could not have been raised previously because of a change in law. *Id.* at 7:25-8:4. Both of these assertions, however, were incorrect; motions to compel arbitration are *not* jurisdictional, and there has been *no change* in the law affecting this case.

In any event, Defendants' argument—then and now—is that the July 1, 2020 Amendments to the Department of Education Borrower Defense Regulations (the "New Regulations") have somehow resuscitated their arguments for arbitrating this case. Even if that were true—it isn't— Defendants could have made this argument months ago in response to the original Complaint. Indeed, although not effective until July 1, 2020, the New Regulations were published in September 2019 (months before this lawsuit was even filed), and the July 1, 2020 effective date occurred before the completion of briefing on the last motion to compel arbitration, not to mention months before the December 3, 2020 hearing on that motion. Of course, Defendants could have argued the effect of the New Regulations in their original motion, in their reply brief, in a notice of supplemental authority, in seeking leave to file a supplemental memorandum of law, or in any other number of ways that were readily available to them at the time. Defendants did not do so then, and they have forfeited their right to do so now.

Untimeliness aside, Defendants' entire effort to inject the New Regulations into this case is without merit. As even Defendants concede in their motion, ECF No. 70 ("Motion") at 8, the

New Regulations, on their face, are applicable only to students with federal loans distributed *on or after July 1, 2020*. *See* 84 Fed. Reg. 49,788 (Sept. 23, 2019). The Eleventh Circuit, in *Grand Canyon*, also expressly confirmed this to be the case. 980 F.3d at 816 n.1. The Amended Complaint likewise makes clear that the classes and subclasses in this case terminate on the date of the filing of this lawsuit (April 20, 2020), well before the July 1, 2020 effective date for the New Regulations, and thereby expressly *exclude* any individuals that are subject to the New Regulations. ECF No. 66 ¶¶ 263-64. And, yet, despite this overwhelming clarity, Defendants have argued the New Regulations somehow govern. They do not.

In any event, like with their prior motion, it remains clear and undisputed that Defendants expressly and unequivocally agreed in writing that they would not invoke any arbitration agreement to prevent a class action lawsuit such as this one. That written waiver applies with equal weight to the claims in the Amended Complaint. Accordingly, this Court's prior ruling that Defendants waived their right to arbitrate the claims in this lawsuit compels the same result here.

Defendants' motion to dismiss should also be denied. Each of the claims is well-pleaded, more than satisfying the applicable pleading standard, as well as addressing this Court's specific concerns from the hearing on the motion to dismiss the original Complaint. As is their wont, Defendants argue for dismissal based on law that does not apply and with disregard for the clear allegations in the First Amended Complaint. The Court should reject these arguments.

As explained in detail below, the motion to compel arbitration and the motion to dismiss should both be denied.

**THE MOTION TO COMPEL ARBITRATION SHOULD BE DENIED**

Defendants' motion to compel arbitration is a second, truly desperate effort to avoid litigating this case before this Court. The motion has zero merit and should be denied.

**I.   Brief Factual Background on Arbitration**

In 2016, the Department of Education issued the 2016 Borrower Defense Regulations (the "BDRs"), which were designed to protect student borrowers from schools like FCC—that is, misleading and predatory schools receiving federal student aid. The BDRs became effective in October 2018. In relevant part, the BDRs conditioned schools' participation in the federal loan program on their abstaining from enforcing certain arbitration or class action waivers.

To comply with the BDRs, Defendants promised to abstain from enforcing these provisions in their contracts with students. *See* Supplement (attached as Exhibit 2); First Amended Complaint ("FAC") (ECF No. 66) ¶ 103. In fact, Defendants went even further than the BDRs required, broadly waiving and abstaining as to arbitration over a broad category of potential claims. *Id.* FCC promised students it would not "use any predispute arbitration agreement to stop [them] from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained." *Id.*

Plaintiffs each entered into a contract with FCC. *Id.* ¶¶ 129–31, 271–73. Each contract consists of the terms of each Plaintiff's Enrollment Agreement, the terms of the Course Catalog, and the May 14, 2019 Supplement that FCC sent to students updating the terms of their agreements, including the arbitration provisions. *Id.* ¶¶ 103, 129–31, 271–73. The Supplement updating the arbitration provision of the contracts with FCC is clear and unambiguous:

> We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims.

*Id.*

On September 23, 2019, the Department of Education published amendments to the BDRs with a July 1, 2020 effective date—the New Regulations. *See* ED, Final Rule, Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 84 Fed. Reg. 49,788–49,801 (Sept. 23, 2019). Although these New Regulations

change the borrower defense framework for schools, the New Regulations "apply only to loans distributed on or after July 1, 2020, and are therefore inapplicable" to earlier loans. *Grand Canyon*, 980 F.3d at 816 n.1.

This action commenced after the Department of Education published these amendments to the BDRs. Plaintiffs filed their Complaint on April 20, 2020. On June 1, 2020, Defendants moved to compel arbitration or, alternatively, to dismiss. ECF No. 24. Defendants asked the Court to determine what claims were borrower defense claims under the BDRs and compel only *non*-borrower defense claims to arbitration. Defendants argued all of Plaintiffs' claims should be arbitrated because all of them were non-borrower defense claims. Despite having substantial notice of the New Regulations and their effective date of July 1, Defendants made no arguments regarding them or their effect on Plaintiffs' claims, including none of the arguments they raise now.

Plaintiffs responded to Defendants' arbitration motion in two ways. First, Plaintiffs contended that all of their claims were borrower defense claims under the BDRs and thus none should be arbitrated. Second, Plaintiffs argued that Defendants' Supplement, which contained broader language than the BDRs' definition for borrower defense claims, barred Defendants from arbitrating for three alternative reasons unrelated to the BDRs: (1) the Supplement contractually amended the arbitration provisions of Defendants and Plaintiffs' contract; (2) the Supplement contained a promise that was binding under the doctrine of promissory estoppel; and (3) the Supplement constituted a waiver of any right of Defendants to arbitrate.

On December 3, 2020, the Court held a hearing on Defendants' motion. As detailed below, Defendants mostly jettisoned their arguments in support of their motion to compel arbitration, and offered new argument that had never been presented and also had no merit.

On December 4, 2020, the Court denied Defendants' arbitration motion. ECF No. 62. The Court held that all of Plaintiffs' claims were borrower defense claims under the BDRs. The Court also agreed with Plaintiffs' waiver argument, holding that the Supplement waived any rights Defendants may have had to arbitrate claims regarding "any acts or omissions regarding the making of the Federal Direct Loan or the provision . . . of educational services for which the Federal Direct Loan was obtained;" and that Plaintiffs' claims were related to such acts or omissions.

Plaintiffs filed the FAC on January 18, 2021. ECF No. 66. It makes clear that the classes and subclasses in this case do not include any students or loans that are subject to the New

Regulations. *Id.* ¶¶ 263–64. Undaunted, on February 1, 2021, Defendants moved again to compel arbitration.

## II.   Argument

Because Defendants' arguments regarding the New Regulations were previously available to them, this Court should refuse to even entertain Defendants' arguments now. Their arguments in favor of arbitration are also meritless. Their attempt to invoke the New Regulations in this case is at odds with a recent decision from the Eleventh Circuit, not to mention being contradicted by the express allegations of the FAC. And, the claims are not arbitrable because there is no agreement with Defendants to arbitrate any of the claims; the Supplement to the parties' written agreement eliminated arbitration for the claims in this case; and Defendants are foreclosed as a matter of law from enforcing any arbitration provision in this case.

### A.   The Court Should Reject Defendants' Arguments Regarding the New Regulations as Untimely and Waived.

#### 1.   Defendants Improperly Argued the New Regulations.

At the December 3, 2020 hearing on their prior motion to compel arbitration, Defendants attempted—for the first time, and without notice to Plaintiffs or the Court—to argue that the New Regulations somehow compel arbitration of this case. Even though it was obvious that Defendants were grasping at straws following the effect of Eleventh Circuit's *Grand Canyon* decision, they persisted in arguing the Court should allow them to brief these arguments about the New Regulations because they (1) implicate the Court's subject-matter jurisdiction over this case, and (2) address an intervening change in law that Defendants had lacked the opportunity to address previously. Neither of these assertions was accurate.

Agreements to arbitrate do not implicate a court's subject-matter jurisdiction. Indeed, courts—including, most importantly, the Eleventh Circuit—"considering the issue have concluded that the arbitrability of a claim is not a jurisdictional limitation." *Borrero v. United Healthcare of New York, Inc.*, 610 F.3d 1296, 1307 (11th Cir. 2010); *see* also *id.* (concluding that "[t]he arbitrability of claims is not jurisdictional"); *Álvarez-Maurás v. Banco Popular of Puerto Rico*, 919 F.3d 617, 623 n.8 (1st Cir. 2019) ("[T]his circuit has consistently held that the existence of a valid arbitration agreement does not strip the court of jurisdiction."); *Seldin v. Seldin*, 879 F.3d 269, 272 (8th Cir. 2018) ("An arbitration agreement alone, without other statutory or binding jurisdictional limits, does not divest the federal courts of subject matter jurisdiction."). As

described by the Seventh Circuit, "the effect of the arbitration clause on the present lawsuit is in any event not jurisdictional…. [E]ven if the defense [of arbitration] is sound, it no more deprives the court of jurisdiction than a defense based on any other contractual forum-selection clause would." *Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 695 (7th Cir. 2009) (Posner, J.).

Not grappling with any of this law, Defendants rely chiefly on *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 941 (1995).[1] But this case offers no support. Defendants' quotation from the case is misleading at best—they quote language from the Third Circuit that the Supreme Court quoted to describe the Third Circuit's decision below, and the opinion indicates that court never had subject-matter jurisdiction in mind. *See Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1509 (3d Cir. 1994) ("[W]hether the arbitrator has jurisdiction over a particular dispute—i.e. whether the controversy is arbitrable—is a question for the court to decide."); *cf. Bodine v. Cook's Pest Control, Inc.*, 830 F.3d 1320, 1324 n.2 (11th Cir. 2016) ("We did not use the term 'jurisdiction' in its technical sense, but rather to convey that whether the arbitration agreement [given a delegation clause] was enforceable was a decision committed not to the court, but to the arbitrator.").

Here, the Court has subject-matter jurisdiction of this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. *See* FAC ¶ 29. Thus, even if a valid arbitration agreement existed that governed Plaintiffs' claims, the Court's subject-matter jurisdiction would not be implicated. *See, e.g., Borrero*, 610 F.3d at 1307; *Álvarez-Maurás*, 919 F.3d 623 n.8. Thus, although courts "may consider subject matter jurisdiction claims at any time during litigation," *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999), nothing about Defendants' arguments affect the Court's subject-matter jurisdiction here.

Defendants are also wrong when they state that their new arguments about the New Regulations arose from a change in federal law that they never had the opportunity to brief (a

---

[1] Defendants also cite language seen from district courts that "'[m]otions to compel arbitration are generally treated as motions to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).'" Motion at 10 (quoting *Schriever v. Navient Sols., Inc.*, 2014 WL 7273915, at *2 (M.D. Fla. Dec. 19, 2014)). But it is clear from *Schriever* that the court was referring solely to whether courts "may consider matters outside the pleadings" in deciding motions to compel arbitration. *Schriever*, 2014 WL 7273915, at *2. Neither *Schriever* nor similar district-court orders appear to stand for the proposition that the arbitration issue is itself jurisdictional—which, in the light of *Borrero*, would at any rate be an incorrect statement of the law.

charge they repeat in this motion). Motion at 8. The Department of Education published the New Regulations on September 23, 2019 with a July 1, 2020 effective date. This publication date was months before this case was even filed. Defendants were thus fully aware when they filed their first motion to compel that the New Regulations were about to become effective, and their first motion even discussed this point. *See* ECF No. 24 at 9. Yet Defendants never once mentioned or argued that the New Regulations on July 1, 2020 would bring about a wholesale change of the legal landscape resulting in a completely different framework for addressing the issue of arbitration in this case. Nor did Defendants raise this argument in any of the five briefs and motions they filed after July 1, 2020 that directly related to the arbitrability of Plaintiffs' claims. *See* ECF No. 34; ECF No. 36; ECF No. 39; ECF No. 43; ECF No. 45.

Against this backdrop, the Court was justifiably puzzled by Defendants' attempt to bring forth this new argument at the hearing:

> THE COURT: Well, you could have filed a notice of supplemental authority.
> [DEFENDANTS' COUNSEL]: But it would have only provided the Court with a copy of the regulation, but without discussion –
> THE COURT: I can read. I would have liked the opportunity to read it. I came in today—frankly, I have no idea what you're talking about. So I don't know if the plaintiffs even know what you're talking about. I came in today expecting a concession from you given the *Grand Canyon* decision, which could not have been clearer. And I've spent a lot of time reading *Grand Canyon*, reading the appeal in *Grand Canyon*, reading all the regulations, the statutes, seeing how they interact, reading all the briefing on it, trying to parse it, creating outlines. And you just completely sandbagged me with an argument that no one had a chance to even know about let alone respond to. It's absurd.

Exhibit 1 at 8:5–8:21. The Court was justified in its refusal to allow the arguments at the prior hearing, and it should not permit them to be raised here now given that Defendants' excuses for doing so—that the arguments implicate subject-matter jurisdiction and address a change in law that Defendants never had an opportunity to brief—are baseless.

### 2.     Defendants' Arguments Regarding the New Regulations Have Been Waived.

Defendants offer the same arguments regarding the New Regulations now as they did at the hearing. Not only are they without merit, but they are also untimely and have been waived.

It is well settled that courts "will not entertain arguments that either should have been raised . . . or were raised and rejected." *Silva v. Pro Transport, Inc.*, 2016 WL 11547502, at *2 (S.D. Fla. Sept. 30, 2016); *see also Montgomery v. Great Am. Assurance Co.*, 2013 WL 12093809, at *2

(S.D. Fla. Apr. 8, 2013) ("To the extent that Plaintiff's filing seeks reconsideration of the Court's prior summary judgment ruling, the Court declines to consider it, as Plaintiff presents arguments now that were available but never raised in its myriad of previous filings."). And courts routinely deny motions, like this one, that are based on "new arguments that were 'previously available, but not pressed.'" *Sporea v. Regions Bank, N.A.*, 2020 WL 820269, at *1 (S.D. Fla. Feb. 19, 2020). Defendants' new arguments, which "could and should have been presented to the district court for consideration," are "properly rejected" for constituting a "'second bite at the apple.'" *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949 (11th Cir. 2009).

Defendants offer various excuses for allowing these arguments to be heard. None passes muster. Plaintiffs would plainly be prejudiced because these arbitration issues are still being litigated months after the Eleventh Circuit resolved all such issues. Defendants' reliance on *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), is similarly misplaced. Although Defendants here knew well before July 1, 2020 what the regulatory change would bring, no party in *AT&T* knew what the Supreme Court would hold before the opinion was issued. Also, if the supposed change were indeed so monumental, that is all the more reason why Defendants could have and should have made these arguments previously.

In any event, as discussed below, any changes in the New Regulations brought no actual change to the arbitration issues in this lawsuit.

### B.      The New Regulations Do Not Apply to this Lawsuit.

In *Grand Canyon*, the Eleventh Circuit stated that the New Regulations "apply only to loans distributed on or after July 1, 2020, and are therefore inapplicable here." 980 F.3d 814, 816 n.1 (citing 34 C.F.R. § 685.300 (2020)); 84 Fed. Reg. 49788, 49788 (Sep. 23, 2019)). And just two weeks ago, a Georgia appellate court ruled the same way. *See Grand Canyon Educ., Inc. v. Ward*, 2021 WL 631634, at *3 n.1 (Ga. Ct. App. Feb. 17, 2021) ("On September 23, 2019, the Department of Education issued a final rule rescinding the predispute class action and arbitration waiver conditions of the 2016 amendments; however, *this change applies only to loans distributed on or after July 1, 2020*, and therefore is not implicated in this case.").

Claiming that *Grand Canyon* "is no longer applicable," Motion at 1 n.1., Defendants assert that the "New Regulations eliminated" the sections of the Old Regulations that "contained the restrictions on arbitration agreements and class action waivers and the definition of a borrower defense claim for purposes of the restrictions," *id.* at 10. As a result, Defendants assert that the

"New Regulations impose no condition that a school refrain from using existing pre-July 1, 2020 arbitration provisions for borrower defense claims" and that "Defendants no longer need to seek a judicial determination as to whether or not the claims at issue are BDR claims." *Id.* Defendants are mistaken.

At the outset, the Court should refuse Defendants' invitation to contravene the Eleventh Circuit, which held that the BDRs—and not the New Regulations—continue to govern claims like those of Plaintiffs. In any event, Defendants arguments are wrong for at least two reasons. First, they ignore the New Regulations' clear language on their temporal scope. *See* 84 Fed. Reg. 49,788, 49,790 (September 23, 2019). Second, depriving Plaintiffs of their access to the federal court *would* have substantive effects, contrary to Defendants' claims, *see* Motion at 12–13. Under these circumstances, interpreting the BDRs to apply would result in Plaintiffs losing one of several available means of relief. The New Regulations, like the BDRs, allow students the option of seeking full or partial relief from the Secretary of Education based on a "nondefault, favorable contested judgment based on State or Federal law *in a court or administrative tribunal* of competent jurisdiction." *See* 34 C.F.R. § 685.222(b) (2020) (emphasis added); 34 C.F.R. § 685.222(b) (2016). Compelling Plaintiffs to arbitrate would deprive them of a substantive right they possessed under the BDRs (and would otherwise still possess) by depriving them of the opportunity to obtain a judgment in a court. Defendants cite *Nat'l Sur. Co. v. Architectural Decorating Co.*, 226 U.S. 276 (1912), to suggest that a law altering a "remedy" does not affect Plaintiffs' substantive rights. This is misleading, however, as *Nat'l Sur.* used "remedy" to refer to a newly-imposed prerequisite for obtaining relief—the imposition of a pre-suit notice requirement. *See id.* The case had nothing to do with depriving a party of substantive, available relief.

Applying the law here leads inexorably to the conclusion that the New Regulations are not applicable to this case. Here, the classes and subclasses in this case include *only* students who enrolled at FCC up through the filing of the Complaint on April 20, 2020, *see* FAC ¶ 263, which is before the July 1, 2020 effective date of the New Regulations. And the classes specifically *exclude* any "individuals with federal student loans that were issued on or after July 1, 2020" and thus potentially subject to the New Regulations. *Id.* ¶ 264. Applying *Grand Canyon* to the allegations, the New Regulations do not apply to this case.

### C.      Plaintiffs' Claims Are Not Subject to Arbitration.

In evaluating motions to compel arbitration, the court must first "determine whether the parties agreed to arbitrate the dispute." *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). "Because arbitration is a matter of contract…[,] the FAA's strong pro-arbitration policy only applies to disputes that the parties have agreed to arbitrate." *Klay*, 389 F.3d at 1200. Whether parties have agreed to arbitrate a dispute depends on the terms of the parties' contract. *Id.*

Plaintiffs' claims are not subject to arbitration because there is no agreement with Defendants to arbitrate any of the claims. First, the Supplement to the parties' written agreement modified their contract and eliminated arbitration for the claims alleged. Second, even if the Supplement did not modify the contracts, FCC still cannot compel arbitration because of waiver.

Plaintiffs' contracts with FCC specifically exclude from arbitration the claims in this lawsuit. On May 14, 2019, FCC emailed students a Supplement updating the terms of their contracts with FCC, including the arbitration provisions. Exhibit 2; FAC ¶ 103. The language in the Supplement could not be clearer:

> We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims.

Exhibit 2.

Plaintiffs' claims plainly fall within the Supplement's definition of non-arbitrable claims because they "regard[] the making of the Direct Loan or the provision of educational services . . . for which the loan was obtained." Exhibit 2; FAC ¶ 103. Indeed, this entire lawsuit centers around the core theme that Defendants committed grievous acts and omissions toward their own students, in the context of providing so-called educational services, in order to benefit from their making and obtaining Federal Direct Loans.

The claims and allegations confirm this point. *See, e.g.*, FAC ¶¶ 267 (alleging Defendants' acts and omissions violating FDUTPA were "[i]n connection with the making of federal student loans for enrollment. . . or for the provision of educational services), 275 (breach of contract claim relates to FCC's failure to provide the educational experience and job placement assistance promised in the contract itself and for which direct loans were obtained); 280 (negligence claim

relates to acts in which Defendants engaged in order to procure students' enrollment and loan funds); 290, 296, 306 (Equal Credit Opportunity Act and Title VI claims relate to discriminatory acts taken in the making of student loans and educational services provided); 310 (FDUTPA claim for racial discrimination subclass also regards the making of the Direct Loan and educational services provided).

### 1. The Supplement Is Enforceable Because It Modified the Parties' Contracts.

The Supplement updated the terms of students' contracts with FCC, including the arbitration provisions. Exhibit 2; FAC ¶¶ 103. Each Plaintiff's contract with FCC consists of the terms of each Plaintiff's Enrollment Agreement and the terms of the Course Catalog. The Course Catalogs included extensive provisions and notifications governing the terms of Plaintiffs' enrollment at FCC. Among these provisions are terms allowing FCC to unilaterally update its agreement with Plaintiffs so long as Plaintiffs receive adequate notification. ECF No. 24-2 at 31 ("The College is required to make changes in programs or policies when ongoing federal, state, or accrediting changes require such changes. These changes may affect students currently in attendance at the time the change is made. Changes will be published in a revision to the Catalog. Students will be notified of any changes at the institution."). In the notification email, FCC explicitly acknowledged that the Supplement was "a supplement to your Enrollment Agreement." Exhibit 2. Because the students' contract with FCC specifically allows for contract supplements, modifications, and revisions, as quoted above, the Supplement expressly modified any terms that purported to prevent Plaintiffs from bringing this class action in federal court.

Nor is the Supplement unenforceable for lack of consideration or reliance. Under well-established contractual principles, where, as here, "a contract provides for modification and the parties modify the contract in accord with the contract, no new and independent consideration is required to support the modification. Rather, the contract as modified is supported by the original consideration." *Bolus v. Morrison Homes, Inc.*, No. 8:08-cv-1957-T-23TBM, 2009 WL 4730601, at *2 (M.D. Fla. Dec. 9, 2009) (citations and internal quotation marks omitted); *accord Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014) ("A party can only reserve its right to unilaterally change a contract where that reservation is subject to limitations, such as reasonable notice."); *Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 527 (D. Md. 2011) ("Courts may enforce contracts that provide a party with the unilateral right to modify an agreement so long as the contract requires the party to give advance notice.").

In sum, Plaintiffs and FCC have a binding contract providing that the claims in this case would not be subject to arbitration. And since it is well settled that "arbitration is a creature of contract" and a "court cannot compel parties to arbitrate their dispute in the absence of a clear agreement to do so," the motion to compel here must be denied as a matter of law. *Larsen v. Citibank FSB*, 871 F.3d 1295, 1302 (11th Cir. 2017).

### 2.    The Supplement Also Precludes Arbitration Based on Waiver.

Defendants also expressly waived any right to arbitrate these claims. Waiver is the "voluntary, intentional relinquishment of a known right." *Witt v. Metro. Life Ins. Co.*, 772 F.3d 1269, 1279 (11th Cir. 2014). "[W]hether waiver has occurred depends upon the facts of each case." *Freeman v. SmartPay Leasing, LLC*, 771 F. App'x 926, 932 (11th Cir. 2019) (citation and internal quotation marks omitted). Here, the Supplement clearly states that arbitration is waived. *See Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1318 (11th Cir. 2002) (waiver of arbitration may occur by actions conducted outside the litigation context).

Defendants claim, yet again, that the Supplement did not waive their ability to arbitrate Plaintiffs' claims. This time, however, they rely on the New Regulations and point to certain language from the Supplement—". . . shall apply to your arbitration agreement with Florida Career College for any period during which these regulations are in effect."—and argue that the New Regulations have thereby completely undone their express waiver of arbitration. This is not so.

Indeed, Defendants' reading of the Supplement ignores the entirety of the plain language of the waiver, which contemplates analyzing the issue of waiver at a time before the effective date of the New Regulations (which, as discussed above, is what all other courts have done, including the Eleventh Circuit). In other words, since Plaintiffs' claims indisputably arose during a period to which 34 C.F.R. § 685.300(e) and (f) could be applied, and did not arise after the New Regulations became effective, there is nothing to Defendants' arguments against waiver.[2]

Further, it would make little sense to interpret the word "period" as constituting anything other than a period during which claims arise. First, the Supplement repeatedly emphasizes that it

---

[2] Defendants also claim the restrictions on arbitration agreements and class action waivers in the BDRs do not apply to Plaintiff Henry because Plaintiff Henry attended before July 1, 2017. *See* Motion at 7 n.5. This is incorrect. Section 685.300 included no language limiting its application to post-2017 claims only. That the BDRs did include such a limit for borrower defense applications before the Secretary of Education, *see* § 685.222(a)(1) and (2), also indicates that the Department of Education never intended such a time limit to apply to BDR claims.

governs not Defendants' ability to file motions to compel arbitration, but their ability to apply the arbitration agreement to particular claims. The Supplement expressly states that the provisions "apply only to claims" and that it "affect[s] the enforceability of the arbitration agreement . . . with respect to . . . claim[s]." Exhibit 2.

Moreover, the Court already heard and rejected this exact argument during the hearing on the last motion to compel arbitration. *See* Exhibit 1 at 11:2–11:8; 31:6–31:9. In fact, the Court went to great lengths to explain the obvious shortcomings with Defendants' arguments on this point:

> THE COURT: When was this notice sent?
> [DEFENDANTS' COUNSEL]: This notice was sent during the pendency of the active dates of the regulation. I think this one is in 2019.
> THE COURT: So the regulation was active at the time.
> [DEFENDANTS' COUNSEL]: Right. But it applies to the arbitration agreement during any period in which the regulations are in effect.
> THE COURT: Right. So the regulations -- hold on -- the regulations were in effect when the alleged misconduct occurred. The regulations were in effect when the notice was sent. The regulations were in effect when the lawsuit was filed. The regulations were in effect when the motion to dismiss was filed, the response, the reply. And just by virtue of the fact that I was a relatively new judge, and that combined with the pandemic, I had ten million of my colleagues' favorite cases that took me 18 months to try to move off my docket, this issue might have all been resolved before July. And it's just a matter of complete happenstance that the regulation happens to have been removed when it was. Again, I know nothing about that regulation, so I don't want to opine on it one way or the other. It's all in the way of saying that all of the operative facts occurred while the regulations were in effect.
> . . .
> THE COURT: So it was -- the question is whether it was waived during the period when the regulations were in effect, and the regulations were in effect when it was waived.
> [DEFENDANTS' COUNSEL]: No, your Honor. The -- if you call it a waiver – let's call it a contract for the moment – it's conditional. The condition requires the regulation to be in effect. If you think of it in that sense --
> THE COURT: It does not say that.

Exhibit 1 at 13:6 to 15:8. The Court's statement holds true today.[3]

---

[3] The doctrine of promissory estoppel also applies here. *See Uphoff v. Wachovia Sec., LLC*, No. 09-80420-CIV, 2009 WL 5031345, at *4 (S.D. Fla. Dec. 15, 2009) (citing elements for promissory estoppel). Plaintiffs relied on the Supplement in expending their time and resources toward investigating the facts of this lawsuit and assisting their lawyers in the preparation and prosecution of the lawsuit. In fact, but for the Supplement, Plaintiffs would have focused their time and resources elsewhere, including, for example, working at the jobs they have been able to find. This

In sum, Defendants' motion to compel arbitration should be denied because Defendants had the opportunity to raise the argument before and failed to do so, because it has no merit, and because Defendants waived any ability to arbitrate.

## THE MOTION TO DISMISS SHOULD BE DENIED

None of Defendants' arguments for dismissing Plaintiffs' FAC has any merit. The motion to dismiss should be denied.

### I.   Plaintiff Henry's Counts I, III, IV and VII are Not Time Barred

Defendants argue that Plaintiff Henry's FDUTPA, negligence, and Title VI claims should be dismissed as time barred under a four-year statute of limitations. Motion at 17. Defendants argue that these claims are time barred because they arise from alleged representations or omissions in 2016.[4] Not so.

The addition of Sharon Henry as a new Plaintiff relates back to the filing of the original complaint on April 20, 2020, pursuant to Rule 15(c)(1)(B). Defendants "do[] not argue that they have been prejudiced by the addition of th[is] new Plaintiff[] and do[] not argue that [they] were unable to know that [they] might be called upon to defend claims by th[is] newly added Plaintiff[]." *Asokan v. Am. Gen. Life Ins. Co.*, No. 615CV2048ORL40KRS, 2016 WL 9525232, at *3 (M.D. Fla. July 15, 2016) (citing *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1131–33 (11th Cir. 2004)). *See Grand Lodge of Pa. v. Peters*, 560 F. Supp. 2d 1270, 1274 (M.D. Fla. 2008). Indeed, Defendants are not prejudiced. The case is still in the early stages, and the original complaint gave Defendants notice of Henry's claims, which are identical to those of the other Plaintiffs and arise out of the same conduct, transaction, or occurrence set out in the original pleading. *See* FAC ¶¶ 36–178, 211–34, 265–311; *Davidco Inv'rs, LLC v. Anchor Glass Container*

---

type of reliance is both sufficient and reasonable, and Defendants are therefore estopped from relying on any arbitration provisions. *See Ocean Ave., LLC. v. Great Healthworks, Inc.*, Case No. 0:13-cv-61796-WPD, 2014 WL 11706419, at *5-6 (S.D. Fla. Feb. 4, 2014) (promissory estoppel should be applied "where the promisor reasonably should have expected that his affirmative representations would induce the promisee into action or forbearance substantial in nature, and where the promisee shows that such reliance thereon was to his detriment." (citation omitted)).

[4] "'Generally, the existence of an affirmative defense will not support a motion to dismiss.'" *IAG Engine Ctr. Corp. v. Cagney Glob. Logistics Inc*., No. 17-CIV-23271-RAR, 2020 WL 6736293, at *4 (S.D. Fla. Nov. 17, 2020) (quoting *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984)). "However, 'a complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint.'" *Id*. (citation omitted).

*Corp.*, No. 804CV2561T24EAJ, 2006 WL 8439899, at \*3 (M.D. Fla. May 15, 2006). Moreover, the original complaint alerted Defendants that individuals like Henry fell within the definition of the classes in this case and thus were class members, *see* ECF No. 1 ¶ 220; so Defendants were aware that she could be a potential plaintiff and class representative. *Id.*[5] Therefore, Plaintiff Henry's claims are brought within the applicable statute of limitations.

Further, the FAC does not indicate that Defendants' Title VI violations occurred more than four years before the filing of the FAC. *See* FAC ¶¶ 17, 49, 60, 298–307. As such, because "[t]he Amended Complaint does not include facts to indicate when the alleged violations occurred . . . it is not apparent from the face of the Amended Complaint that any of Plaintiff[] [Henry's] [Title VI] claims are time-barred." *Glover v. Dist. Bd. of Trustees of Palm Beach State Coll.*, No. 9:19-CV-80968, 2019 WL 6340087, at \*3 n.2 (S.D. Fla. Nov. 27, 2019).

Even assuming Plaintiff Henry's claims accrued in 2016, under Florida's continuing torts doctrine, "the statute of limitations runs from the date that the tortious conduct ceases." *Laney v. Am. Equity Inv. Life Ins. Co.*, 243 F. Supp. 2d 1347, 1357 (M.D. Fla. 2003); *see also Edwards v. Fla. Dep't of Child. & Fam.*, No. 8:08-CV-2563T-27TGW, 2009 WL 1686639, at \*4 (M.D. Fla. June 16, 2009) (applying doctrine to negligence claim). In fact, the FAC expressly alleges that Defendants' tortious conduct was ongoing and occurred after Henry enrolled. FAC ¶¶ 225–32. Given that Plaintiffs' claims are premised in part on Defendants' conduct even after a student enrolls, Defendants' conduct underlying Plaintiffs' claims extended well beyond Plaintiff Henry's enrollment date. As such, her negligence, FDUTPA, and Title VI claims are timely. Additionally, "[w]hether the continuing torts doctrine applies to the facts of a case is for a trier of fact to decide" and cannot be resolved at the motion to dismiss stage. *Pearson v. Ford Motor Co.*, 694 So. 2d 61, 67–68 (Fla. 1st DCA 1997); *see also Laney*, 243 F. Supp. 2d at 1357.

## II.   Plaintiffs' Revised FDUTPA Claim (Count I) Is Well-Pleaded.

Defendants claim that Plaintiffs' FDUTPA count must be dismissed because it is barred by the integration clauses. This is mistaken. Unlike in the original Complaint, Plaintiffs do not allege that Defendants are liable under FDUTPA for just misleading statements. Instead—as stated expressly in the title of the Count I and taking into account the Court's ruling—Plaintiffs'

---

[5] *See Davidco Inv'rs, LLC*, No. 8:04-cv-2561-T-24 EAJ, 2006 WL 8439899, at \*3; *see also In re: Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, No. 16-02709-MD-W-GAF, 2017 WL 3863866, at \*26 (W.D. Mo. Aug. 3, 2017); *Whitehead v. Nautilus Grp., Inc.*, No. 08-CV-4002, 2008 WL 11443140, at \*3 (W.D. Ark. July 30, 2008).

FDUTPA count is now based on deceptive omissions and unfair trade practices, which FDUTPA forbids. *See PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003); *White v. Grant Mason Holdings, Inc.*, 741 F. App'x 631, 636–37, 637 n.1 (11th Cir. 2018); *Coffey v. WCW & Air, Inc.*, 2018 WL 4154256, at *3 (N.D. Fla. Aug. 30, 2018); *Zamber v. Am. Airlines, Inc.*, 282 F. Supp. 3d 1289, 1300 n.8 (S.D. Fla. 2017) ("Even if Plaintiff had not adequately pled a deceptive representation, he would still alternatively state a claim based on a deceptive omission."). Because the integration clauses do not bar liability for pre-contractual omissions and unfair trade practices, Defendants' motion to dismiss Count I should be denied. *See Solar Star Sys., LLC v. BellSouth Telecommunications, Inc.*, No. 10-21105-CIV, 2012 WL 37387, at *3 (S.D. Fla. Jan. 6, 2012).

Defendants also appear to ask the Court to strike certain subparts to paragraph 267 that expressly state the conduct on which Plaintiffs premise Defendants' FDUTPA liability. *See* Motion at 18–20. Because, as discussed below, Rule 12(g)(2) bars this argument, and because in any event each subpart plausibly alleges an omission or trade practice in violation of FDUTPA, the Court should deny Defendants' requests.

### A.     The Integration Clause Does Not Bar FDUTPA Allegations Premised on Omissions or Unfair Trade Practices.

Defendants claim that Count I is barred by the integration clause in Plaintiffs' enrollment agreements, which states that "no verbal statements or promises made before the execution of this agreement will be recognized." ECF No. 24-1 at 45. Plaintiffs' amended FDUTPA claim, however, is not based on precontractual statements or promises; it is based on omissions and unfair trade practices. *See* FAC ¶ 267(a)–(c) (omissions); *id.* ¶ 267(d)–(h) (unfair trade practices). The integration clause, of course, is part of a contract, and the "cardinal rule of contractual construction is that when the language of a contract is clear and unambiguous, the contract must be interpreted and enforced in accordance with its plain meaning." *CitiMortg., Inc. v. Turner*, 172 So. 3d 502, 504 (Fla. 1st DCA 2015). Because the integration clause bars reliance only on "verbal statements or promises" and says nothing about precontractual omissions or unfair trade practices, ECF No. 24-1 at 45, the Court—applying the plain language of the contract—should conclude that the integration clause does not help Defendants here.

**B.    Plaintiffs Plausibly Allege that Defendants Are Liable Under FDUTPA for Omissions and Unfair Trade Practices.**

Defendants incorrectly argue that they may not be held liable under FDUTPA for the eight different types of omissions and unfair trade practices on which Plaintiffs premise their FDUTPA claim in paragraph 267.

**1.    Defendants' New FDUTPA Arguments Are Barred by Rule 12(g)(2)**

Defendants' arguments on pages 18–23 (Sections II (B) (1)-(3)) were previously available to Defendants when they filed their first motion to dismiss but were not raised. *Compare* ECF No. 24 at 20–23, 29, *with* Motion at 18–23. The underlying facts and theories of liability are not so altered that Defendants should be permitted to advance arguments previously available to them. The allegations they attack in their current motion, Motion at 18–23, were present in the initial complaint. *See, e.g.*, ECF No. 1 ¶¶ 15, 18, 57, 110, 124, 139, 171, 224(a), 234(d). Thus, these arguments should be deemed barred by Rule 12(g)(2). *See Sherman v. Quest*, No. 18-60973-CIV, 2020 WL 6791100, at *8 (S.D. Fla. Nov. 19, 2020); *Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 618CV576ORL28DCI, 2019 WL 5328738, at *3 (M.D. Fla. Oct. 21, 2019).

**2.    Plaintiffs Plausibly Plead that Defendants Have Engaged in Unfair or Deceptive Omissions in Violation of FDUTPA.**

Even assuming these arguments are not barred by Rule 12(g)(2), Defendants incorrectly claim that they may not be held liable under FDUTPA for unfair or deceptive omissions regarding their "real job placement rates" and the "low rate of FCC students who are able to repay their student loans." *See* Motion at 19 (quoting FAC ¶¶ 267(a)–(b)). Defendants begin by misrepresenting Plaintiffs' allegations—they claim that Plaintiffs allege that "no representations were made about placement rates." *See id.* at 19 n.13. This is false: the FAC repeatedly emphasizes that Defendants fail to tell students about their job placement rates, instead releasing selective job placement data that misleads students, *due to blatant omissions*, about the actual post-graduate employment picture for FCC graduates. *See* FAC ¶¶ 13, 117–128, 136.

Defendants also claim that Plaintiffs cannot base a FDUTPA claim on omissions because certain Florida statutes and regulations regulate educational institutions like FCC. *See* Motion at 19–20. Plaintiffs acknowledge that educational institutions in Florida are subject to various state and federal regulations. The relevant question, however, is whether anything in either FDUTPA or these other state statutes and regulations indicates that FDUTPA does not apply to educational

17

institutions. Defendants cite nothing indicating that FDUTPA cannot or does not apply to educational institutions, and the evidence strongly indicates the opposite. The preamble to Florida's Nonpublic Postsecondary Act (the "NPA") states that the Florida legislature intended to establish *minimum* standards—not a cap on the amount or quality of information educational institutions must provide to prospective students. *See* Fla. Stat. §1005.01(1). FDUTPA itself also includes provisions clarifying that FDUTPA "is supplemental to, and makes no attempt to preempt, local consumer protection ordinances not inconsistent with this part," and that "[t]he remedies of this part are in addition to remedies otherwise available for the same conduct under state or local law." Fla. Stat. §501.213. Defendants' argument that conduct regulated by Florida's educational statutes and regulations cannot be subject to a FDUTPA claim also makes little sense considering that FDUTPA expressly states that a violation of such laws or regulations may also constitute a FDUTPA violation. *See* 501.203(3)(c).

In addition, Defendants argue that the federal Higher Education Act (the "HEA") and the regulations implemented in Chapter 6 of Florida's Administrative Code have together "legislatively determined" what does and does not constitute "fair consumer practices." Nonsense. Neither the HEA nor Chapter 6E of the Florida Administrative Code were intended by the United States Congress or Florida, respectively, to do anything other than establish minimum standards. The HEA is a federal statute that includes no language preempting state consumer protection measures like FDUTPA. *See* 20 U.S.C § 1001, *et seq.*; *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009) ("'In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Chapter 6E of the Florida Administrative Code, in turn, merely implements Florida's NPA, which, as discussed above, was expressly intended to establish minimum standards governing certain educational institutions in the state. *See, e.g.*, Fla. Admin. Code r. 6E-1.003, *et seq.*

Defendants also incorrectly argue that Plaintiffs must prove that Defendants made an affirmatively misleading statement in order to plausibly plead an omission because, absent such a statement, no "disclosure obligation" could exist. *See* Motion at 20–21. Defendants cite the transcript from the hearing on Defendants' first motion to dismiss to support this argument, but

the language to which they refer dealt with the Court's suggestions on how Plaintiffs could plausibly plead a FDUTPA claim based on a misrepresentation. Because the Court held the integration language prevented Plaintiffs from basing a FDUTPA count on "verbal statements or promises made before the execution of this agreement," the Court appears to have been advising Plaintiffs that a FDUTPA count based on such "verbal statements or promises" would need to relate to statements or promises contained in the contract itself; nothing in the transcript indicates that the Court ruled on, or considered, whether or how Plaintiffs could plausibly allege Defendants' trade practices, or failure to make statements, in violation of FDUTPA. *See, e.g.*, Transcript at 33:21-33:22 ("I just see one FDUTPA claim dealing with alleged misrepresentations"), 59:16-59:19.

Defendants also cite a Northern District of California case, *Parziale v. HP, Inc.*, 445 F. Supp. 3d 435 (N.D. Cal. 2020), to support their position that a duty to disclose can only arise if a party alleges an affirmatively misleading statement. *See* Motion at 20. Defendants overstate *Parziale*. Indeed, *Parziale* cited *Virgilio v. Ryland Grp, Inc.*, 680 F.3d 1329 (11th Cir. 2012) in support. But *Virgilio* never held that a duty to disclose is necessary to make an omission claim under FDUTPA. Rather, it held that even if it were required, the parties in that matter would have had no such duty under Florida law for reasons relating to agency principles that have no import here. *See Virgilio*, 680 F.3d at 1336–38; *see also Coffey*, 2018 WL 4154256, at *4, *4 n. 12 (discussing import of *Virgilio* in FDUTPA context).[6] In addition, the *plaintiff* in *Parziale* had claimed that an affirmative misrepresentation was necessary to make an omissions claim, and the court analyzed the facts given that concession. *See Parziale*, 445 F. Supp. 3d at 443. In any event, construing *Parziale* as Defendants wish would be inconsistent with decades of Florida law and decisions of the Federal Trade Commission in interpreting the Federal Trade Commission Act.[7]

---

[6] Even if this Court held that a duty to disclose was a FDUTPA element, however, there is no question that Defendants were under such a duty here. "The Florida Supreme Court has long held that a seller has a duty to disclose material information that is 'not equally within the ken of the buyer.'" *Coffey*, 2018 WL 4154256, at *4. Plaintiffs plainly, repeatedly, and plausibly allege that Defendants possessed highly material information that Plaintiffs never possessed and were never provided. *See, e.g.*, FAC ¶¶ 117–19, 136.

[7] "Since FDUTPA is the state counterpart to the Federal Trade Commission Act, in deciding whether an act or practice may be deemed deceptive, we must give due consideration and great weight to the interpretations made by the Federal Trade Commission and the federal courts." *Millennium*, 761 So.2d at 1260 (Fla. 3d DCA 2000); *see also* Fla. Stat. § 501.204 (2001 FDUTPA amendments codified judicial deference to Federal Trade Commission interpretations).

By requiring parties to plead an affirmatively misleading statement in order to plead an omission claim, Defendants would have this Court effectively bar consumers from bringing an independent omission claim. This would dramatically upend decades of Florida Supreme Court, 11th Circuit, Southern District of Florida, and FTC precedents. *See White*, 741 F. App'x at 637 ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." (emphasis added) (quoting *Davis v. Powertel, Inc.*, 776 So. 2d 971, 973 (Fla. 1st DCA 2000))); *PNR, Inc.*, 842 So. 2d at 777 ("[D]eception occurs if there is a 'representation, omission, *or* practice that is likely to mislead the consumer . . . .'" (emphasis added) (quoting *Millennium*, 761 So.2d at 1263)); *Coffey*, 2018 WL 4154256, at *3; *Zamber*, 282 F. Supp. 3d at 1300 n.8 ("Even if Plaintiff had not adequately pled a deceptive representation, he would still alternatively state a claim based on a deceptive omission."); *In the Matter of Intern. Harvester Co.*, 1984 WL 565290 at *86–87 (1984) ("Actionable deception theory is not limited to false or misleading statements."). Defendants' position also contravenes standing FTC guidance that the deceptiveness of an omission does not depend on whether it was accompanied by a false statement or even any utterance at all. *See In the Matter of Intern. Harvester Co.*, 1984 WL 565290 at *86–87 (1984) (omissions may be deceptive if true statement left out context or if silence created implied but false impression).

Defendants also object to FAC paragraph 267(c) because, they submit, a party "may not maintain an action in tort and contract based on the same alleged conduct where the conduct is an integrated one." Motion at 21. Defendants made this same argument in their first motion regarding the FDUTPA and contract counts, and the Court correctly rejected it, upholding the contract count and dismissing the FDUTPA count on a different basis. *See* ECF No. 24 at 23–24. Plaintiffs have already briefed this issue, and believe the Court's decision to reject Defendants' argument was proper. *See* ECF No. 30 at 21–22; Exhibit 1 at 68.

### 3.    Subparts (d) and (f) of Paragraph 267 Plausibly Plead that Defendants Have Engaged in Unfair or Deceptive Trade Practices.

Defendants state that subparts (d) and (f) of Paragraph 267 "are not affirmative misleading statements or omissions," and are implausible. Motion at 21. Plaintiffs agree with Defendants that Subparts (d) and (f) do not allege affirmative misleading statements or omissions; those subparts allege unfair or deceptive trade practices, one of the three types of behavior upon which a FDUTPA count may be based. *See PNR, Inc.*, 842 So. 2d at 777. Defendants' acknowledgement that subparts

(d) and (f) do not allege an affirmative misleading statement or omission is important: Because the integrated enrollment term pertained solely to "verbal statements or promises," *see* ECF No. 24-1 at 45, Defendants' concession indicates that a FDUTPA count based on at least subparts (c) and (d) should survive even if the Court agreed with Defendants' incorrect argument that the integration language bars Plaintiffs from predicating a FDUTPA claim on misleading statements or omissions. *See* Motion at 17–21.

Defendants also state that Plaintiffs implausibly assert that Defendants (1) "failed to disclose material facts regarding the terms and conditions of the education they were providing, such as the quality of the equipment, the qualifications of the professors, the level or preparation provided," *see* ¶ 267(c), and (2) "violated regulations pertaining to 'ethical practices and procedures in the recruitment of students' by using, for example, high-pressure sales tactics and job search websites to recruit students, Fla. Admin. Code r. 6E-2.004(5)(b)(2)," *see* ¶ 267(d). Defendants claim these allegations are implausible because Plaintiffs had time to consider FCC and returned to enroll on their own volition. Defendants' depiction of the enrollment process contradicts Plaintiffs' allegations in the FAC and asks the Court to upend the motion to dismiss standard.

To be clear, the FAC repeatedly alleges that Defendants exerted pressure on prospective students to enroll at FCC before, during, and after those students had visited FCC. *See* FAC ¶¶ 82, 97, 105, 108, 218–19, 224, 239–40, 248–50. Moreover, even if the Court did concur with Defendants' version of events, Defendants never explain how time to ruminate on impressions created by unfair and deceptive omissions and trade practices would somehow render those omissions and trade practices fair and not deceptive.

### 4.    Subparts (g) and (h) of Paragraph 267 Allege Unfair or Deceptive Trade Practices, Not Educational Malpractice.

Defendants argue the Court must strike subparts (g) and (h) of paragraph 267 because those subparts allege a claim for "educational malpractice," not unfair or deceptive trade practices. *See* Motion at 22–23. This is false. Subparts (g) and (h) clearly predicate Defendants' liability on their use of unfair or deceptive trade practices. FDUTPA is not a negligence statute, and does not implicate the "separation of powers" concern that led the Florida Supreme Court to bar students from suing school systems for malpractice. *See, e.g.*, *Dep't of Health & Rehab. Servs. v. B.J.M.*, 656 So. 2d 906, 914 (Fla. 1995).

In essence, Defendants are asking the Court to hold that private, for-profit vocational schools are immune from liability under FDUTPA because their product relates to education. Defendants, however, cite no statutes or judicial authority granting private, for-profit, vocational institutions like FCC any such immunity, and no such statutes or caselaw exist. The FDUTPA claims are well-pleaded and the motion to dismiss them should be denied.

### III.  Plaintiffs' Title VI Claim (Count VI) is Properly Pleaded.

Citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Defendants mistakenly argue (as they did previously, Exhibit 1 at 79:22–79:23) that Plaintiffs "Britt and Henry plead no direct evidence of discrimination," and "also fail to plead *circumstantial* evidence establishing a *prima facie* showing of discrimination." Motion at 25 (emphasis in original). That argument ignores that this heightened *McDonnell Douglas* standard does not apply at the motion to dismiss stage or to Title VI claims. *See Buchanan v. Delta Air Lines, Inc.*, 727 F. App'x 639, 642 (11th Cir. 2018); *Methelus v. Sch. Bd. of Collier Cty., Fla.*, 243 F. Supp. 3d 1266, 1278 (M.D. Fla. 2017).

Defendants also ignore that, under the applicable pleading standard, Plaintiffs have pleaded sufficient factual content to support the reasonable inference that Defendants intentionally discriminated against Plaintiffs and similarly-situated students on the basis of race. FAC ¶¶ 22, 23, 175, 176, 296, 306.[8]  The FAC makes factual allegations from which the Court can reasonably infer intentionality. For example, citing statistics that compare Black, White, and Latino populations at nearby colleges, the FAC alleges that FCC's student population is predominantly Black compared to other nearby colleges. *Id.* ¶¶ 164–74. It also alleges facts sufficient to indicate that this disproportionality is due to intentional targeting. *Id.* ¶¶ 22, 23, 175, 176, 296, 306. The FAC alleges that FCC targets Black people through its advertising and recruitment tactics, and that such conduct results in Black people failing to obtain gainful employment and defaulting on their student loans. *Id.* ¶¶ 6–9, 20–23, 47, 60–72, 101, 111, 136, 143–44, 147, 149–162, 175–78, 267, 296. It strategically and intentionally recruits Black people for its educational programs by

---

[8] *See* also FAC ¶ 22 ("FCC deliberately and intentionally targets Black people by directing its advertising to them on certain media and in certain locations"); ¶ 145 ("FCC intentionally targets Black people for enrollment because it believes that Black people will qualify for the maximum amount of federal aid."); ¶ 147 ("FCC intentionally profits from systemic racism."); ¶ 176 ("FCC intentionally targets Black people for its predatory product; discriminating against students on the basis of race by inducing them to purchase a worthless product by taking on debt that FCC knows they will not likely be able to repay.") ¶ 296 ("Defendants' acts, policies, and practices in relation to these credit transactions intentionally discriminate against Black people.").

focusing its marketing on avenues that disproportionately reach a Black audience (e.g., by using Black models in advertisements, by advertising on Hip Hop and R&B radio stations, by conducting outreach at high schools with high percentages of Black students, as well as by using social media, telemarketing, billboards and mailings targeting Black people). *See id.*; *see also id.* ¶¶ 5, 139–141.

The FAC further alleges that "Defendants target Black people with their advertising because they believe Black people are more likely to qualify for maximum amounts of federal student aid, because they believe Black people are more likely to be lured in by their scheme." *Id.* ¶ 23. Also, the FAC alleges "[t]hese facts support the inference that the motivating factor behind FCC's policies and practices are to target Black people as it believes Black people will be a ready source of revenue and profit." *Id.* ¶ 175; *id.* ¶¶ 164–74. These are well-pleaded factual allegations that are not conclusory legal conclusions, that must be accepted as true, construed in the light most favorable to Plaintiffs, and from which all reasonable inferences must be drawn in Plaintiffs' favor. *MSPA Claims 1, LLC v. Scottsdale Ins. Co.*, 352 F. Supp. 3d 1234, 1237 (S.D. Fla. 2018); *see also La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Indeed, the Court previously acknowledged that the Title VI claim is "broader" than the ECOA claim, and that "the predatory aspect of the targeting and everything else, if that's true, could meet the Title VI standard." Exhibit 1 at 78:22-24, 83:9-10; *see also id.* at 80:4-6. Thus, the FAC plausibly alleges that Defendants intentionally discriminated against Plaintiffs on the basis of race.[9]

Defendants argue that Plaintiffs failed to heed the Court's previous advice and add new allegations supporting the assumptions underlying Plaintiffs' reasons for why the targeting makes sense and is predatory. Motion at 25. This is plainly false. The FAC includes these additional allegations. For example, paragraph 145 alleges that "FCC intentionally targets Black people for enrollment because it believes that Black people will qualify for the maximum amount of federal aid." Paragraph 146 similarly alleges that "FCC is aware of the systemic underrepresentation of Black people in postsecondary education, which make Black people particularly vulnerable in both

---

[9] *See, e.g.*, *Brook*, 2017 WL 1743500, at *3–4 ("Plaintiff is not arguing that targeted advertising alone constitutes a violation of Title VI. Rather, she is arguing that targeting her for a fraudulent scheme because of her ethnicity or national origin violates Title VI. It is the combination of the targeted advertising *and* the allegedly 'sham' educational program that allows the Court to infer intentional discrimination. The discrimination claim arises from the harmful product being peddled; the targeted advertising simply helps to prove that the discrimination was intentional." (footnote omitted)).

the traditional educational space and labor market." And, paragraph 147 alleges "FCC targets Black people because it maximizes advertising dollars, guaranteeing an easy, steady stream of revenue and profit, and highest return on investment. In other words, FCC intentionally profits from systemic racism." *See also* FAC ¶ 175.

Defendants further criticize Plaintiffs' allegations and for failing to include certain allegations in the FAC that, Defendants imply, would have supported a valid Title VI claim. *See* Motion at 26 & n.17, 27. But, Defendants' selective reliance on hypothetical allegations that are *not* before the Court, and their construing of the FAC's allegations in their favor, *see id.*, is simply an attempt to avoid the actual factual content that is before the Court and that, properly construed, supports reasonable inferences that Defendants are liable for intentional discrimination.

Defendants argue that Plaintiffs allege a "prohibited 'discriminatory impact' claim" rather than an actual intentional discrimination claim under Title VI. Motion at 26 n.17. But that argument ignores that the Court already rejected this contention, *see* Exhibit 1 at 78:2–78:4, and that the FAC alleges Defendants' policies or practices intentionally discriminate against Plaintiffs and similarly-situated students on the basis of race, FAC ¶¶ 22, 23, 175, 176, 296, 306.[10] The FAC alleges that "Defendants target Black people with their advertising because they believe Black people are more likely to qualify for maximum amounts of federal student aid, because they believe Black people are more likely to be lured in by their scheme." FAC ¶ 23. Further, noting the statistics showing that a substantially greater percentage of Black students are enrolled at FCC as compared to area colleges, *Id.* ¶¶ 164–174, the FAC alleges "[t]hese facts support the inference that the motivating factor behind FCC's policies and practices are to target Black people as it believes Black people will be a ready source of revenue and profit." *Id.* ¶ 175. "Taken together, these allegations more than suffice to state a claim for intentional discrimination." *Methelus*, 243 F. Supp. 3d at 1278 (citing *N.Y. by Schneiderman v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739,

---

[10] *See also* FAC ¶ 22 ("FCC deliberately and intentionally targets Black people by directing its advertising to them on certain media and in certain locations"); ¶ 145 ("FCC intentionally targets Black people for enrollment because it believes that Black people will qualify for the maximum amount of federal aid."); ¶ 147 ("FCC intentionally profits from systemic racism."); ¶ 176 ("FCC intentionally targets Black people for its predatory product; discriminating against students on the basis of race by inducing them to purchase a worthless product by taking on debt that FCC knows they will not likely be able to repay.") ¶ 296 ("Defendants' acts, policies, and practices in relation to these credit transactions intentionally discriminate against Black people.").

752 (N.D.N.Y. 2016)).[11] Defendants also fail to show that Plaintiffs' allegations do not adequately state a claim of reverse redlining. *See* FAC ¶¶ 298–307; *Brook*, 2017 WL 1743500, at *4 ("The Court sees no reason why Plaintiff cannot pursue her Title VI claim using a theory akin to reverse redlining").

Finally, Defendants' argument that the FAC contains allegations that would apply to all prospective students (including individuals who are not Black) and hence renders the claims deficient, Motion at 27, amounts to a selective interpretation of the allegations and ignores that, considered as a whole, they plausibly allege the requisite intentional discrimination by Defendants. *See, e.g.*, FAC ¶¶ 21–27, 145, 147, 175–76, 296.

## IV.    Plaintiffs' ECOA Claims (Counts IV and V) Are Not Subject to Dismissal.

Under ECOA, it is unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction." 15 U.S.C. § 1691(a). A creditor is defined as "any person who regularly extends, renews, or continues credit; any person who *regularly arranges for the extension, renewal, or continuation of credit*[.]" 15 U.S.C. § 1691a. (emphasis added). "The term creditor also includes a person who, in the ordinary course of business, *regularly refers applicants or prospective applicants to creditors*, or selects or offers to select creditors to whom requests for credit may be made." 12 C.F.R. § 202.2(l) (emphasis added). Plainly, both definitions

---

[11] Defendants argue that the requisite discriminatory intent is absent in part because the Court previously took judicial notice that Defendants have no control over the administration of the federal student financial aid program. Motion at 26 n.17. But that argument ignores that Defendants guided Plaintiffs through the financial aid process, FAC ¶¶ 101–104, and, as indicated above, that Plaintiffs' allegations of discriminatory intent do not depend on whether FCC is ultimately responsible for issuance of federal student financial aid. *Id.* ¶¶ 23, 50–53, 102–104, 145, 298–307. Defendants further argue that Plaintiffs unpersuasively claim "it sold the very same product to all students who decided to enroll at an FCC campus," thereby suggesting that Plaintiffs failed to allege they were treated differently than similarly situated students who are not members of the protected class. Motion at 26 & n.17, 27. But "even in the absence of a comparator, '. . . judgment [for defendant] is appropriate [only] where no other evidence of discrimination is present.'" *Sirpal v. Univ. of Miami*, No. 09-22662-CIV, 2011 WL 3101791, at *12 (S.D. Fla. July 25, 2011) (citation omitted), *aff'd*, 509 F. App'x 924 (11th Cir. 2013). Such other evidence of discrimination is present here, as discussed above. Indeed, on facts similar to this case (*i.e.*, alleging intentional targeting of students of a particular race), courts in this circuit have rejected this line of argument. *See Brook*, 2017 WL 1743500, at *3–4 (rejecting argument "that Plaintiff has not sufficiently alleged that [defendant] intentionally discriminated against her because she is Latino, in part because she has not alleged that [defendant] treated her differently than a non-Latino student in its educational program," where complaint alleged that defendant intentionally targeted Latinos for its sham educational program).

express that arranging credit, the facilitating of the credit interaction, establishes an entity as a "creditor."

Plaintiffs allege that Defendants violated ECOA by engaging in reverse redlining. Reverse redlining is the practice of extending credit on unfair terms because of the plaintiff's race and geographic area. *Steed v. EverHome Mtg. Co.*, 308 F. App'x. 364, 369 (11th Cir. 2009) (quoting *Hargraves v. Cap. City Mtg. Corp.*, 140 F. Supp. 2d 7, 20 (D.D.C. 2000)). The elements of a reverse redlining claim are that defendant's lending practices and loan terms were unfair and predatory and that defendant either intentionally targeted on the basis of race or that there was a disparate impact on the basis of race. *Hargraves*, 140 F. Supp. 2d at 20. In a reverse redlining case, as here, it is not necessary for the Plaintiffs to show that Defendants made loans on more favorable terms to anyone other than the targeted class. *Id.*; *see also Greer v. Home Realty Co. of Memphis, Inc.*, 2008 WL 11318325, at *17 (W.D. Tenn. Aug. 7, 2009) ("In the alternative, if the plaintiff presents direct evidence that the lender intentionally targeted her for unfair loans on the basis of [membership in a protected class], the plaintiff need not also show that the lender makes loans on more favorable terms to others.") (quoting *Matthews v. New Century Mtg. Corp.*, 185 F. Supp. 2d 874, 886–87 (S.D. Ohio 2002)). Among the practices that constitute predatory lending are making loans the borrower is unable to repay in order to take advantage of the borrower. *Hargraves*, 140 F. Supp. 2d at 20-21.

Here, Defendants are "creditors" because they regularly arrange for credit and regularly refer applicants or potential applicants to creditors, even though they did not make the actual loans to Plaintiffs or other class members. The issue here is not the terms of the loans *per se*, or that loans were made to Black people on less favorable terms than other groups. Neither are essential elements of Plaintiffs' claims. Rather, Plaintiffs' ECOA claims succeed because Plaintiffs allege that the loans arranged by Defendants are predatory and unfair because, as a general proposition, the amounts that FCC students must borrow in order to pay for FCC classes is more than they can pay back given their realistic job prospects after completing their courses at FCC. FCC arranges for these loans and gets the benefit of these loans vis-à-vis paid tuition, while students are left with crushing debt that, because of Defendants' conduct, they are unable to repay.

Second, Plaintiffs' ECOA claims succeed because Plaintiffs allege that Defendants *targeted* Black people for the predatory and unfair student loans they offer to finance their alleged

training programs.[12] It is not necessary to show that Defendants offered or arranged for loans on less favorable *terms* for Black people in order to make out a reverse redlining claim; nor is it necessary to show *why* Defendants chose to target Black people—only that they intentionally did. As is alleged in detail in the FAC, Defendants direct their targeting efforts at the Black community, which satisfies this element of a reverse redlining claim. *See supra* Section III (Plaintiffs' Title VI Claim (Count VI) is Properly Pleaded) (detailing allegations in the complaint that establish the reasonable inference that Defendants intentionally discriminated against Plaintiffs and similarly-situated students on the basis of race).

*Brook v. Sistena Universitario Ada G. Mendenez, Inc.*, 2017 WL 1743500 (M.D. Fla. May 4, 2017), is distinguishable in that the *pro se* plaintiff did not allege what loan terms she believed to be unfair or predatory. *Id.* at *3. The court assumed that since all government student loans were offered on the same terms, it would be unlikely the plaintiff could have alleged her loans were unfair. *Id.* But, as explained above, it is not necessary to show disparate loan *terms* to make out a reverse redlining claim. Moreover, "unfair" covers far more ground than a member of one group receiving less favorable loan terms. "Unfair" is "1.  Not honest, impartial, or candid; unjust.  2. Inequitable in business dealings, esp. with regard to labor and employment." Black's Law Dictionary.

The loans pushed by Defendants in this case are "unfair" not because they are on less favorable terms for Black people than for others, but because they are "not honest," "unjust" and "inequitable." The Defendants know that students at whom it targets its marketing efforts are generally unable to pay the loans back after their alleged vocational training. Plaintiffs need not allege the inner workings of the reasons Defendants have targeted Black people for their predatory product, or explain whether and how such targeting is based on racist ideas about Black people's ability to repay the loans. Rather, a claim of reverse redlining under ECOA need be based on Plaintiffs' allegations that the Defendants, the creditors in question, are peddling a predatory product, and the Defendants are targeting that product in a discriminatory manner.

---

[12] It is also not necessary that Defendants be the party making the loan. They fall within the definition of a "creditor," and ECOA prohibits "creditors" from discriminating with respect to loan transactions. As is explained above, reverse redlining is a form of discrimination with respect to loan transactions.

V.      **The Racial Discrimination FDUTPA Claim (Count VII) Is Also Well-Pleaded.**

Defendants argue Count VII must be dismissed because Plaintiffs fail to plausibly state "allegations of intentional targeting dealing with a class of people who are protected under the Constitution." Defendants seem barely able to make this dispirited argument, as they do not even bother to refer to the FAC at all. And nor could they.

Plaintiffs' actual allegations on the issue are clear, detailed, and extensive. *See, e.g.*, ¶¶ 137–44 (discussing racial inequities in higher education, wealth, and loan debt); ¶¶ 145–48, 176–78 (describing FCC's motives for targeting Black people for enrollment); ¶¶ 149–62 (detailing FCC's extensive efforts to target Black people for enrollment); ¶¶ 162–175 (discussing evidence of FCC's success in race-based targeting and advertising). The Court should sustain Count VII because Plaintiffs have plausibly pleaded that Defendants intentionally targeted a protected class.

VI.     **Plaintiffs Properly Plead Their Claim for Injunctive Relief.**

Defendants argue that Plaintiffs' claim for injunctive relief based on "continuing" or "ongoing" harm (*i.e.*, inability to repay student loans) lacks merit because this Court previously rejected it. Motion at 28. That is false. The Court's comments indicated that it did not perceive the previous complaint as alleging a likelihood of future harm. *See* Exhibit 1 at 89–93. The Court did not reject the theory that an ongoing inability to repay student loans or obtain employment as a result of Defendants' conduct (as alleged by Plaintiffs here, *see* FAC ¶¶ 69–72, 111, 136, 142–44, 176, 178, 203–208, 230–33, 260–61, 288–90, 293–96) satisfies the Article III standing requirement of alleging future or ongoing harm for purposes of injunctive relief. *See* Exhibit 1 at 89–93. The Court did not address that issue.

Because Plaintiffs have alleged they suffer from an ongoing and future inability to repay student loans or obtain employment as a result of Defendants' unlawful conduct, under the applicable standard,[13] they have plausibly alleged an ongoing or future harm for purposes of Article III standing and injunctive relief. *See Belin v. Health Ins. Innovations, Inc.*, No. 19-CV-61430, 2021 WL 358102, at *5 (S.D. Fla. Feb. 1, 2021) (indicating that past exposure to illegal

---

[13] *See Elend v. Basham*, 471 F.3d 1199, 1208 (11th Cir. 2006) ("When standing is questioned at the pleading stage, as it is here, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.' . . . We accept as true all material allegations contained in the complaint and construe the complaint in a light most favorable to the complaining party." (citations omitted)).

conduct, if accompanied by continuing, present adverse effects, would show present case or controversy regarding injunctive relief) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *cf. Gingras v. Rosette*, No. 5:15-CV-101, 2016 WL 2932163, at *7 (D. Vt. May 18, 2016) ("Plaintiffs respond that they continue to owe money on unlawful loans and suffer reputational harm through credit reporting of non-payment. The court agrees with Plaintiffs that the FAC contains sufficient allegations to support individualized standing for each Plaintiff. There is little dispute that both borrowed money on terms which would violate Vermont's usury laws."), *aff'd*, 922 F.3d 112 (2d Cir. 2019).

## VII.   Defendants' Argument that Plaintiffs' Claims Should Be Dismissed "With Prejudice" Under the Doctrine of Futility Lacks Merit and is Premature

Defendants argue that the Court should dismiss Plaintiffs' claims "with prejudice" and that Plaintiffs should not be permitted to file any future motion to amend their complaint because any claims therein would be futile. Motion at 28–29. That argument is unpersuasive for at least three reasons. First, it is academic, as Plaintiffs' current allegations more than satisfy Rules 8 and 12(b)(6), and Defendants have failed to show that any future amended allegations would be futile. Second, Defendants' request is premature in the absence of (1) a decision by this Court granting Defendants' latest motion to dismiss; (2) a future motion for leave to amend filed by Plaintiffs; and (3) a fully briefed motion to dismiss from Defendants addressing any later amended complaint. *See Foley v. Morgan Stanley Smith Barney, LLC*, No. 0:11-CV-62476-KMW, 2012 WL 13135188, at *2 (S.D. Fla. Feb. 23, 2012) (rejecting as premature defendant's argument that amended complaint would be futile where court did "not have the benefit of a fully briefed motion to dismiss and a consequent decision on the merits," and holding that "Defendant may raise their arguments on a renewed motion to dismiss"); *see also Dernier v. U.S. Bank Nat'l Ass'n for CSMC Mortg.-Backed Pass-Through Certificates, Series 2006-3*, No. 2:16-CV-000230, 2017 WL 2483799, at *7 (D. Vt. June 8, 2017) ("In the absence of a formal motion for leave to amend the complaint in a particular manner, the Court cannot analyze whether any proposed amendment would be futile. Accordingly, the Court rejects Defendants' request that all future leave to amend be denied, as such a request is premature at this point."). Third, Defendants have raised additional arguments in their second motion to dismiss that they did not raise previously and that have not been addressed by the Court. *See, e.g.*, Motion at 19–23. Defendants are not entitled to dismissal "with prejudice" of Plaintiffs' claims on any such grounds. *See Bryant v. Dupree*, 252 F.3d 1161, 1164 (11th Cir.

2001) (indicating that dismissal with prejudice would not be appropriate where plaintiffs had not been given notice by court of possible deficiencies in their complaint).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to compel arbitration and the motion to dismiss.

Dated: March 2, 2021                    Respectfully Submitted,

                                        */s/Adam M. Schachter*
                                        ADAM M. SCHACHTER
                                        Florida Bar No. 647101
                                        aschachter@gsgpa.com
                                        BRIAN W. TOTH
                                        Florida Bar No. 57708
                                        btoth@gsgpa.com
                                        ANDREW J. FULLER
                                        Florida Bar No. 1021164
                                        afuller@gsgpa.com
                                        GELBER SCHACHTER & GREENBERG, P.A.
                                        SunTrust International Center
                                        One Southeast Third Avenue, Suite 2600
                                        Miami, Florida 33131
                                        Telephone: (305) 728-0950
                                        E-service: efilings@gsgpa.com


                                        TOBY MERRILL (*pro hac vice*)
                                        tomerrill@law.harvard.edu
                                        EILEEN CONNOR (*pro hac vice*)
                                        econnor@law.harvard.edu
                                        EMMANUELLE VERDIEU (*pro hac vice*)
                                        everdieu@law.harvard.edu
                                        MARGARET O'GRADY (*pro hac vice*)
                                        mogrady@law.harvard.edu
                                        MICHAEL N. TURI (*pro hac vice*)
                                        mturi@law.harvard.edu
                                        LEGAL SERVICES CENTER OF HARVARD
                                        LAW SCHOOL
                                        122 Boylston Street
                                        Jamaica Plain, MA 02130
                                        Telephone: (617) 390-2576


                                        ZACHARY S. BOWER
                                        Florida Bar No. 17506
                                        zbower@carellabyrne.com
                                        Security Building
                                        117 NE 1st Avenue
                                        Miami, FL 33132-2125
                                        Telephone: (973) 994-1700

31

CAROLINE F. BARTLETT (*pro hac vice*)
cbartlett@carellabyrne.com
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY
& AGNELLO P.C.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
Telephone: (973) 994-1700

*Counsel for Plaintiffs*