# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-60814-CIV-ALTMAN/Hunt

**KAREEM BRITT,** *et al.,*

     *Plaintiffs*,

*v.*

**IEC CORP.,** *et al.,*

     *Defendants*.

_____/

## <u>ORDER</u>

When the Plaintiffs, Kareem Britt and Sharon Henry, enrolled in Florida Career College ("FCC"), they agreed to arbitrate any claims they might later bring against the school. In 2016, the Department of Education promulgated a series of regulations that required any school participating in a federal student-loan program (like FCC) to waive the arbitration agreements they had signed with their students. In accordance with those regulations, FCC sent its students a notice, in which it waived its right to arbitrate. But that notice wasn't timeless. It made clear that FCC's waiver would "apply to your arbitration agreement with [FCC] for any period during which these regulations are in effect." While this case was pending, a *new* set of Department of Education regulations took effect. These new regulations, among other things, erased the prior scheme's anti-arbitration provisions. Because the now-excised regulations—which conditioned federal aid on the school's waiver—are no longer *in effect*, FCC's waiver has expired, and the parties are bound by their original agreement to arbitrate. FCC's Motion to Compel Arbitration [ECF No. 70] (the "Motion") is therefore **GRANTED**.

## THE FACTS

### A. Background

The Plaintiffs—Kareem Britt and Sharon Henry—are former students at FCC, a for-profit vocational school. *See* Compl. [ECF No. 66] ¶¶ 1, 31–35.[1] Britt enrolled in FCC's Heating, Ventilation, and Air Condition program in August 2018, and he graduated from that program the following year. *Id.* ¶¶ 31, 188. Henry enrolled in FCC's Medical Assistant Program in 2016, but she "dropped out of her program" before completing her degree. *Id.* ¶¶ 32, 231. Britt and Henry brought this putative class action against FCC, alleging (1) breach of contract; (2) negligence; (3) violations of the Florida Deceptive and Unfair Trade Practices Act; (4) violations of the Equal Credit Opportunity Act; and (5) violations of Title VI of the Civil Rights Act of 1964. *Id.* ¶¶ 265–311. They aver, in short, that FCC engages in certain "deceptive" conduct and that the school uses discriminatory admissions practices. *Id.* ¶¶ 1–27.

### B. The Arbitration Agreement

When they enrolled at FCC, each Plaintiff entered into a contract with the school, consisting of an Enrollment Agreement and a Course Catalog. *Id.* ¶¶ 129–31, 271–73; *see also* Britt Enrollment Agreement [ECF No. 70-2]; Britt Course Catalog [ECF No. 70-3]; Henry Enrollment Agreement [ECF No. 70-4]; Henry Course Catalog [ECF No. 70-5]. Each of the Enrollment Agreements contained the following arbitration clause:

> Any dispute I may bring against School or any of its parents, subsidiaries, affiliated entities, officers, directors, agents or employees, without limitation, or which the School may bring against me, no matter how characterized, pleaded or styled, shall be resolved by binding arbitration conducted by the American Arbitration Association (the "AAA"), under its Consumer Arbitration Rules ("Consumer Rules"), and decided by a single Arbitrator.

---

[1] The Defendants in our case are FCC and its parent company, IEC Corporation. We refer to them, collectively, as "FCC."

2

*See* Britt Enrollment Agreement at 4; Henry Enrollment Agreement at 4. The Enrollment Agreements also included class-action waivers, which required the students to arbitrate their claims individually. Those waivers looked like this:

> I agree that any dispute or claim I may bring shall be brought solely in my individual capacity, and not as a plaintiff or class member in any purported class action, representative proceeding, mass action, consolidated or joint action.

*See* Britt Enrollment Agreement at 4; Henry Enrollment Agreement at 4. When signing their Enrollment Agreements, Britt and Henry acknowledged that they had read, understood, and agreed to the arbitration clauses and class-action waivers. *See* Britt Enrollment Agreement at 4; Henry Enrollment Agreement at 4.

### C.  The 2016 Borrower Defense Regulations

Congress passed Title IV of the Higher Education Act of 1965 (the "HEA") to expand access to higher education. The HEA empowers the Secretary of Education "to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education by" providing financial aid. 20 U.S.C. § 1070(a). The William D. Ford Federal Direct Loan Program (the "Direct Loan Program") allows students who attend "participating institutions" to obtain direct loans from the federal government to help defray the costs of higher education. 20 U.S.C. § 1087a(a). Schools that participate in the Direct Loan Program must sign a "program participation agreement" with the Secretary of Education. 20 U.S.C. § 1094. "In signing such an agreement, the school promises to comply with all federal statutes applicable to [the HEA] and the regulations promulgated thereunder." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1044 (11th Cir. 2015).

The HEA gives the Secretary of Education authority to include in its program participation agreements such "provisions as the Secretary determines are necessary to protect the interests of the

United States." 20 U.S.C. § 1087d(a)(6). In exercising that authority, the Department of Education, on November 1, 2016, promulgated what the parties refer to as the 2016 Borrower Defense Regulations (the "Old Regulations"). 81 Fed. Reg. 75,926 (Nov. 1, 2016) (codified in scattered sections of 34 C.F.R.). The Old Regulations amended the rules that govern the terms of the program participation agreements "to prohibit participating schools from using . . . predispute arbitration agreements or class action waivers." *Id.* at 75,926.

The Old Regulations provided that, "[i]n the program participation agreement, the school must promise to comply with the Act and applicable regulations and must agree to" waive any "[p]redispute arbitration agreements" and "[c]lass action bans." 34 C.F.R. § 685.300(e), (f) (2018). With respect to arbitration agreements, the Old Regulations provided that "[t]he school will not enter into a predispute agreement . . . or rely in any way on a predispute arbitration agreement." *Id.* § 685.300(f)(1)(i). And, for class-action waivers, the Old Regulations mandated that "[t]he school will not seek to rely in any way on a predispute arbitration agreement or on any other predispute agreement with a student who has obtained or benefited from a Direct Loan, with respect to any aspect of a class action." *Id.* § 685.300(e)(1). To the extent the school had entered into an arbitration agreement or class-action waiver "before the effective date" of the Old Regulations, the school was required, as a condition of the program participation agreement, to *either* amend its agreement with the students *or* send the students a waiver notice. *Id.* § 685.300(e)(3)(iii), (f)(3)(iii). The Old Regulations required that the arbitration waiver read as follows:

> We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether

a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.

*Id.* § 685.300(f)(3)(iii)(B). And they mandated that the class-action waiver state the following:

We agree not to use any predispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.

*Id.* § 685.300(e)(3)(iii)(B).

**D. FCC's Waiver Notice**

In May 2019, consistent with these provisions, FCC sent a notice to its current students (the "Notice"). *See* Notice [ECF No. 81-2]. FCC sent the Notice to Britt, who was a current student at the time, but never sent it to Henry, who (by that time) had left the school. *See* Reply [ECF No. 83] at 4. In its cover email, FCC told its students that it was "providing [them] with the attached notice as a supplement to [their] Enrollment Agreement." *See* Notice. It then went on to say this:

When you enrolled at Florida Career College, you signed a pre-dispute arbitration agreement that contained a class action waiver. Under federal law, Florida Career College is providing you with the notice below. These provisions are included pursuant to U.S. Department of Education regulations at 34 C.F.R. § 685.300(e) and (f), respectively, and shall apply to your arbitration agreement with Florida Career College for any period during which these regulations are in effect. They apply only to claims concerning acts or omissions regarding the making of the Federal Direct Loan or the provision by Florida Career College of educational services for which the Federal Direct Loan was obtained. They do not affect the enforceability of the arbitration agreement with respect to any other claim.

(1) We agree not to use any predispute agreement to stop you from being part of a class action lawsuit in court. You may file a class action lawsuit in court or you may be a member of a class action lawsuit even if you do not file it. This provision applies only to class action claims concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the

Federal Direct Loan was obtained. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Federal Direct Loan or the provision of educational services for which the loan was obtained.

(2) We agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit concerning our acts or omissions regarding the making of the Federal Direct Loan or the provision by us of educational services for which the Federal Direct Loan was obtained. You may file a lawsuit regarding such a claim or you may be a member of a class action lawsuit regarding such a claim even if you do not file it. This provision does not apply to any other claims. We agree that only the court is to decide whether a claim asserted in the lawsuit is a claim regarding the making of the Direct Loan or the provision of educational services for which the loan was obtained.

*Id.* FCC thus waived its right to arbitrate "for any period during which these regulations [34 C.F.R. § 685.300(e) and (f)] are in effect." *Id.*

### E.  The 2019 Borrower Defense Regulations

On September 23, 2019, the Department of Education promulgated amendments to the Old Regulations (the "New Regulations"). *See* 84 Fed. Reg. 49,788 (Sept. 23, 2019) (codified in scattered sections of 34 C.F.R.). The New Regulations went into effect on July 1, 2020. *Id.* at 48,788. As relevant here, the New Regulations *removed* the requirement that schools agree to waive their arbitration agreements and class-action bans: "Under final § 685.300, paragraphs (d) through (i) finalized in the 2016 final regulations covering . . . class action bans [and] pre-dispute arbitration agreements . . . are removed from the regulations." *Id.* at 49,907. As the Department of Education explained, it had "decided to bring its policies to align more closely with the liberal federal policy favoring arbitration agreements." *Id.* at 49,840.

### F.  Our Case

The Plaintiffs filed this lawsuit on April 20, 2020. *See generally* Docket. About a month-and-a-half later, on June 1, 2020, FCC filed an (initial) motion to compel arbitration or, in the alternative, to dismiss. *See* Initial Motion to Compel Arbitration [ECF No. 24]. At that time, the Old Regulations

6

were still in effect. As a result, FCC relied—not on the view that its waiver was ineffectual—but on

the narrower contention that the Plaintiffs' claims didn't qualify as "borrower defense claims." *See*

Initial Motion to Compel Arbitration at 12–15. In advancing this argument, though, FCC observed

that "[t]he BDR Regulations are in flux," and it expressly "reserve[d] its right to compel arbitration of

any remaining claims in the event of new legal or factual developments." *Id.* at 9 & n.6. When it filed

its reply brief, on July 6, 2020, the New Regulations had gone into effect just five days earlier.

About five months later (on December 3, 2020), at the hearing on its initial motion to compel

arbitration, FCC told the Court that there'd been "a big change in the [legal] landscape." *See* Tr. [ECF

No. 65] at 5:3–11. It explained:

> The Department of Education regulation governing borrower's defense that was
> operative in 2017 has been dramatically amended and transformed and became
> effective on July 1st, 2020, a month after the motion was filed. And it became effective
> only after Congress tried to repeal it with a congressional review action, and that repeal
> was vetoed by President Trump, and then again only after Congress failed to do an
> override vote on June 28th.

*Id.* While noting that FCC hadn't pointed the Court to this change in the law in its "reply or in a

subsequent notice of supplemental briefing," the Court—to give both sides an adequate opportunity

to litigate the issue—nonetheless concluded as follows: "What I'll do is, I think I'll probably deny your

motion to arbitrate . . . [a]nd then you could just file a new . . . motion to arbitrate based on newly

developed facts[.]" *Id.* at 9:4–5, 11:17–22. The Court thus declined to "opine on [the issue] one way

or the other" without the benefit of full briefing. *Id.* at 14:1–2. Several months have passed, and the

issue is now ripe for resolution. *See* Motion [ECF No. 70]; Response [ECF No. 81]; Reply [ECF No.

83].

**THE LAW**

In 1925, Congress enacted the Federal Arbitration Act "[t]o overcome judicial resistance to arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). The purpose of the FAA was "to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that is speedier and less costly than litigation." *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (quoting *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005)). To that end, the FAA provides:

> A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "The FAA embodies a 'liberal federal policy favoring arbitration agreements.'" *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

**ANALYSIS**

In assessing a party's motion to compel arbitration, we ask whether: "(1) a written agreement exists between the parties containing an arbitration clause; (2) an arbitrable issue exists; and (3) the right to arbitration has not been waived." *Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004) (Altonaga, J.); *see also Emeric v. Fla. Fine Cars, Inc.*, 2019 WL 2269083, at *2 (S.D. Fla. May 28, 2019) (Gayles, J.) (same). We navigate through these three elements below.

**A.  The Parties Agreed to Arbitrate**

The parties in our case agreed to arbitrate. When Britt and Henry enrolled at FCC, they each executed an Enrollment Agreement that contained materially identical arbitration clauses, through

8

which the Plaintiffs promised that "[a]ny dispute I may bring against School . . . shall be resolved by binding arbitration." *See* Britt Enrollment Agreement at 4; Henry Enrollment Agreement at 4. Both students specifically *initialed* the arbitration clause, signifying their acceptance, and acknowledged that they had "read, underst[ood], and agree[d]" to the terms of the agreement. *See* Britt Enrollment Agreement at 4; Henry Enrollment Agreement at 4. The parties, in short, entered into a written arbitration agreement.

Looking to escape this conclusion, Britt and Henry argue that "there is no agreement with Defendants to arbitrate any of the claims" because FCC's Notice waiving arbitration "modified their contract and eliminated arbitration." Response at 10.[2] But FCC never purported to "eliminate[]" the

---

[2]    Britt and Henry contend that we should analyze that Notice as a *modification* to the contract—not a *waiver. See, e.g.,* Response at 11–12. They never explain why this matters—but, perhaps, they place so much importance on the modification-waiver distinction because "the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate." *Klay v. All Defendants,* 389 F.3d 1191, 1200 (11th Cir. 2004). In other words, Britt and Henry seem to think that any interpretive presumptions in favor of arbitration won't apply if we construe the Notice as a modification. But, because the plain language of FCC's Notice requires the parties to arbitrate, we needn't rely on any pro-arbitration interpretive cannons. So, we'll simply assume, as Britt and Henry request, that the Notice *modified* the parties' agreements.
    Britt and Henry also argue (in a footnote) that, even if the Notice doesn't bind FCC under a theory of waiver or modification, it should still constrain FCC's rights under a common law theory of promissory estoppel. *See* Response at 13 n.3. As Britt and Henry point out, "[t]o state a cause of action for promissory estoppel, it is necessary to show that (1) a plaintiff detrimentally relied on a promise made by a defendant, 2) that a defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance on the part of a plaintiff or a third person, and 3) that injustice can be avoided only by enforcement of the promise against a defendant." *Uphoff v. Wachovia Sec., LLC,* 2009 WL 5031345, at *4 (S.D. Fla. Dec. 15, 2009) (Marra, J.).
    There are (at least) four problems with this argument. *First,* Britt and Henry never assert a promissory-estoppel cause of action in their complaint. The Court identified this threshold problem at the initial motion-to-dismiss hearing. *See* Tr. at 9:16–21. But Britt and Henry chose not to add a promissory-estoppel count to their amended complaint. *Second,* the only reliance Britt and Henry point to is their "time and resources toward investigating the facts of this lawsuit and assisting their lawyers." Response at 13 n.3. But they never explain why they cannot seek remuneration for this (presumably minimal) time expenditure at arbitration. *Third,* Britt and Henry haven't alleged that they detrimentally

arbitration clause. Instead, FCC simply agreed "not to use any predispute arbitration agreement" *while*

the Old Regulations—which made federal aid contingent on the waiver—were "in effect." *See* Notice.

Here's the pertinent language:

> These provisions [agreeing not to enforce the arbitration agreements and class-action waivers] are included pursuant to U.S. Department of Education regulations at 34 C.F.R. § 685.300(e) and (f), respectively, and shall apply to your arbitration agreement with Florida Career College for any period during which these regulations are in effect.

Notice.

In interpreting arbitration agreements, courts generally "apply ordinary state-law principles."

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Larsen v. Citibank FSB*, 871 F.3d

1295, 1303 (11th Cir. 2017) (confirming that "state contract law governs the question whether an

agreement to arbitrate exists"). Under Florida law, "[t]he intent of the parties to a contract, as

manifested in the plain language of the arbitration provision and contract itself, determines whether a

dispute is subject to arbitration." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013); *see*

*also Citigroup, Inc. v. Amodio*, 894 So. 2d 296, 298–99 (Fla. 4th DCA 2005) ("Florida's general contract

law requires that the court discern the intent of the parties from the language used in their

agreement."); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56

---

relied *on FCC's waiver.* They don't say, for instance, that they *only* brought this case because they thought they wouldn't be required to arbitrate. *Fourth*, even if they *had* said that, any such belief—that, for instance, FCC wouldn't enforce its arbitration agreement or that no court would allow FCC to enforce that arbitration agreement—would've been unreasonable. FCC's Notice plainly stated that its waiver would remain applicable *only* for the period during which the Old Regulations were "in effect." And the New Regulations, which erased the relevant provisions of the old ones, were promulgated *before* the Plaintiffs filed their complaint. *Compare* 84 Fed. Reg. 49,788 (promulgated Sept. 23, 2019) *with* Compl. (filed Apr. 20, 2020). When they brought this lawsuit, in other words, the Plaintiffs understood that, in light of the changing legal landscape, they might be sent to binding arbitration.

(2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").[3]

  Here, the language of the Notice is *clear* that FCC's waiver of its right to arbitrate "shall apply to your arbitration agreement with Florida Career College for any period during which these regulations [34 C.F.R. § 685.300(e) and (f)] are in effect."[4] And those "regulations"—which required schools to waive their arbitration agreements and class-action bans—are *no longer in effect*. When the Department of Education promulgated the New Regulations, it "removed from the regulations" the provisions "covering . . . class action bans [and] pre-dispute arbitration agreements" (*i.e.*, the regulations in 34 C.F.R. § 685.300(e) and (f)). *See* 84 Fed. Reg. at 49,907. The New Regulations had an effective date of July 1, 2020. *Id.* Looking at the Code of Federal Regulations as it stands today, then, the Old Regulations—the ones FCC conditioned its waiver on—have been *removed*. 34 C.F.R. § 685.300 (2020). The "period" during which those Old Regulations were in effect has thus ended.[5]

  Trying to parry this result, Britt and Henry advance three arguments—all unconvincing.

---

[3] The parties never say what law (they think) applies. They did brief the case under Florida law, which makes sense, since all the events in this case (as far as we can tell) occurred in Florida. So, we'll just assume that Florida law applies. *Cf. Goodnight v. Bos. Sci. Corp.*, 2020 WL 6873737, at *1 (S.D. Fla. Nov. 23, 2020) (Altman, J.) (applying Florida law where "*both* parties have briefed the case's substantive and procedural questions under *Florida* law"). And it probably doesn't matter much which law applies because "[t]hese principles of contract construction are, in any event, matters of hornbook law." *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1061 (11th Cir. 1998) (Cox, J., concurring) (assuming that Florida law applied to an arbitration dispute where the parties didn't specify the applicable law).

[4] In this way, the Notice operated like a condition subsequent: once the Old Regulations were removed, FCC's obligation to waive its arbitration agreement was discharged. *See generally* 13 WILLISTON ON CONTRACTS § 38:9 (4th ed. updated May 2021) ("A condition subsequent has been defined as a future event, the happening of which discharges the parties from their otherwise binding agreement.").

[5] In addition to all this, FCC—as far as we can tell—never sent a notice to Henry. It's difficult to see, then, how FCC's waiver, however interpreted, could permit Henry to escape arbitration.

*First*, focusing on the Notice's use of the word "period," they contend that it would "make little sense" to interpret the word as "constituting anything other than a period during which claims arise." Response at 12–13. In support of this (strained) reading, they point to language in the Notice suggesting (for instance) that the waiver provisions "apply only to *claims* concerning acts or omissions regarding the making of the Federal Direct Loan or the provision by [FCC] of educational services for which the Federal Direct Loan was obtained." Notice (emphasis added). But we have no need to guess as to which "period" FCC had in mind. That's because the Notice expressly tells us that the relevant period is the "period *during which these regulations are in effect*." *Id.* (emphasis added). If FCC had wanted to, it could have easily said that the waiver applied to "*any claims* arising during a period in which the regulations were in effect." But it didn't say that. And "[n]othing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*)." SCALIA & GARNER at 93.

*Second*, Britt and Henry claim—in an argument that appears to mirror the first—that our (very plain) reading "ignores the entirety of the plain language of the waiver, which contemplates analyzing the issue of waiver at a time before the effective date of the New Regulations." Response at 12. "In other words," they say, the waiver applies because their "claims indisputably arose during a period to which 34 C.F.R. § 685.300(e) and (f) could be applied, and did not arise after the New Regulations became effective." *Id.* But, again, the Notice doesn't say that FCC's waiver operates as to "*any claims that arose* during a period in which the Regulations *could be applied*." And Florida law requires us to "discern the intent of the parties"—what (to use the Plaintiffs' words) the waiver "contemplates"— from the actual "language used in their agreement." *Amodio*, 894 So. 2d at 298–99. If anyone's reading is divorced from the text, in other words, it's the Plaintiffs'—not ours.

*Third*, Britt and Henry gesture obliquely towards "what all other courts have done, including the Eleventh Circuit," insisting that those courts "analyz[ed] the issue of waiver at a time before the effective date of the New Regulations." Response at 12. Here, we assume they're referring (primarily) to *Young v. Grand Canyon University, Inc.*, 980 F.3d 814 (11th Cir. 2020). But that decision doesn't require a different result in our case. In *Young*, Grand Canyon University—like FCC—sent its students a waiver when the Old Regulations went into effect, promising that "it wouldn't seek to enforce pre-dispute arbitration agreements and class-action waivers 'if [Young] assert[ed] a borrower defense claim, as that term is defined in 34 [C.F.R.] § 685.300(i)(1).'" *Id.* at 817 (quoting Grand Canyon's waiver notice). The question for the Eleventh Circuit was quite specific: what does the phrase "borrower defense claim" mean? *Id.* at 815. In answering that question, the court focused its attention on the Department of Education's Old Regulations, and—using those regulations—determined that the plaintiff's claims *were* borrower-defense claims, meaning that the students *weren't* required to arbitrate. *Id.* at 816 n.1, 821.

To be fair to the Plaintiffs, *Young* is (to our mind) ambiguous on the central question we face here: whether the school's obligation to waive its right to arbitration was a *contractual* or a *regulatory* requirement. In other words, the court's decision could be read to say that the school's obligation to waive arbitration arose *either* from its notice *or* from the regulations themselves.[6] Here's why that

---

[6] The only other decision Britt and Henry rely on—from the Georgia Court of Appeals—expressly recognized this dichotomy but declined to address it. As that court explained:

> GCU contends that even if Ward's claims qualify as borrower defense claims, the arbitration clause between the parties nonetheless should be enforced because § 685.300 merely governs the relationship between a school and the Department of Education and not the relationship between a school and its students. Thus, according

distinction matters in our case. If *Young* held only that a student's right to avoid arbitration stems from the school's waiver, then our simple contractual reading—that the waiver has expired because the Old Regulations are no longer "in effect"—settles the whole case. But, if *Young* concluded that the regulations independently operated to bar arbitration (in that case as well as ours), then—whatever the waiver says—the regulations may well have invalidated FCC's arbitration agreement. On closer inspection, though, we think that *either* reading of *Young* is consistent with the result we reach today. Here's why.

If we read *Young* as answering a contract question, then the case is easily distinguishable from ours—because Grand Canyon's waiver was completely different from FCC's. There, remember, Grand Canyon promised not to enforce its arbitration agreement "if [the student] assert[ed] a borrower defense claim, as that term is defined in 34 [C.F.R.] § 685.300(i)(1)." *Id.* at 817. Under this contractual reading, then, the *Young* Court turned to the regulations only for help in interpreting the crucial phrase—"borrower defense claim"—and, after some regulatory exegesis, did little more than conclude that the plaintiff *had* asserted borrowed defense claims. But Grand Canyon's notice *never* said—as FCC's does—that its waiver applied only so long as the Old Regulations were "in effect." As a result, the dispositive *contract* question in our case never came up in *Young*.

---

to GCU, the provisions of § 685.300 cannot be used by Ward to undo the valid arbitration agreement.

Regardless of whether the regulations do or do not provide a basis for a student to resist a motion to compel arbitration, GCU is foreclosed from seeking to enforce the arbitration clause it publicly announced it would not enforce as to borrower defense claims, as determined by a court.

*Grand Canyon Educ., Inc. v. Ward*, 855 S.E.2d 415, 421 (Ga. Ct. App. 2021).

Notice, though, how the Plaintiffs' alternate reading of *Young*—in which *Young* is seen as holding that the regulations *themselves* prohibited Grand Canyon from arbitrating[7]—doesn't change our conclusion. Recall that, in *Young*, the Eleventh Circuit had every reason to assume that the regulations—rather than the waiver—was doing the heavy lifting because the parties *never presented* this contract-v.-regulation dichotomy (the one that's so crucial to our case) in that appeal. As the Eleventh Circuit noted in a footnote:

> For the first time at oral argument, Grand Canyon asserted a new argument—namely, that even if the borrower-defense regulations apply, reading them to invalidate an otherwise enforceable arbitration agreement would contravene the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* Grand Canyon, however, has waived this argument, which it failed to present either to the district court or in its brief to us.

*Id.* at 821 n.4. In other words, the court had no need to consider whether it was the contract *or* the regulations that precluded the school's motion to compel, because the school had never argued that it would be unlawful for the regulations *themselves* to require that result.

This may also explain why the court elected to reach a separate question in that case: whether the New Regulations apply retroactively. *Id.* at 816 n.1. Because the parties assumed that the *regulations* controlled their legal relationship, deciding *which* set of regulations to apply mattered a great deal: the Old Regulations, after all, prohibited arbitration while the new ones permitted it. *Compare* 34 C.F.R. § 685.300 (2018) *with* 34 C.F.R. § 685.300 (2020). The court was thus forced to decide that question—which it did by saying that "President Trump's Department of Education amended the borrower-

---

[7] The Plaintiffs' reading of *Young*, for what it's worth, finds support in at least three different parts of the Eleventh Circuit's opinion. *See Young*, 980 F.3d at 815 ("One section of that regulation pretty clearly prohibits a college or university that accepts federal student-loan money from enforcing pre-dispute arbitration agreements . . . ."); *id.* at 816 ("[T]he Obama-era § 685.300 prohibited schools from entering into or relying on pre-dispute arbitration agreements . . . ."); *id.* at 821 (concluding that the regulations "prohibit[] Grand Canyon from enforcing its pre-dispute arbitration agreement with respect to Young's claims").

defense regulations in 2018. Those amendments, though, apply only to loans distributed on or after July 1, 2020, and are therefore inapplicable here." *Id.* at 816 n.1. Overanalyzing this footnote, the parties in our case vigorously debate whether the New Regulations are retroactive (this, despite the Eleventh Circuit's rather clear ruling on the issue)—apparently assuming that, if they aren't, the students can invoke the Old Regulations to avoid arbitration.

But it's not at all clear to us that this retroactivity debate is in the least bit relevant to our facts. Suppose, for instance, that we decide to read *Young* as a contract case. In that scenario, of course, the question of whether the New Regulations apply retroactively would seem inapposite. In *Young*, after all, the Old Regulations *obviously* governed the meaning of the phrase "borrower defense claims." Indeed, the *Young* waiver, by its terms, applied only to a "borrower defense claim, as that term is defined in 34 [C.F.R.] § 685.300(i)(1)." Since that provision—§ 685.300(i)(1)—*only* existed in the Old Regulations (it having been removed in the New Regulations), the Old Regulations unambiguously supplied the applicable definition. But that's not true in our case. For starters, we don't need to decide whether the Plaintiffs' claims qualify as "borrower defense claims" because we've already held that they do. Tr. at 30:20–31:9 ("I find that the claims are all borrower defense claims."). So, at least in that respect, we have no similar need to draw from the Old Regulations a definition that only existed there. More fundamentally, though, in the circumstances of our case, it doesn't really make sense to ask whether the New Regulations apply retroactively. That's because, unlike the waiver in *Young*, FCC's waiver was limited only to the period during which the Old Regulations were "in effect." Since those Old Regulations are no longer in effect, the waiver has expired by the terms of its own internal contingency—which is to say, expired for reasons having *nothing* to do with any retroactive application of the New Regulations.

If, on the other hand, we read *Young* as a regulatory case, then the question of retroactivity is mostly irrelevant because our case *does* squarely pose the question the *Young* Court wasn't asked to reach: whether students—like Britt and Henry—*even* have a right to invoke the regulations for their own benefit. Answering that question today, we think—for three reasons—that they don't. *First*, to construe the Old Regulations as invalidating a certain class of arbitration clauses would be to bring them into direct conflict with the seemingly straightforward dictates of the FAA. Since we shouldn't lightly assume that the Department of Education purposefully promulgated a set of unlawful regulations, we should probably read those regulations as suggesting that the Department intended no such thing. And, in fact, we needn't speculate about the Department's intentions because, to its credit, the Department made clear (in its Final Regulations) that the arbitration restriction *shouldn't* be read as displacing the FAA:

> [T]he Department does not have the authority, and does not propose, to displace or diminish the effect of the FAA. . . . These regulations do not invalidate any arbitration agreement, whether already in existence or obtained in the future. *Moreover, the Department does not have the authority to invalidate any arbitration agreement, did not propose to do [so], and does not in this final rule attempt to do so.*

81 Fed. Reg. at 76,023 (emphasis added). In other words, rather than invalidate any existing arbitration clause, the Department of Education simply conditioned participation in its programs on a school's promise not to enforce its arbitration agreements. 34 C.F.R. § 685.300 (2018) (setting out the conditions of a program participation agreement). As the D.C. District Court recently explained:

> [The parties] agree that the FAA would displace a federal rule that declared particular arbitration agreements invalid or unenforceable. . . . . But that is not what the 2016 Rule did. To the contrary, the Department acknowledged that it lacks "the authority, and does not propose, to displace or diminish the effect of the FAA." 81 Fed. Reg. at 76,023. Consistent with that understanding, the 2016 Rule "does not invalidate any arbitration agreement, whether already in existence or obtained in the future." *Id.* Institutions of higher education remain free to seek and to invoke predispute class action waivers and arbitration agreements, and, when confronted with any such

agreement that is otherwise enforceable, courts must—and will—enforce the agreement. The 2016 Rule does not provide a basis for a student to resist a motion to compel arbitration, *see* 9 U.S.C. § 4, or to stay a judicial proceeding pending arbitration, *see id.* § 3. Instead, the regulations "impose a condition on the participation of a school in" the Direct Loan program, "a Federal program in which Congress explicitly stated that 'no institution shall have a right to participate.'" 81 Fed. Reg. at 76,023 (quoting 20 U.S.C. § 1087b(b)). In other words, if a school wants to participate in a federal program and to benefit from the many billions of dollars that the United States distributes in Direct Loans every year, it must agree to abide by the conditions that the Secretary reasonably determines are necessary to protect the public fisc and the integrity of the program. *See* 20 U.S.C. § 1087d(a)(6).

*Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 436 F. Supp. 3d 333, 343–44 (D.D.C. 2020) (Moss, J.), *vacated as moot*, 2020 WL 9171125 (D.C. Cir. Oct. 14, 2020). Our Plaintiffs, in short, have no authority to *invoke* the regulations, *enforce* the regulations, or deploy the regulations to *invalidate* their arbitration agreements. As we've said, to say otherwise would raise serious questions about the legality of the Old Regulations. Why? Because, in our constitutional system, an agency regulation cannot displace, supplant, or conflict with the requirements of a congressional statute. *See In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1255 (11th Cir. 2020) ("The Administrative Procedure Act requires that we 'hold unlawful and set aside agency action' that is 'in excess of statutory jurisdiction, authority, or limitations.'" (quoting 5 U.S.C. § 706(2)(C)). And, if the Plaintiffs are right—if the regulations invalidated, revoked, or otherwise rendered unenforceable their arbitration agreements—then those regulations would (very likely) conflict with the FAA's clear directive that arbitration clauses "shall be valid, irrevocable, and enforceable[.]" 9 U.S.C. § 2. As we've said, the Department of Education has made clear that the regulations did no such thing. *See* 81 Fed. Reg. at 76,023.

*Second*, in interpreting the HEA (the statute that authorized the regulations at issue here), the Eleventh Circuit has held that, "[w]hile the HEA endows [students] with certain rights . . . , the HEA expressly empowers only the Secretary of Education—not [students]—with the authority to enforce

18

the HEA and rectify HEA violations." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1123 (11th Cir. 2004); *see also McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1223 (11th Cir. 2002) ("In enacting the HEA, Congress expressly provided a detailed regulatory scheme which confers on the Secretary of Education the exclusive authority to monitor and enforce the provisions of the HEA."); *L'ggrke v. Benkula*, 966 F.2d 1346, 1348 (10th Cir. 1992) ("The express language of the Higher Education Act, and the regulations promulgated thereunder, does not create a private cause of action . . . . No provision provides for student enforcement or entitlement to civil damages.").[8] So, even though the Old Regulations required participating institutions to agree to litigate their students' claims in court, the Secretary—*not* the students—has the exclusive power to enforce that agreement.[9]

---

[8] Authority on this point abounds. *See, e.g.*, *Slovinec v. DePaul Univ.*, 332 F.3d 1068, 1069 (7th Cir. 2003) ("The HEA . . . is a funding statute, attaching conditions to grants, scholarships, and guarantees underwritten by the national government. Congress provided in each statute for enforcement by the national government, and in the HEA for enforcement against the Secretary of Education as well. *See* 20 U.S.C. § 1082(a)(2). Neither statute authorizes litigation by a private plaintiff against anyone other than the Secretary. If the Secretary is not doing his job in holding recipients to the conditions of federal support, then complaint should be made of the Secretary and may be renewed in court if the Secretary declines to act and if the would-be plaintiff has standing."); *Labickas v. Ark. State Univ.*, 78 F.3d 333, 334 (8th Cir. 1996) ("We conclude that no private right of action is implied under the HEA for student borrowers. The HEA specifies that the Secretary of Education has the power to carry out the Act's purposes; the Secretary has promulgated numerous and comprehensive regulations that regulate educational institutions' compliance with the HEA; and the statute and legislative history do not otherwise suggest congressional intent to create a private remedy."); *Paine Coll. v. S. Ass'n of Colleges & Sch. Comm'n on Colleges, Inc.*, 342 F. Supp. 3d 1321, 1332 (N.D. Ga. 2018) (concluding, even after amendments to the HEA, that "no private right of action exists under the Higher Education Act").

[9] Indeed, the HEA and its regulations set out a comprehensive scheme through which the Secretary can enforce its provisions. For example, the Secretary is authorized to limit, suspend, or terminate a school's participation in any Title IV program or to impose civil penalties on non-compliant institutions. *See* 20 U.S.C. § 1094(c)(1)(F) (2016); *see also* 34 C.F.R. 668.81 (2018) (establishing regulations for fines and the limitation, suspension, or termination of an institution in a Title IV program). One could argue that FCC has violated its agreement with the federal government. After all, for loans disbursed on or before July 1, 2020, FCC promised the federal government that it would *not* move to compel arbitration. In moving to compel arbitration here, then, it's (arguably) done precisely what it promised not to do. FCC seems to think that it isn't violating its agreement with the

*Third*, the structure of the Old Regulations supports our view that students—like Britt and Henry—have *no* right to rely on those regulations to defeat a motion to compel arbitration. The requirement that schools waive their arbitration clauses was found in a section titled "[a]greements between an eligible school and the Secretary for participation in the Direct Loan Program." 34 C.F.R. § 685.300 (2018). That section required participating schools to "[e]nter into a written program participation agreement with the Secretary." *Id.* § 685.300(a)(2). And it added that the school "must agree to . . . [c]omply with the provisions of paragraphs (d) through (i) of this section regarding student claims and disputes." *Id.* § 685.300(b)(11). The agreements to waive arbitration clauses and class-action bans are found in paragraphs (e) and (f). *Id.* § 685.300(e), (f). The obvious inference to draw from all this is that the Old Regulations did little more than outline the terms of a contract between the school and the federal government. This means that, if the school violates its agreements or goes back on its promises, the Secretary of Education may well have a cause of action against it. But the regulations appear to have no bearing, strictly speaking, on the school's agreement with its students. *That* relationship is governed *only* by the agreements the students have entered into with the school.[10]

---

federal government because (it says) the New Regulations apply retroactively in the sense that—like the *Kol Nidrei*—they absolve FCC of its earlier promise. The problem, from FCC's perspective, is that the Eleventh Circuit seems to have rejected this position by concluding that the New Regulations do *not* apply retroactively. As the *Young* Court explained: "President Trump's Department of Education amended the borrower-defense regulations in 2018. Those amendments, though, apply only to loans distributed on or after July 1, 2020, and are therefore inapplicable here." 980 F.3d at 816 n.1 (citing 34 C.F.R. § 685.300 (2020) and 84 Fed. Reg. at 49,788 (Sept. 23, 2019)); *see also Ward*, 855 S.E.2d at 418 n.1 ("On September 23, 2019, the Department of Education issued a final rule rescinding the predispute class action and arbitration waiver conditions of the 2016 amendments; however, this change applies only to loans distributed on or after July 1, 2020, and therefore is not implicated in this case."). In any event, whether the federal government has grounds to assert an enforcement action against FCC is a question we need not—and do not—reach today.

[10] Take a hypothetical. Imagine that A enters into a contract with B and that, in the contract, B agrees not to enforce arbitration agreements against any other person. Imagine, too, that C sues B, who

Here's where all of this leaves us: If *Young* was a contract case—*i.e.*, if it held only that the school's notice had worked a waiver of the arbitration clause—then it's completely distinguishable from our case because the Eleventh Circuit wasn't there faced with the central question we have here: whether the Old Regulations are still "in effect." Since the Old Regulations aren't "in effect," FCC's waiver is no longer applicable. If, on the other hand, *Young* is a regulatory case—*i.e.*, if it determined that the *regulations*, standing alone, vitiated the arbitration clause—then it should be seen as assuming that students could invoke the Old Regulations to invalidate an arbitration agreement *only* because the parties never raised (or briefed) that issue. Since the issue has been squarely presented here, we hold that students have *no* independent right to call on the Old Regulations to invalidate an otherwise-valid arbitration clause. Either way, in sum, *Young* doesn't affect our result.[11]

---

promptly moves to compel arbitration. Can C escape arbitration by invoking the contractual provision B signed with A? Probably not. We say "probably" because C might (we suppose) make some hay by recasting itself as a third-party beneficiary to the contract between A and B. There are, of course, problems with this theory, too—but we needn't worry too much about them here because, by never mentioning any of this, the Plaintiffs have indisputably waived the point. *See, e.g.*, *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").

[11] Britt and Henry *could have* argued that the Old Regulations *are* still "in effect" as to their loans, citing the Eleventh Circuit's holding in *Young* that the New Regulations apply only to loans disbursed on or after July 1, 2020. Because Britt and Henry's loans were disbursed *before* July 1, 2020, the Old Regulations *might* still apply to them. Again, however, the Plaintiffs have waived this point. *See In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it.").

Even if they hadn't waived it, though, we likely wouldn't find the argument persuasive. *First*, ordinary English usage strongly supports FCC's view that the Old Regulations are *no longer* in effect, even if, as *Young* said, they still govern (or apply to) *some* claims. To help illustrate this point, we've devised the following sentence: "Because the New Regulations are not retroactive, the Old Regulations—which are no longer *in effect*—continue to *govern* loans disbursed before July 1, 2020." As the sentence demonstrates, we can use regular English words to distinguish between the one concept

## B.  The Issues Are Arbitrable

In assessing the scope of an arbitration agreement, the Supreme Court has said that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses*, 460 U.S. at 24–25). "There also is nothing unusual about an arbitration clause . . . that requires arbitration of all disputes between the parties to the agreement. We have enforced such a clause before because it evinced a clear intent to cover more than just those matters set forth in the contract." *Bd. of Trustees of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Markets, Inc.*, 622 F.3d 1335, 1343 (11th Cir. 2010) (cleaned up).

---

(whether the regulations are still *in effect*) and the other (whether the Old Regulations *govern* the Plaintiffs' claims). And we can think of other ways to do this without losing our meaning. For example: "Although the Old Regulations are no longer in effect, they still *apply* to loans disbursed before July 1, 2020." The point is that the Old Regulations still govern—or apply to—*some* loans (the gravamen of *Young's* note 1) without being "in effect" for purposes of FCC's Notice.

    *Second*, dictionary definitions bolster our conclusion that the Old Regulations are *not* "in effect." *Cf. United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009) ("To ascertain ordinary meaning, courts often turn to dictionary definitions for guidance."). The Oxford English Dictionary, for instance, defines "in effect" as "[t]he state or fact of being operative or in force." *In Effect*, OXFORD ENGLISH DICTIONARY (updated June 2021). To be "in force" is to be "operative or binding at the time." *In Force*, OXFORD ENGLISH DICTIONARY (updated June 2021). And we think it beyond peradventure to say, as of July 1, 2020—when the New Regulations *erased* the old ones— that the Old Regulations are *neither* operative *nor* binding. Of course, the Plaintiffs could have argued that the Old Regulations *are* still "in effect" to the extent they're operative and binding *as to their loans*. But the Notice doesn't say that the waiver is binding ". . . for any period during which these regulations are in effect *as to your loans*." That this crucial sentence ends after the words "in effect" makes plain that the relevant question is whether the regulations are operative or binding *generally*—and not as to any specific loan. In any event, as we've hinted, the Plaintiffs have waived this argument, too, by failing to raise it.

    *Third*, federal courts consistently use the phrase "in effect" in a way that supports our conclusion that the Old Regulations are no longer *in effect*—even if they do still *govern* loans disbursed before July 1, 2020. *See, e.g.*, *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 n.1 (2011) (noting that "in 2009 the Board amended Regulation Z, such that the provisions discussed in this opinion are no longer *in effect*," even though "the pre–2009 provisions are the ones *applicable to the case before us*" (emphasis added)).

Our parties have agreed to submit "[a]ny dispute . . . no matter how characterized, pleaded or styled. . . [to] binding arbitration." Britt Enrollment Agreement at 4; Henry Enrollment Agreement at 4. That expansive opening clause—covering *any* dispute—plainly includes the claims the Plaintiffs have filed here. *See, e.g., Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1220 (11th Cir. 2000) (enforcing a similar arbitration clause, which stipulated that "any dispute between [the parties] . . . shall be resolved by binding arbitration"); *Southland Health Servs., Inc. v. Bank of Vernon*, 887 F. Supp. 2d 1158, 1164 (N.D. Ala. 2012) (enforcing a similar arbitration clause, which provided that "all disputes, claims, or controversies . . . shall be resolved by arbitration"). Unsurprisingly, Britt and Henry never dispute this point.

### C.  FCC Has Not Waived its Right to Arbitrate

Because FCC has consistently pushed for arbitration—from the very beginning of this case— it hasn't, by its conduct, waived its right to arbitrate, implicitly or otherwise. "An agreement to arbitrate, just like any other contract, may be waived." *Citibank, N.A. v. Stok & Assocs., P.A.*, 387 F. App'x 921, 923 (11th Cir. 2010) (cleaned up). At the same time, "because federal law favors arbitration, any party arguing waiver of arbitration bears a heavy burden of proof." *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018) (quoting *Stone v. E.F. Hutton & Co.*, 898 F.2d 1542, 1543 (11th Cir. 1990)); *see also Moses*, 460 U.S. at 25 (noting that any "doubts" as to "waiver" should be "resolved in favor of arbitration").

"In determining whether a party has waived its right to arbitrate, we have established a two-part test." *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1315 (11th Cir. 2002). *First*, "we decide if, under the totality of the circumstances, the party has acted inconsistently with the arbitration right." *Id.* at 1315–16 (cleaned up). *Second*, "we look to see whether, by doing so, that party has in some way

23

prejudiced the other party." *Id.* at 1316 (cleaned up). "Careful examination of our precedent reveals that the purpose of the waiver doctrine is to prevent litigants from abusing the judicial process. Acting in a manner inconsistent with one's arbitration rights and then changing course mid-journey smacks of outcome-oriented gamesmanship played on the court and the opposing party's dime." *Gutierrez*, 889 F.3d at 1236. As we explain below, Britt and Henry stumble at both steps: they can show neither that FCC acted inconsistently with its right to arbitrate nor that they've been prejudiced in any meaningful way.

### 1. FCC Hasn't Acted Inconsistently with its Right to Arbitrate

A party acts inconsistently with a right to arbitrate where it "substantially invokes the litigation machinery prior to demanding arbitration." *S & H Contractors v. A.J. Taft Coal Co., Inc.*, 906 F.2d 1507, 1514 (11th Cir. 1990) (cleaned up). That didn't happen here. This case was filed on April 20, 2020. FCC moved to compel arbitration less than two months later, on June 1, 2020. And its position hasn't changed since: from that point on, FCC has insisted that this case be sent to arbitration.

Nor has FCC invoked the "litigation machinery prior to demanding arbitration." To the contrary, FCC sought to stay discovery pending our resolution of its motion to compel. *See* Motion to Stay [ECF No. 34]. And it only later participated in discovery because we denied the stay. *See* Order Denying Stay [ECF No. 46]. Far from acting *inconsistently* with its right to arbitrate, then, FCC has pressed the point throughout the pendency of this litigation.

The Plaintiffs contend that FCC's "arguments regarding the New Regulations have been waived," Response at 7—principally because FCC failed to raise the issue in its *initial* motion to compel. For three reasons, we disagree.

*First*, "[t]his circuit does not require a litigant to engage in futile gestures merely to avoid a claim of waiver." *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir. 1986). And, at the time FCC filed its initial motion to compel arbitration, the New Regulations hadn't taken effect. In fact, there was some uncertainty—given the political climate—as to whether those regulations would *ever* go into effect. *See* Tr. at 5:3–11 (describing this uncertainty). It was thus entirely sensible for FCC not to rely, in its initial motion, on the tenuous position that the New Regulations—which were not then (and might never be) in effect—required arbitration. To invoke the New Regulations at that point "would almost certainly have been futile." *Miller*, 791 F.2d at 854. Thus, "[t]o find that [FCC] waived a right [it] did not have until after [the New Regulations went into effect] is not only illogical, but also would encourage litigants, in order to avoid a finding of waiver, to file motions they knew to be futile." *Ackerberg v. Johnson*, 892 F.2d 1328, 1333 (8th Cir. 1989).

And, while Britt and Henry are right to say that the New Regulations *did* take effect before FCC filed its reply, it would've been no less futile for FCC to raise the point then. That's because we typically refuse to consider arguments that are only made for the first time in reply. *Kellner v. NCL (Bahamas), LTD.*, 753 F. App'x 662, 667 (11th Cir. 2018) ("[I]t is by now clear that we cannot consider arguments raised for the first time in a reply brief."); *Oliveiri v. United States*, 717 F. App'x 966, 967 (11th Cir. 2018) (finding that the district court properly declined to consider an argument because the party "raised it for the first time in his reply"); *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1352 n.11 (11th Cir. 2009) ("Because they raised this argument for the first time in their reply brief, we treat this argument as waived.").

*Second*, even if it wouldn't have been futile for FCC to rely on the New Regulations in its reply (or in a notice of supplemental authority), that still wouldn't be enough to find that FCC waived its

right to arbitrate. After all, a mere five (or so) months had passed between the effective date of the New Regulations and our hearing on the motion to compel. *Compare* 84 Fed. Reg. at 49,788 (effective July 1, 2020) *with* Paperless Minute Entry [ECF No. 61] (showing that hearing on initial motion to compel took place on December 3, 2020). And courts generally refuse to find waiver in the face of similarly minor delays. *See, e.g., Sherrard v. Macy's Sys. & Tech. Inc.*, 724 F. App'x 736, 740 (11th Cir. 2018) (citing favorably a Second Circuit decision that found that neither filing an answer nor waiting four months to seek arbitration were sufficient to support a claim of waiver); *Hodgson v. Royal Caribbean Cruises, Ltd.*, 706 F. Supp. 2d 1248, 1257 (S.D. Fla. 2009) (Altonaga, J.) (finding "six months' delay" insufficient to establish waiver); *Pecou v. Royal Caribbean Cruises, Ltd.*, 2011 WL 13223743, at *4 (S.D. Fla. Dec. 20, 2011) (Scola, J.) ("Here, the eight-month delay is not helpful for the purpose of showing [an] intent [to waive arbitration] because Royal Caribbean already clearly indicated an intent to arbitrate the dispute in its first motion [to compel arbitration].").

Indeed, even a delay—without more—isn't enough to support a viable claim of waiver. "Although delay is undoubtedly a factor to be considered, in our precedent where waiver was found, the delay was always coupled with other substantial conduct inconsistent with an intent to arbitrate." *Grigsby & Assocs., Inc. v. M Sec. Inv.*, 635 F. App'x 728, 733 (11th Cir. 2015); *see also Dockeray v. Carnival Corp.*, 724 F. Supp. 2d 1216, 1222 (S.D. Fla. 2010) (Altonaga, J.) (noting that the length of delay is not dispositive and that "[t]he length of delay . . . must be evaluated in the context of litigation activities engaged in during that time" (cleaned up)). As we've said, a party acts inconsistently with its right to arbitrate when it "*substantially* invokes the litigation machinery prior to demanding arbitration." *S & H Contractors*, 906 F.2d at 1514 (emphasis added & cleaned up). FCC hasn't come anywhere close to that line. Britt and Henry, in fact, can muster only five filings FCC has made between the day the New

26

Regulations took effect and our hearing on the initial motion to compel—where FCC first told us that the New Regulations had changed the legal landscape. Even those five submissions demonstrate that FCC engaged in no such substantial invocation of the litigation machinery. One of those five is actually FCC's reply in support of its initial motion to compel—a filing we can't, in good conscience, separate from FCC's demand for arbitration. The other four filings were (1) FCC's briefs in support of a motion to *stay* discovery [ECF Nos. 34, 39]; and (2) FCC's briefs for a motion seeking an order relieving it of its discovery obligations [ECF Nos. 43, 45]. Of course, these submissions manifest an intent to *avoid* the litigation machinery, not to *invoke* it.

At the end of the day, this isn't the case of "a defendant who elects to forego arbitration when it believes that the outcome in litigation will be favorable to it, . . . and then suddenly changes course and pursues arbitration when its prospects of victory in litigation dim." *Gutierrez*, 889 F.3d at 1236. To the contrary, in its in initial motion to compel, FCC specifically observed that "[t]he BDR Regulations are in flux" and "reserve[d] its right to compel arbitration of any remaining claims in the event of new legal or factual developments." Initial Motion to Compel at 9 & n.6. And FCC brought the New Regulations to our attention at the *very* beginning of oral argument—*before* we'd made any substantive rulings. *See* Tr. at 5:3–11. This chronology, in sum, belies the Plaintiffs' contention that FCC is relying on the New Regulations in a sudden attempt to get out of a case it was already losing.

*Third*, when examined closely, the Plaintiffs' waiver position seems to be, not that FCC waived its *right* to arbitrate, but only that FCC waived its *argument* that the New Regulations vitiated the arbitration waiver.[12] None of the Plaintiffs' cases, however, supports this contention. Those cases all

---

[12] Britt and Henry are right when they say that arbitration isn't jurisdictional—in the sense that the right to arbitrate *can* be waived. *Johnson v. Orkin, LLC*, 556 F. App'x 543, 544 (7th Cir. 2014) ("An

involved parties who waited until *after* the court had denied their motions to advance arguments that were available to them *before* they filed their motions. *See Silva v. Pro Transp., Inc.*, 2016 WL 11547502, at *2 (S.D. Fla. Sept. 30, 2016) (Scola, J.) (declining to entertain, after ruling on a summary-judgment motion, "arguments that either should have been raised during summary judgment proceedings or were raised and rejected"); *Montgomery v. Great Am. Assurance Co.*, 2013 WL 12093809, at *2 (S.D. Fla. Apr. 8, 2013) (Lenard, J.) (refusing to consider, after ruling on two summary-judgment motions, arguments seeking "reconsideration of the Court's prior summary judgment ruling" that were premised on claims "that were available but never raised in its myriad of previous filings"); *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 958 (11th Cir. 2009) (refusing to consider arguments not presented to the district court).

Indeed, the Plaintiffs' own cases support the commonsense proposition that we "may grant reconsideration when there is . . . an intervening change in controlling law." *Sporea v. Regions Bank N.A.*, 2020 WL 820269, at *1 (S.D. Fla. Feb. 19, 2020) (Bloom, J.). But they point to no case—and we haven't found any—for the illogical view that a court is powerless to allow supplemental briefing on an issue that's been affected by an intervening change in the law. Nor have they shown that our decision to permit FCC to include its New-Regulation arguments in a renewed motion to compel was in any way ill-conceived or improper. They've thus failed to meet the "heavy burden of proof" that's required to show that FCC acted inconsistently with its right to arbitrate. *Gutierrez*, 889 F.3d at 1236.

---

arbitration agreement, however, can be waived by the parties, so the effect of such an agreement on a lawsuit is not jurisdictional."). But that doesn't help us understand whether FCC waived its right to arbitrate here.

## 2. FCC Has Caused No Prejudice

Britt and Henry haven't shown that they've been prejudiced by any delay in sending this case to arbitration. To evaluate this prejudice prong, we consider "the length of delay in demanding arbitration," "the use of pre-trial discovery procedures by a party seeking arbitration," and "the expense incurred by the party alleging prejudice from participating in the litigation process." *Stok*, 387 F. App'x at 924 (cleaned up). All of these factors weigh in favor of FCC: *First*, FCC has pursued arbitration from the inception of this case. *Second*, to the extent FCC has engaged in discovery, it did so only because Britt and Henry opposed—and this Court denied—FCC's request for a stay. *Third*, other than asserting, in the most general way, that they "expend[ed] their time and resources toward investigating the facts of this lawsuit and assisting their lawyers," Response at 13 n.3, the Plaintiffs haven't shown any significant financial hardship. In other words, they have "presented no evidence in support of this claim." *Drexel Burnham Lambert, Inc. v. Warner*, 665 F. Supp. 1549, 1553 (S.D. Fla. 1987) (Paine, J.) (finding no prejudice to support claim that defendant waived an arbitration agreement). And, in any event, "incurring minimal fees in responding to lawsuits is insufficient to establish prejudice supporting a finding of waiver." *Grigsby*, 635 F. App'x at 733.

### CONCLUSION

After a careful review of the record, the briefing, and the applicable law, the Court hereby

**ORDERS AND ADJUDGES** as follows:

1. The Motion to Compel Arbitration [ECF No. 70] is **GRANTED**.

2. The parties shall submit their dispute to individual arbitration.[13]

---

[13] There's no dispute that, if the parties do arbitrate, they must do so on an individualized basis. *See* Britt Enrollment Agreement at 4 (agreeing to bring suit "solely in my individual capacity"); Henry

3. This case is **STAYED** pending arbitration.

4. The Clerk shall **CLOSE** this case. All pending deadlines and hearings are **TERMINATED**, and any pending motions are **DENIED AS MOOT**.

5. Every **ninety (90) days** from the date of this Order, the parties shall jointly file a report on the status of their arbitration proceedings.

6. Within **fifteen (15)** days of the arbitration's conclusion, the parties shall jointly file a notice briefly describing the outcome of that arbitration.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 13th day of September 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

Enrollment Agreement at 4 (agreeing to bring suit "solely in my individual capacity"). That's because the agreement to forego class-wide arbitration *is* enforceable. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) ("Requiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA.").