## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-cv-60814-ALTMAN

**KAREEM BRITT**, *et al.*,

     *Plaintiffs,*

*v.*

**IEC CORP.**, *et al.*,

     *Defendants.*

_____/

### OMNIBUS ORDER

On September 13, 2021, we granted FCC's Motion to Compel Arbitration (the "Motion to Compel") [ECF No. 70]. *See* Order Granting the Motion to Compel Arbitration (the "Order") [ECF No. 143]. Unhappy with our ruling, the Plaintiffs have now filed *both* a Motion for Reconsideration under Rule 59(e) (the "Motion for Reconsideration") [ECF No. 144] and a Motion to Certify the Order Compelling Arbitration for Interlocutory Review (the "Motion to Certify") [ECF No. 145]. But, because the Plaintiffs are really just looking for a "second bite at the apple," *O'Neal v. Kennamer*, 958 F.2d 1044, 1047 (11th Cir. 1992), their motions fail to justify the "extraordinary" relief they've requested. The motions are **DENIED**.

### BACKGROUND

The Plaintiffs, Kareem Britt and Sharon Henry, are former students at the Florida Career College ("FCC"). When they enrolled, both Britt and Henry agreed to arbitrate any claims they might later have against the school. *See* Britt Enrollment Agreement [ECF No. 70-2] at 4; Henry Enrollment Agreement [ECF No. 70-4] at 4. In 2016, the Department of Education ("DOE") promulgated several regulations that required schools participating in a federal student-loan program to refrain from enforcing any pre-dispute arbitration agreements or class-action waivers they'd signed with their

students. *See* 81 Fed. Reg. 75,926 (Nov. 1, 2016) (codified in scattered sections of 34 C.F.R.) (the "Old Regulations"). To comply with the Old Regulations, FCC sent its students a notice updating their enrollment agreements (the "Notice") [ECF No. 81-2]. In the Notice, FCC waived its right to arbitrate—and made clear that its waiver would "apply to your arbitration agreement with [FCC] for any period of time during which these regulations are in effect." Notice at 3. In July 2020, while this case was pending, a new set of regulations took effect. *See* 84 Fed. Reg. 49,788 (Sept. 23, 2019) (codified in scattered sections of 34 C.F.R.) (the "New Regulations").[1] The New Regulations removed the Old Regulations' requirement that participating schools waive their arbitration agreements and class-action bans. On this crucial issue, it provided as follows: "Under final § 685.300, paragraphs (d) through (i) finalized in the 2016 final regulations covering . . . class action bans [and] pre-dispute arbitration agreements . . . are removed from the regulations." *Id.* at 49,907.

When the New Regulations came into effect, we allowed FCC to re-brief its then-pending motion to compel arbitration. *See* Order at 7. In that second round of motions practice, FCC argued that, because the Notice's arbitration waiver was expressly limited to "any period of time during which [the Old Regulations] are in effect," FCC was no longer precluded from enforcing the arbitration agreements Britt and Henry had signed in 2018 and 2016, respectively. Finding this argument persuasive, we granted FCC's Motion to Compel Arbitration. *See* Order at 29. Since then, the parties agree, neither the facts nor the law has changed.

## ANALYSIS

### I.     The Motion for Reconsideration

"The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (cleaned up); *see also Eveillard*

---

[1] The New Regulations were actually promulgated on September 23, 2019, *see generally* 84 Fed. Reg. 49,788 (Sept. 23, 2019)—some seven months *before* the Plaintiffs filed this lawsuit (on April 20, 2020).

*v. Nationstar Mortg. LLC*, 2015 WL 1191170, at *5 (S.D. Fla. Mar. 16, 2015) (noting that "an intervening change in controlling law" may serve as a basis for Rule 59 relief); *United States v. Russell*, 994 F.3d 1230, 1243 n.4 (11th Cir. 2021) ("[R]econsideration is justified in civil cases when there is (1) an intervening change in controlling law; (2) the availability of new evidence; [or] (3) the need to correct clear error or prevent manifest injustice." (cleaned up)). "[C]lear error or manifest injustice occurs where the Court 'has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension[.]'" *Great Lakes Ins. SE v. Boat Rental Miami, Inc.*, 2020 WL 264674, at *6 (S.D. Fla. Jan. 17, 2020) (Altonaga, C.J.).

To prevail on a Rule 59(e) motion, then, the movant "must demonstrate why the court should reconsider its prior decision and set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Instituto de Prevision Militar v. Lehman Bros.*, 485 F. Supp. 2d 1340, 1343 (S.D. Fla. 2007) (Moore, J.). "[A] Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005). "This prohibition includes new arguments that were previously available, but not pressed." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (cleaned up); *see also Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 684 (S.D. Fla. 2007) (Seitz, J.) ("[T]o the extent Plaintiff merely reargues points previously considered and rejected by the Court, or tries to raise new arguments and point to new evidence that could have been raised earlier, this is insufficient grounds to satisfy the clear error or manifest injustice standard for granting a motion for reconsideration."). It's thus "well-settled that motions for reconsideration are disfavored and that relief under Rule 59(e) is an extraordinary remedy to be employed sparingly." *Krstic v. Princess Cruise Lines, Ltd.*, 706 F. Supp. 2d 1271, 1282 (S.D. Fla. 2010) (Gold, J.) (cleaned up). And "[t]he decision to alter or amend a judgment is committed to the sound discretion of the district court."

*O'Neal*, 958 F.2d at 1047 (citing *Am. Home Assur. Co. v. Glenn Estess & Assoc., Inc.,* 763 F.2d 1237, 1238–39 (11th Cir. 1985)).

The Plaintiffs[2] don't identify any new facts or changes in the governing law. *See generally* Motion for Reconsideration. Their Motion for Reconsideration thus turns on their view that our Order resulted in four "clear errors" and a not-insignificant helping of "manifest injustice." In the main, they contend as follows: (1) "[t]he [Court] failed to acknowledge that arbitration is a question of venue determined at the time of filing"; (2) "the Court's decision . . . rests on an argument not advanced by the Parties"; (3) "the Court's decision . . . misinterprets and misapplies a condition subsequent"; (4) "the Court . . . did not construe ambiguity in the Supplement[3] against FCC"; and (5) "the Court's decision is patently unfair and contravenes public policy." Motion for Reconsideration at 1. We address—and reject—each argument in turn.

### A.      The Plaintiffs' First Ground for Reconsideration

In their first argument for reconsideration, the Plaintiffs contend that our Order was "clearly erroneous" because it "failed to acknowledge" that arbitration clauses implicate questions of *venue*, which (the Plaintiffs say) must be determined on the facts as they existed at the time the complaint was filed. *See id.* at 2. But, as the Defendant points out, *see* Motion for Reconsideration Response [ECF No. 146] at 3, this (purported) connection between arbitration clauses and the law of venue appeared *nowhere* in the Plaintiffs' briefing on the Motion to Compel. Resisting this conclusion, the Plaintiffs insist they've "consistently argued" that "[t]his question of timing is dispositive." Motion for

---

[2] We'll refer to the Plaintiffs (plural) throughout this Order. We'd be remiss, though, if we didn't reiterate here what we said about Henry in our prior Order: "FCC—as far as we can tell—never sent a notice to Henry. It's difficult to see, then, how FCC's waiver, however interpreted, could permit Henry to escape arbitration." Order at 11 n.5. The Plaintiffs never challenge this conclusion—which suggests that we're probably dealing only with Britt's claims, because Henry doesn't appear to have any.

[3] The Plaintiffs refer to the Notice as the "Supplement."

Reconsideration at 2. *Timing*, yes—but not *venue*. In their opposition to the Motion to Compel, the Plaintiffs relied on "the plain language of the waiver," which (they claimed) "contemplates analyzing the issue of waiver at a time before the effective date of the New Regulations[.]" Motion to Compel Response [ECF No. 81] at 12. But they never tied this discussion to the law of *venue*—as they do now. Nor did they suggest—even obliquely—that arbitration clauses implicate questions of venue. Venue, in fact, never came up. That's sufficient for us to conclude that this is a new argument the Plaintiffs cannot advance in a motion for reconsideration. *See O'Neal*, 958 F.2d at 1047 ("Motions to amend should not be used to raise arguments which could, and should, have been made before the judgment was issued."); *see also Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) (holding that the district court need not, on a motion for reconsideration, entertain positions the parties had "available, but [did] not press").[4]

Even if this argument had been preserved, it would fail. In support of their venue theory, the Plaintiffs create a new—what they call—"rule" of law by stringing together sentences from two completely unrelated Eleventh Circuit cases: *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (11th Cir. 1998); and *Flowers Indus., Inc. v. F.T.C.*, 835 F.2d 775 (11th Cir. 1987). *See* Reply in Support of Motion to Certify ("Motion to Certify Reply") [ECF No. 150] at 3. According to the Plaintiffs, "[t]he Eleventh Circuit treats issues involving arbitration clauses as questions of venue, *see Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1290 (11th Cir. 1998), which 'must be determined based on the facts at the time of filing,' *see Flowers Indus., Inc. v. F.T.C.*, 835 F.2d 775, 776 n.1 (11th Cir. 1987)."

---

[4] Note (too) that, if this were an old argument, it would be equally inappropriate on a motion for reconsideration. *See Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 687 F. Supp. 2d 1322, 1324 (S.D. Fla. 2009) (Marra, J.) ("A motion for reconsideration should not be used to reiterate arguments already made or to ask the Court to rethink what the Court . . . already thought through." (cleaned up)).

Motion for Reconsideration at 2. *Lipcon* (the Plaintiffs say) thus stands for the proposition that the court's enforcement of an arbitration clause implicates questions of venue.

*Lipcon*—an international-arbitration case with a forum-selection clause that mandated arbitration in England—*did* hold that "motions to dismiss upon the basis of choice-of-forum and choice-of-law clauses are properly brought pursuant to Fed. R. Civ. P. 12(b)(3) as motions to dismiss for improper venue." 148 F.3d at 1290. The problem for the Plaintiffs is that the Supreme Court *explicitly* abrogated this aspect of *Lipcon* in 2013. *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49 (2013). In *Atlantic Marine*—as the Plaintiffs are no doubt aware—the Supreme Court *specifically* held that "§ 1406(a) and Rule 12(b)(3) are *not proper mechanisms* to enforce a forum-selection clause[.]" *Id.* at 61 (emphasis added). Indeed, the Court was very clear, "[w]hether the parties entered into a contract containing a forum-selection clause *has no bearing* on whether" venue is proper. *Id.* at 56 (emphasis added). "Whether venue is 'wrong' or 'improper,'" the Court explained, "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say *nothing* about a forum-selection clause." *Id.* at 55 (emphasis added). The Court therefore concluded that the plaintiff's argument in that case—which our Plaintiffs essentially regurgitate here—"improperly conflates the special statutory term 'venue' and the word 'forum.'" *Id.* at 56. In other words, according to the Supreme Court of the United States, the enforcement of a forum-selection (or, as here, arbitration) clause has *nothing* to do with venue.[5]

With the Plaintiffs' venue distraction out of the way, we can focus on what courts in our Circuit have actually said about "timing" in the context of orders to compel arbitration: "When enforcing an arbitration provision," one of our wiser colleagues has written, "a court may direct the

---

[5] The Plaintiffs also cite a footnote in *Flowers Industries* for their contention that "venue must be determined based on the facts at the time of filing." 835 F.2d at 776 n.1. But that case had nothing to do with arbitration clauses—and, as we've just explained, our case has nothing to do with venue.

case to arbitration *at any time before trial.*" *Galeano v. Celebration Cruise Operator, Inc.*, 2014 WL 12479278, at *1 (S.D. Fla. Dec. 12, 2014) (Middlebrooks, J.) (emphasis added). And that seems right. As the Eleventh Circuit has explained, a litigant's right to compel arbitration is revived when there's an intervening change in the controlling law or a factual development that unexpectedly changes the scope or theory of the case. *See Benoay v. Prudential-Bache Sec., Inc.*, 805 F.2d 1437, 1440 (11th Cir. 1986) ("Despite the fact that [the defendants'] motion to compel arbitration was made two and one-half years after initiation of the civil action, we conclude that the motion was timely in light of a change in law affecting the parties' rights."); *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1203 (11th Cir. 2011) (compelling arbitration and holding that, after nine months of litigation, the plaintiff's filing of an amended complaint that "unexpectedly change[d] the scope or theory of the plaintiff's claims" nullified the defendant's arbitration waiver).

Since arbitration clauses don't implicate the laws of venue—and because we properly considered, in adjudicating the Motion to Compel, the sea change the New Regulations effected in the parties' relationship—the Plaintiffs' first argument for reconsideration is **DENIED**.[6]

### B.   The Plaintiffs' Second Ground for Reconsideration

In their second argument for reconsideration, the Plaintiffs say that our decision "rest[ed] on arguments not advanced by the parties." Motion for Reconsideration at 4. Here, the Plaintiffs advance along two fronts—both unavailing.

*First*, the Plaintiffs insist that we "picked up" an argument FCC "failed to make: that when the occurrence of the condition subsequent caused Defendants' waiver to 'expire[],' . . . Defendants

---

[6] In this first section, the Plaintiffs also include a paragraph on a *different* argument that mostly presages their third claim for reconsideration. *See* Motion for Reconsideration at 3 (criticizing the Court for failing to note that "[t]he text of the [Notice] . . . identifies the filing of a lawsuit, and the timing of that filing, vis-à-vis the occurrence of the 'condition subsequent,' as controlling"). Because we consider—and reject—this third argument in a different section, we'll hold off on addressing it here.

became entitled to *reverse* the performance that they had rendered under the waiver." *Ibid.* (emphasis added). In saying so, the Plaintiffs foreshadow an argument they make much more explicitly in their third ground for reconsideration—*viz.*, that we've somehow allowed FCC to reach back into the past and, once there, to "reverse" their prior "performance." But we never said any such thing. As we'll explain in much more detail below (*see infra* Section I.C.), FCC wasn't asking us to revoke any *prior* performance—and we never granted them that right. That's because, when FCC moved to compel arbitration, the performance the Plaintiffs think they had received *in the past*—*i.e.*, permission to "bring a lawsuit" against FCC in federal court—hadn't happened yet.

So, what *did* happen? The Plaintiffs agreed to arbitrate any dispute they might later have with FCC. *See* Britt Enrollment Agreement at 4; Henry Enrollment Agreement at 4. When the Old Regulations took effect, FCC sent Britt (not Henry) a notice, agreeing "not" to use the arbitration agreement to "stop" Britt from "bringing a lawsuit." *See generally* Notice. But, by its own terms, that promise came with its own expiration date (a condition subsequent). So, when did this promise expire? When the Old Regulations were no longer "in effect." Notice at 3. And, since the Old Regulations were no longer "in effect" on the day the Federal Rules of Civil Procedure[7] required FCC to decide whether to "stop" the Plaintiffs from "bringing [their] lawsuit," FCC was perfectly free, on that date, *not* to perform. Note the tense here: FCC *hadn't* yet performed. Had FCC performed, as the Plaintiffs rightly say, it wouldn't have been permitted to revoke that prior performance. But FCC wasn't asking to go back in time to reverse some *prior* performance; it was asking to be absolved of its obligation to perform going forward—which is to say, *in the future*.

---

[7] Under FED. R. CIV. P. 15(a)(3), FCC had 14 days to respond to the Plaintiffs' Amended Complaint [ECF No. 66]—which was filed on January 18, 2021, *see generally* Docket. FCC thus had until February 1, 2021, to file any renewed motion to dismiss or to compel arbitration. FCC complied with this requirement by submitting its Motion to Compel on that day.

In other words, the Plaintiffs are correct that neither party "took up" FCC's right to reverse a *past* performance. But they're wrong to suggest that our Order had anything to do with *past* performance. On the contrary, as we've explained, our Order had everything to do with absolving FCC, in light of the triggering of a condition subsequent, of its obligation to perform *going forward*. And the Plaintiffs concede—as they must—that the triggering of that condition did (in fact) absolve FCC of all *future* obligations. *See* Motion for Reconsideration at 4 ("Had Plaintiffs been afforded the opportunity to address the issue, they would have argued that any change to Defendants' duty of performance is only prospective, and that interpreting the Supplement otherwise would be contrary to central canons of construction[.]" (cleaned up)). Since we didn't make the argument the Plaintiffs now say we made, we reject the first part of their second ground for reconsideration.[8]

*Second*, the Plaintiffs fault us for deciding the case "outside the adversarial issues presented to the Court by the parties[.]" *Id.* at 5 (cleaned up). In support, they quote our discussion of whether students have the "authority to *invoke* the [Old Regulations], *enforce* the regulations, or deploy the regulations to *invalidate* their arbitration agreements." *Ibid.* (quoting Order at 18). But FCC *did* make this argument—rather explicitly as it turns out. *See* Motion to Compel at 7 n.6 (contending that the "[Old R]egulations [did] not invalidate any arbitration agreement," and that, as a result, the "[r]ights acquired by the institution under agreements already executed *with students* remain fully enforceable on their own terms" (emphasis added)). In saying so, FCC specifically quoted the language of 81 Fed. Reg. 75,926, 76,023 (2016), *see* Motion to Compel at 7 n.6—the very same provision we then quoted for the proposition the Plaintiffs now say we invented, *see* Order at 17 (quoting 81 Fed. Reg. at 76,023

---

[8] The Plaintiffs also say that the "parties did not brief the issue of Defendants' duty of performance under the arbitration agreement, as modified by the supplement." Motion for Reconsideration at 4. This is a curious claim. Whether FCC had a duty to perform on the promise it made in the Notice is—we think—almost the only thing the parties did brief. *See* Motion to Compel at 11, 13, 15; Motion to Compel Response at 2, 4, 8–13; Motion to Compel Reply at 2, 5.

for the DOE's position that "the [DOE] does not have the authority to invalidate any arbitration agreement, did not propose to do [so], and does not in this final rule attempt to do so"); *see also id.* at 18 (quoting 81 Fed. Reg. at 76,023 for our view "that the [DOE] has made clear that the [Old R]egulations" couldn't have "invalidated, revoked, or otherwise rendered unenforceable [the Plaintiffs'] arbitration agreements"). In conducting some quick Westlaw research on cases interpreting this provision—a provision that, again, FCC *quoted* in its Motion to Compel—we found, near the top of our search results, a well-reasoned federal decision that directly supported FCC's contention. *See Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 436 F. Supp. 3d 333, 343–44 (D.D.C. 2020) (Moss, J.). And the passage we excerpted from that case eviscerated the Plaintiffs' view—which *they too* laid out in their Motion to Compel briefing—that they retained some "substantive right . . . under the [Old Regulations] . . . to obtain a judgment in a court." Motion to Compel Response at 9. That excerpt— which we recreate here—included, not one, not two, but *three* separate citations to (and quotations from) the specific regulatory provision FCC had relied on in its Motion to Compel:

> [The parties] agree that the FAA would displace a federal rule that declared particular arbitration agreements invalid or unenforceable. . . . . But that is not what the 2016 Rule did. To the contrary, the Department acknowledged that it lacks **"the authority, and does not propose, to displace or diminish the effect of the FAA." 81 Fed. Reg. at 76,023**. Consistent with that understanding, the 2016 Rule **"does not invalidate any arbitration agreement, whether already in existence or obtained in the future." *Id.*** Institutions of higher education remain free to seek and to invoke predispute class action waivers and arbitration agreements, and, when confronted with any such agreement that is otherwise enforceable, courts must—and will—enforce the agreement. The 2016 Rule does not provide a basis for a student to resist a motion to compel arbitration, *see* 9 U.S.C. § 4, or to stay a judicial proceeding pending arbitration, *see id.* § 3. Instead, the regulations **"impose a condition on the participation of a school in" the Direct Loan program, "a Federal program in which Congress explicitly stated that 'no institution shall have a right to participate.'" 81 Fed. Reg. at 76,023** (quoting 20 U.S.C. § 1087b(b)). In other words, if a school wants to participate in a federal program and to benefit from the many billions of dollars that the United States distributes in Direct Loans every year, it must agree to abide by the conditions that the Secretary reasonably determines are necessary to protect the public fisc and the integrity of the program. *See* 20 U.S.C. § 1087d(a)(6).

*Cal. Ass'n of Priv. Postsecondary Sch.*, 436 F. Supp. 3d at 343–44.

Now, it's true that FCC hadn't cited this specific case in its Motion to Compel. But we know of no rule—and the Plaintiffs cite to none—for the absurd proposition that federal judges are restricted to citing only those decisions the parties happen to find on their own. Indeed, our Circuit has said just the opposite. *See United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1350 (11th Cir. 2019) ("[T]he court is not limited to choosing one side's position or the other's. The court's role is to get it right, not to choose which side's argument is better and adopt it lock, stock, and barrel."). In any event, as we explained in our Order, the Plaintiffs *themselves* cited (*see* Motion to Compel Response at 8) to a case that "expressly recognized this dichotomy" between a school's relationship with its students and the school's relationship to the DOE. *See* Order at 13–14 n.13 (quoting *Grand Canyon Educ., Inc. v. Ward*, 855 S.E.2d 415, 421 (Ga. Ct. App. 2021)). As that case explained:

> GCU contends that even if Ward's claims qualify as borrower defense claims, the arbitration clause between the parties nonetheless should be enforced because § 685.300 merely governs the relationship between a school and the Department of Education and not the relationship between a school and its students. Thus, according to GCU, the provisions of § 685.300 cannot be used by Ward to undo the valid arbitration agreement.

> Regardless of whether the regulations do or do not provide a basis for a student to resist a motion to compel arbitration, GCU is foreclosed from seeking to enforce the arbitration clause it publicly announced it would not enforce as to borrower defense claims, as determined by a court.

*Ward*, 855 S.E.2d at 421. Again, we found this case—which highlights the very same dichotomy the Plaintiffs now say we made up—in *the Plaintiffs'* Motion to Compel Response.

But here's the thing: The Plaintiffs (we agree) used much of their Motion to Compel Response on a *contractual*-waiver argument for which they relied (to a significant degree) on the Eleventh Circuit's decision in *Young v. Grand Canyon University, Inc.*, 980 F.3d 814 (11th Cir. 2020). *See* Motion to Compel Response at 12. As our Order explained, this argument—and, in particular, its reliance on *Young*— was unviable:

> If we read *Young* as answering a contract question, then the case is easily distinguishable from ours—because Grand Canyon's waiver was completely different from FCC's. There, remember, Grand Canyon promised not to enforce its arbitration agreement "if [the student] assert[ed] a borrower defense claim, as that term is defined in 34 [C.F.R.] § 685.300(i)(1)." [*Young*, 980 F.3d] at 817. Under this contractual reading, then, the *Young* Court turned to the regulations only for help in interpreting the crucial phrase—"borrower defense claim"—and, after some regulatory exegesis, did little more than conclude that the plaintiff *had* asserted borrowe[r] defense claims. But Grand Canyon's notice *never* said—as FCC's does—that its waiver applied only so long as the Old Regulations were "in effect." As a result, the dispositive *contract* question in our case never came up in *Young*.

Order at 14; *see also ibid.* ("If *Young* held only that a student's right to avoid arbitration stems from the school's waiver, then our simple contractual reading—that the waiver has expired because the Old Regulations are no longer 'in effect'—settles the whole case."); *id.* at 21 ("If *Young* was a contract case—*i.e.*, if it held only that the school's notice had worked a waiver of the arbitration clause—then it's completely distinguishable from our case because the Eleventh Circuit wasn't there faced with the central question we have here: whether the Old Regulations are still 'in effect.' Since the Old Regulations aren't 'in effect,' FCC's waiver is no longer applicable.").

Trying to give the Plaintiffs the benefit of the doubt, though, we considered whether they could prevail under an "alternate reading of *Young*—in which *Young* is seen as holding that the regulations *themselves* prohibited Grand Canyon from arbitrating[.]" *Id.* at 15. For reasons that are beyond the scope of this Order, we found that the Plaintiffs couldn't win under that alternate (regulation-based) reading either. *Id.* at 15–21. In reaching this conclusion, however, we noted that *Young* itself had identified the dichotomy the Plaintiffs now claim we've conjured out of thin air. Here's how we described that part of *Young*:

> Recall that, in *Young*, the Eleventh Circuit had every reason to assume that the regulations—rather than the waiver—was doing the heavy lifting because the parties *never presented* this contract-v.-regulation dichotomy (the one that's so crucial to our case) in that appeal. As the Eleventh Circuit noted in a footnote:

> > For the first time at oral argument, Grand Canyon asserted a new argument—namely, that even if the borrower-defense regulations apply, reading them to invalidate an otherwise enforceable arbitration

agreement would contravene the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. Grand Canyon, however, has waived this argument, which it failed to present either to the district court or in its brief to us.

*Id.* at 821 n.4. In other words, the court had no need to consider whether it was the contract *or* the regulations that precluded the school's motion to compel, because the school had never argued that it would be unlawful for the regulations *themselves* to require that result.

*Id.* at 15.

So, here's where we are: The Plaintiffs cited *Young* for their view that, through a contract modification,[9] FCC had waived its right to arbitration. We explained that, if read as a contract case, *Young* was easily distinguishable from our facts because (unlike our Notice) the waiver there didn't "expire[ ] by the terms of its own internal contingency[.]" *Id.* at 16. At the same time, we recognized that the Plaintiffs had claimed a "substantive right" under the Old Regulations to pursue their claims in court. They cited *Young* and a Georgia Court of Appeals case (*Ward*). *See* Motion to Compel Response at 8. And each of *those* cases identified the central question we addressed in the challenged portion of our Order—*i.e.*, whether the *students*, rather than the DOE, could enforce any "substantive right" under the Old Regulations.[10] Meantime, FCC quoted a regulation that strongly suggested an answer to this question—*viz.*, that only the DOE, and not the students, retained the power to enforce the Old Regulations. From this, FCC argued that the "[Old R]egulations [did] not invalidate any arbitration agreement," and that, as a result, the "[r]ights acquired *by the institution* under agreements already executed *with students* remain fully enforceable on their own terms[.]" Motion to Compel at 7 n.6 (emphasis added). FCC claimed, in other words, that the Old Regulations—affecting *only* the relationship between the DOE and the schools—had no effect, separate and apart from any written

---

[9] The Plaintiffs insisted that the Notice constituted a *modification* to the arbitration agreements the students had signed with FCC—and, without deciding the issue, we were willing to go along with them on this. *See* Order at 9 n.2.

[10] Of course, as we've explained, both cases declined (for reasons inapplicable here) to resolve that question.

waiver by the school, on the agreements the schools had entered into with their students. We then found a district court case that said exactly that and set out three reasons (none of which the Plaintiffs even try to assail here) for our view that FCC's reading of the relevant regulatory scheme was the right one.

Since all of this was squarely presented by the parties, the Plaintiffs' second ground for reconsideration is **DENIED**.

### C.   The Plaintiffs' Third Ground for Reconsideration

In their third argument for reconsideration, the Plaintiffs insist that we misapplied the law of conditions subsequent. *See* Motion for Reconsideration at 5. In support of this claim, they point to the Notice, which (all agree) included the following statement: "We [FCC] agree not to use any predispute arbitration agreement to stop you from *bringing a lawsuit*." Notice at 3 (emphasis added). The Plaintiffs make much of the emphasized portion of this sentence. They claim that, as soon as they filed this lawsuit, "the time for performance under the agreement, with respect to *this lawsuit*, ha[d] passed." Motion for Reconsideration at 6. At that point, they maintain, the "Plaintiffs ha[d] brought their lawsuit and Defendants did not stop them from doing so. The occurrence of the condition subsequent has no bearing, because no further performance is possible." *Ibid.* But there are two dispositive problems with the Plaintiffs' position.

*One*, they never presented this "bringing a lawsuit" argument in their briefing on the Motion to Compel. There, remember, they argued only that "since Plaintiffs' claims indisputably arose" while the Old Regulations were still "in effect," FCC had waived its right to compel arbitration. Motion to Compel Response at 12. They also claimed that the term "period" as it appears in the Notice must be construed as the "period during which claims arise." *Ibid.* But they never suggested that the "bringing a lawsuit" language in the Notice had anything to do with the outcome of this case. Indeed, we've searched in vain through the Plaintiffs' Motion to Compel Response for any argument relating to this

phrase.[11] Again, "a motion for reconsideration isn't a blank slate to raise new arguments for the first time." *Watkins v. Session*, 2021 WL 1838902, at *3 (S.D. Fla. May 7, 2021) (Altman, J.); *see also Jackson v. Scott*, 2022 WL 35612, at *2 (11th Cir. Jan. 4, 2022) ("A Rule 59(e) motion may not be used . . . to raise arguments that could have been raised prior to the judgment.").

*Two*, when the condition subsequent finally kicked in—*i.e.*, when the Old Regulations were no longer "in effect"—FCC was absolved of its promise to perform in the future. The Plaintiffs agree with this. *See* Motion for Reconsideration at 5 ("[W]hen Defendants agreed not to use any predispute arbitration agreement to stop students from 'bringing a lawsuit' while the 2016 Regulations were in effect, the recission of the 2016 Regulations may have allowed them to stop *further lawsuits*[.]" (emphasis in original)). They seem to think, though, that FCC's promise—*viz.*, to "agree not to use any predispute arbitration agreement to stop you from bringing a lawsuit"—was somehow inoculated against the triggering of the condition subsequent *in this case*. For this proposition, they rely on a fundamental rule of conditions subsequent—which they then misapply. The rule is this: "A condition subsequent has been defined as a future event, the happening of which discharges the parties from their otherwise binding agreement. . . . The term 'condition subsequent,' as normally used in contracts in contrast to 'condition precedent,' should mean an event which occurs subsequent to a duty of immediate performance, that is, a condition which divests a duty of immediate performance of a contract after it has once accrued and become absolute." 13 WILLISTON ON CONTRACTS § 38:9 (4th ed. updated May 2022). To help us understand the rule, the Plaintiffs even give us a helpful example:

---

[11] The phrase appears only once in the Plaintiffs' brief. *See* Motion to Compel Response at 11 ("Because the students' contract with FCC specifically allows for contract supplements, modifications, and revisions, as quoted above, the Supplement expressly modified any terms that purported to prevent Plaintiffs from bringing this class action in federal court."). As this quotation makes clear, however, the Plaintiffs never deployed the phrase to any purpose—and none of their arguments stemmed from its wording.

"[I]f Party A breaks her leg and agrees to pay Party B to walk her dog until she recovers, her recovery relieves Party A of the obligation to continue paying Party B to walk her dog—it does not entitle her to the return of all sums she has paid Party B up until that point." Motion for Reconsideration at 5.

But this example only highlights the Plaintiffs' error. Party A promises to pay Party B money to walk Party A's dog *as long as* Party A's convalescence is still in effect. It's true, as the Plaintiffs point out, that Party A cannot, once she recovers, ask Party B to return the money Party A had *already paid* Party B to walk the dog. Imagine, however, that Party A's husband (a doctor) gives her a cortisone shot, which makes her suddenly feel well enough to walk again. Imagine, too, that the results of Party A's MRI come back and show no tears, no strains—just a bit of swelling. Suppose that with this new information in hand—and feeling fully recovered—Party A then calls Party B and tells her: "You know what? I'm recovered. Thank you for agreeing to walk my dog, but I'm OK. I'll walk him myself." Since the point at which Party A is obligated to perform is still somewhere *in the future*—Party B, after all, hadn't yet had the chance to walk Party A's dog—Party A now has *no* obligation to pay Party B anything. (Note, too, that Party B now has no obligation to walk the dog). Party A, in sum, will have been absolved of her payment obligation by the occurrence of a condition subsequent.

So too here. Like our convalescing girl, FCC received wonderful news: The Old Regulations were no longer "in effect." At that point—as the Plaintiffs rightly note—FCC wouldn't have been permitted to go back and retract any past performance. So, for instance, if (by the time the Old Regulations were withdrawn) the case had been resolved by a settlement, FCC couldn't have asked us to reopen the case on the ground that the condition subsequent had been triggered and that, as a result, it wanted its money back. Or imagine that, early on in the litigation, the parties had stipulated—because of the Old Regulations and without any caveats—to proceed in federal court and never to seek arbitration. Here, again, FCC wouldn't have been allowed, during the ensuing litigation, to change its mind on account of the withdrawal of the Old Regulations. That's because, in both of these

scenarios, FCC would've already performed on its promise not to "stop" the Plaintiffs from "bringing a lawsuit"—and, as the Plaintiffs explain, in the land of conditions subsequent, there are no take-backs.

But FCC never had a chance to perform on its promise *before* it filed its Motion to Compel. To the contrary, it's undisputed that, by the time the Federal Rules forced FCC to show its hand—to decide, in other words, whether to "stop" the Plaintiffs from "bringing a lawsuit"—the condition subsequent had already occurred. As a result, long *before* we issued our Order—and, indeed, *before* FCC filed its Motion to Compel—FCC had been absolved of fulfilling its promise. Like the girl who recovers *before* her friend has the chance to walk her dog—and *before* she pays her friend any money—FCC was no longer obligated to perform in the *future*.

One last thing on this. We say *future* (not past) because, as we've hinted, there was no earlier inflection point at which FCC *could have* stopped the Plaintiffs' lawsuit. Our Federal Rules don't allow a defending party to stand at the courthouse steps and tackle the plaintiff's lawyer before he dockets his complaint. The Rules contemplate only that, once the complaint is filed, the defendant can "stop" the lawsuit by filing a proper motion to dismiss (or, as here, a motion to compel arbitration). Since FCC had no *previous* opportunity to "stop" the lawsuit—and because it moved to "stop" the lawsuit at the first available opportunity—it hadn't yet performed (hadn't, in other words, failed to "stop" the lawsuit) when the condition subsequent was triggered.[12]

---

[12] The Plaintiffs also claim that our reading of the Notice renders the promise FCC made there "illusory." Motion for Reconsideration at 9. Not so. An illusory promise is one that "appears on its face to be so insubstantial as to impose no obligation at all on the promisor—who says, in effect, 'I will if I want to.'" *Princeton Homes, Inc. v. Virone*, 612 F.3d 1324, 1331 (11th Cir. 2010) (quoting *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998)); *see also Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1347 (11th Cir. 2019) ("It seems equally well-settled that '[w]here an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration.'" (quoting 3 WILLISTON ON CONTRACTS § 7:7 (4th ed. 2010))). But FCC's promise was very real and may well have been acted upon had the waiver's own internal contingency never materialized (or, to be more precise, had the contingency not been triggered

The Plaintiffs' third argument for reconsideration is **DENIED**.

### D.     The Plaintiffs' Fourth Ground for Reconsideration

In their fourth argument for reconsideration, the Plaintiffs say that we "did not construe ambiguity [in the Notice] against FCC." Motion for Reconsideration at 6. And (they tell us) they've found "ambiguity" in two places: in the meaning of the phrase "bringing a lawsuit" (which we've discussed already) and on the "effect of a condition subsequent[.]" *Ibid.* Two problems with this. *One*, the Plaintiffs said *precisely the opposite* in their briefing on the Motion to Compel—where, recall, they referred to the wording of the Notice as "clear and unambiguous." Motion to Compel Response at 3. Again, this isn't the time for new arguments the Plaintiffs haven't thought of before. *See Arthur*, 500 F.3d at 1343 ("[A] Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." (quoting *Michael Linet*, 408 F.3d at 763)); *see also O'Neal*, 958 F.2d at 1047 ("Motions to amend should not be used to raise arguments which could, and should, have been made before the judgment was issued."); *Great Lakes*, 2020 WL 264674, at *6 ("To the extent [the movant] . . . tries to raise new arguments . . . that could have been raised earlier, this is insufficient grounds to satisfy the clear error or manifest injustice standard for granting a motion for reconsideration." (cleaned up)); *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002) (Gold, J.) ("[C]ourts and litigants cannot be repeatedly called upon to backtrack through the paths of litigation which are often laced with close questions."); *Mierzwicki v. Citigroup, Inc.*, 2015 WL 13388667, at *1 (S.D. Fla. Oct. 13, 2015) (Bloom, J.) ("Arguments that were or should have been raised in the first instance are not appropriate grounds for a motion for reconsideration.").

---

*before* FCC was required to perform). To claim that FCC's promise was "illusory" is, again, to ignore the fact that the Notice came with its own expiration date—and that, unfortunately for the Plaintiffs, that expiration date arrived *before* FCC was obligated to fulfill its promise under the contract.

*Two*, we've already thought long and hard about this case and have agreed with the Plaintiffs that the Notice is *unambiguous*—just not in the way the Plaintiffs hoped. *See* Order at 11 ("Here, the language of the Notice is *clear* that FCC's waiver of its right to arbitrate 'shall apply to your arbitration agreement with Florida Career College for any period during which these regulations [34 C.F.R. § 685.300(e) and (f)] are in effect.'" (emphasis in original)). We understand that the Plaintiffs disagree with our conclusion. But motions for reconsideration aren't a chance for a "second bite at the apple[.]" *O'Neal*, 958 F.2d at 1047. And, contra the Plaintiffs' position, it doesn't matter that the *purpose* of the Notice was to "comply with Federal law," Motion for Reconsideration at 6, because the Notice left itself an escape hatch—under the plain terms of which FCC would be absolved of its arbitration waiver if federal law changed. *See* Notice at 3 (providing that "[t]hese provisions . . . shall apply to your arbitration agreement with Florida Career College for any period during which these regulations are in effect"). And guess what: Federal law did change.

We thus **DENY** the Plaintiffs' fourth ground for reconsideration.

### E.   The Plaintiffs' Fifth Ground for Reconsideration

The Plaintiffs' fifth contention—that this result is "unfair" and that our decision will result in "manifest injustice," Motion for Reconsideration at 7—fares no better. Here, they advance six arguments—all unpersuasive.

*First*, they say that it's "unfair" for us to send them to arbitration without their consent. Motion for Reconsideration at 7. But they *did* consent to arbitration—in *express* and *unambiguous* agreements they signed with FCC. *See* Britt Enrollment Agreement at 4 ("Any dispute I may bring against School or any of its parents, subsidiaries, affiliated entities, officers, directors, agents or employees, without limitation, or which the School may bring against me, no matter how characterized, pleaded or styled, shall be resolved by binding arbitration conducted by the American Arbitration Association[.]"); Henry Enrollment Agreement at 4 ("Any dispute I may bring against the school, or any of its parents,

19

subsidiaries, officers, directors, or employees, without limitation, or which the school may bring

against me, no matter how characterized, pleaded or styled, shall be resolved by binding arbitration,

pursuant to Federal Arbitration Act, conducted by the American Arbitration Association[.]"). We

made essentially this point fairly early on in our prior Order. As we said there:

> The parties in our case agreed to arbitrate. When Britt and Henry enrolled at FCC,
> they each executed an Enrollment Agreement that contained materially identical
> arbitration clauses, through which the Plaintiffs promised that "[a]ny dispute I may
> bring against School . . . shall be resolved by binding arbitration." *See* Britt Enrollment
> Agreement at 4; Henry Enrollment Agreement at 4. Both students specifically *initialed*
> the arbitration clause, signifying their acceptance, and acknowledged that they had
> "read, underst[ood], and agree[d]" to the terms of the agreement. *See* Britt Enrollment
> Agreement at 4; Henry Enrollment Agreement at 4. The parties, in short, entered into
> a written arbitration agreement.

Order at 8–9. The Plaintiffs (notably) never challenge this conclusion.

And the Supreme Court has long upheld the viability of arbitration agreements in the face of

*fairness* challenges much like this one. *See, e.g.*, *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019)

("Arbitration is strictly a matter of consent." (cleaned up)); *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612,

1621 (2018) ("The policy may be debatable but the law is clear: Congress has instructed that arbitration

agreements like those before us must be enforced as written."); *AT&T Mobility LLC v. Concepcion*, 563

U.S. 333, 352 (2011) (holding that the FAA preempts California's judicial rule, which found certain

class-arbitration waivers in consumer contracts unconscionable); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l

Corp.*, 559 U.S. 662, 672 (2010) (holding that an arbitration panel exceeded its power by imposing class

procedures based on policy judgments rather than the text of the arbitration agreement itself); *Gilmer

v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) ("Mere inequality in bargaining power, however,

is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment

context.").

*Second*, the Plaintiffs think it's "unfair" that their lawyers did all this work—filing a lawsuit,

trading motions practice, collecting discovery—only to be sent to arbitration. Motion for

Reconsideration at 7. But that's true of any plaintiff who "loses."[13] We practice in an adversarial system where, for the most part, one side has to win and one side has to lose. When, as sometimes happens, the plaintiff is the loser, he must live with the consequences of having brought an unviable lawsuit. That's not "unfair"—it's just the reality of federal-court litigation. *Cf. Royal Palm Props., LLC v. Pink Palm Props., LLC*, 38 F.4th 1372, 1382 (11th Cir. 2022) ("When granting prevailing party status . . . a district court is limited to naming one, and only one, prevailing party."); *Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985) ("The judicial process is an arena of open conflict, and in virtually every case there is, if not always a winner, at least one loser.").

*Third*, the Plaintiffs suggest that there was no way for them to predict that they'd be sent to arbitration. Motion for Reconsideration at 7. That's hard to square with reality. FCC, remember, moved to compel arbitration as soon as they had the chance. We covered all this in our prior Order:

> Britt and Henry haven't alleged that they detrimentally relied *on FCC's waiver*. They don't say, for instance, that they *only* brought this case because they thought they wouldn't be required to arbitrate. [E]ven if they had said that, any such belief—that, for instance, FCC wouldn't enforce its arbitration agreement or that no court would allow FCC to enforce that arbitration agreement—would've been unreasonable. FCC's Notice plainly stated that its waiver would remain applicable *only* for the period during which the Old Regulations were "in effect." And the New Regulations, which erased the relevant provisions of the old ones, were promulgated *before* the Plaintiffs filed their complaint. *Compare* 84 Fed. Reg. 49,788 (promulgated Sept. 23, 2019) *with* Compl. (filed Apr. 20, 2020). When they brought this lawsuit, in other words, the Plaintiffs understood that, in light of the changing legal landscape, they might be sent to binding arbitration.

Order at 9 n.2. Again, the Plaintiffs' Motion for Reconsideration conveniently ignores all of this.

But here's the thing: Even if the Plaintiffs couldn't have predicted that the Old Regulations would be withdrawn—or that the New Regulations would take effect—that's just one of the many

---

[13] It's worth remembering, too, that the Plaintiffs haven't actually "lost" yet. They still have the right— a right they agreed to—to seek recompense in arbitration. As we explained in our Order: "[T]he only reliance Britt and Henry point to is their 'time and resources toward investigating the facts of this lawsuit and assisting their lawyers.' But they never explain why they cannot seek remuneration for this (presumably minimal) time expenditure at arbitration." Order at 9 n.2.

risks a plaintiff and his lawyers take when they embark on the perilous journey of litigation. It's probably fair to say that most plaintiffs think they've found a winner when they file. But (it's also true) not all plaintiffs prevail. And their downfalls come in many different shapes and sizes. For some, it's a new case that comes down from the Supreme Court. For others, it's a set of facts the plaintiffs hadn't shared with their lawyers—or which their lawyers hadn't, for one reason or another, anticipated. For still others, it's a new regulatory scheme that moots or vitiates their claims. Again, whether this is "unfair" isn't hardly the point.

*Fourth*, the Plaintiffs insist that a protective order *they agreed to*, *see* the Joint Motion for Protective Order [ECF No. 63], will prevent them from using the discovery they obtained in this case in arbitration, *see* Motion for Reconsideration at 8. But that's just not true. As FCC explains, the "Plaintiffs' assertion that information they have obtained in the case covered by Protective Order will now not be available to the public or regulatory entities is nonsensical. The purpose of the Protective Order is to protect confidential information from being publicly disclosed or used for purposes other than the litigation. Compelling the claims to arbitration in no way changes the right or obligations as to confidential information under the Protective Order." Motion for Reconsideration Response at 7. In any event, the Plaintiffs *stipulated* to that protective order, so they can't save their legal claims by regretting its aftereffects. More importantly, as the Supreme Court has explained, albeit in the context of *forum-selection* clauses, "a court evaluating a . . . motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests. When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. at 582.

*Fifth*, complaining again about the protective order, the Plaintiffs think it's "unfair" that they won't be able to share the discovery they received in this case with *other* FCC students. Motion for

Reconsideration at 7–8. This is utter frivolity. Whether the protective order prevents the Plaintiffs from sharing discovery with other non-parties (who are not, and never have been, before this Court) is totally irrelevant to the analytical question we faced here—which was whether FCC waived its right to compel the Plaintiffs to arbitration. In either event, again, to the extent the Plaintiffs *agreed to* that protective order, they alone are to blame if its terms turn out to be too restrictive or onerous.

*Sixth*, the Plaintiffs say it's "unfair" that they won't be able to share the information they've received in discovery with the DOE. But, again, that's not a legal issue in this case. We aren't charged with the authority to root out unfairness in the world. We didn't swear an oath to ensure that the Department of Education gets all the information it needs to punish or ostracize schools that renege on their promises. This Court's job was to read an arbitration agreement—together with the Notice and two sets of federal regulations—and to decide what the words in those documents meant. *See Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013) ("The intent of the parties to a contract, as manifested in the plain language of the arbitration provision and contract itself, determines whether a dispute is subject to arbitration."); *see also Citigroup, Inc. v. Amodio*, 894 So. 2d 296, 298–99 (Fla. 4th DCA 2005) ("Florida's general contract law requires that the court discern the intent of the parties from the language used in their agreement."); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). To the best of our ability, we discharged that duty here. We may have been wrong—and an appellate court may tell us so someday. But it simply isn't our job to make the world a happier, better, "fairer" place.

The Plaintiffs' fifth argument for reconsideration is **DENIED**.

## II.   THE MOTION TO CERTIFY

"Under 28 U.S.C. § 1292(b), appeal of a non-final order may be permitted when the district court certifies in writing that its order 'involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.'" *Simpson v. Carolina Builders Corp.*, 222 F. App'x 924, 925 (11th Cir. 2007) (quoting 28 U.S.C. § 1292(b)). "This standard is conjunctive, meaning that if any elements are not satisfied, the Court must deny interlocutory review." *In re Yormak*, 2017 WL 2645601, at *2 (M.D. Fla. June 19, 2017) (Polster Chappell, J.).

"[Section] 1292(b) certification is wholly discretionary with both the district court and [the appellate court]." *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, 549 F.3d 1344, 1358 (11th Cir. 2008). "[Eleventh Circuit] precedent identifies several principles to guide [courts] when deciding whether to exercise [their] discretion under § 1292(b) to allow for a rare interlocutory appeal." *Drummond Co., v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1336 (11th Cir. 2018) (citing *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1264 (11th Cir. 2004)). "In general, [courts] exercise [their] discretion only when (1) the appeal presents a pure question of law, (2) the question is controlling of at least a substantial part of the case, (3) the district court identifies the question in its order, (4) there are substantial grounds for differences of opinion on the question, and (5) resolution of the question may reduce the amount of litigation necessary on remand." *Havana Docks Corp. v. Carnival Corp.*, 2022 WL 1522007, at *2 (S.D. Fla. May 13, 2022) (Bloom, J.) (cleaned up).

There's no shortage of caselaw in our Circuit confirming that interlocutory appeals are the "rare exception[.]" *McFarlin*, 381 F.3d at 1264. As our Chief Judge has said:

> The Eleventh Circuit has articulated a strong presumption against interlocutory appeals. *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) ("Because permitting piecemeal appeals is bad policy, permitting liberal use of [section] 1292(b) interlocutory appeals is bad policy."); *see also Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1276 (11th Cir. 2000) ("[I]nterlocutory appeals are inherently disruptive, time-consuming, and expensive . . . and consequently are generally disfavored."); *Gaisser v. Portfolio Recovery Assocs., LLC*, 2009 WL 590167, at *2 (S.D. Fla. Feb. 26, 2009) ("Federal courts are in agreement that interlocutory appeals are rarely appropriate.").

*Flaum v. Doctor's Assocs., Inc.*, 2016 WL 8677304, at *1 (S.D. Fla. Oct. 27, 2016) (Altonaga, J.) (cleaned up).

In their Motion to Certify, the Plaintiffs identify six questions that (they say) are controlling questions of law:

(1) "Does the Court's decision conflict with the Eleventh Circuit's decision in [*Young*]?"

(2) "At what point should a district court consider the applicability of an arbitration waiver?"

(3) "Can the occurrence of a condition subsequent affect a party's past duty to perform?"

(4) "Can a contractual waiver be illusory?"

(5) "Can an ambiguous contract be interpreted to squarely conflict with its stated purpose?"

(6) "Can a district court compel arbitration on grounds not advanced by the moving party?"

Motion to Certify at 3–6. Each question fails, for one reason or another, to justify an immediate appeal. We address them in turn.

The first question isn't a "pure" (or "controlling") question of law at all. A "controlling question of law" is one that "has reference to a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine[.]" *McFarlin*, 381 F.3d at 1258. It should be an "abstract legal issue" of "'pure' law" the circuit can answer "quickly and cleanly" without having to "delve beyond the surface of the record in order to determine the facts." *Id.* at 1258–59. "The antithesis of a proper § 1292(b) appeal is one that turns on . . . whether the district court properly applied settled law to the facts or evidence of a particular case." *Id.* at 1259.

In our prior Order, we said three main things about *Young*. *One*, we held that, if we view *Young* as a contract case, it's completely distinguishable from our *facts*—because the waiver in that case didn't include "its own internal contingency[.]" Order at 16. *Two*, we explained that, even if we viewed *Young* as a regulatory case, it was different from our *facts* because the parties in that case failed, in their briefing, to raise the specific question we were asked to address here—namely, whether the Old

Regulations created a private "substantive right," Motion to Compel Response at 9, that students could enforce against the schools, *see* Order at 17. *Three*, on the footnote in *Young* dealing with retroactivity, we said:

> [I]t's not at all clear to us that this retroactivity debate is in **the least bit relevant to our facts**. Suppose, for instance, that we decide to read *Young* as a contract case. In that scenario, of course, the question of whether the New Regulations apply retroactively **would seem inapposite**. In *Young*, after all, the Old Regulations *obviously* governed the meaning of the phrase "borrower defense claims." Indeed, the *Young* waiver, by its terms, applied only to a "borrower defense claim, as that term is defined in 34 [C.F.R.] § 685.300(i)(1)." Since that provision—§ 685.300(i)(1)—*only* existed in the Old Regulations (it having been removed in the New Regulations), the Old Regulations unambiguously supplied the applicable definition. But that's not true in our case. For starters, we don't need to decide whether the Plaintiffs' claims qualify as "borrower defense claims" because we've already held that they do. Tr. at 30:20–31:9 ("I find that the claims are all borrower defense claims."). So, at least in that respect, we have no similar need to draw from the Old Regulations a definition that only existed there. More fundamentally, though, **in the circumstances of our case**, it doesn't really make sense to ask whether the New Regulations apply retroactively. That's because, **unlike the waiver in *Young*, FCC's waiver was limited only to the period during which the Old Regulations were "in effect."** Since those Old Regulations are no longer in effect, the waiver has expired by the terms of its own internal contingency—which is to say, expired for reasons having *nothing* to do with any retroactive application of the New Regulations.

*Id.* at 16 (emphases added). At least with respect to our discussion of *Young*, then, we had no occasion to opine on a "pure" question of law—which is to say we didn't purport to interpret the "meaning of a statutory or constitutional provision, regulation, or common law doctrine[.]" *McFarlin*, 381 F.3d at 1258. Instead, we applied our view of *Young*'s holding *to the facts of our case*. That's the very "antithesis of a proper § 1292(b) appeal[.]" *Id.* at 1259; *see also Ibrahim v. FINR III, LLC*, 2016 WL 409630, at *2 (M.D. Fla. Feb. 3, 2016) (Kovachevich, J.) (noting that "mixed questions of law and fact" are not subject to immediate appeal under § 1292(b)).

The Plaintiffs' second question *does* present a "pure question of law," but it fails to justify an immediate appeal because the Plaintiffs do "not meet the second factor": that there be "'substantial ground for difference of opinion.'" *Flaum*, 2016 WL 8677304, at *2 (quoting 18 U.S.C. § 1292(b)). In assessing whether there's substantial ground for difference of opinion, "it is the duty of the district

judge . . . to analyze the strength of the arguments in opposition to the challenged ruling[.]" *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) (cleaned up). The only "opposing argument" the Plaintiffs have cited here is their fabricated claim that, under "clear" Eleventh Circuit law, arbitration is a "question[ ] of venue, which must be determined based on the facts at the time of filing[.]" Motion to Certify Reply at 3; Motion to Certify at 4 (cleaned up). As we've detailed, *see supra* pp. 5–6, the Supreme Court has put this question to bed. *See Atl. Marine*, 571 U.S. at 577. Again, then, the "clear" law is that arbitration clauses do *not* implicate questions of venue.[14]

The third, fourth, fifth, and sixth questions we address together because, as we've explained, they appeared nowhere in our Order and have nothing to do with this case. They thus fail to justify an immediate appeal because, among other things, they're not "controlling of at least a substantial part of the case," because we did not "identif[y] the[se] question[s] in [our] [O]rder," and because there aren't "substantial grounds for differences of opinion on the[se] question[s]." *Drummond*, 885 F.3d at 1336 (cleaned up). In fact, to prove this last point—and, perhaps, to obviate any need for appeal—we *agree* with the Plaintiffs that the answer to all three questions is *No*: No, a condition subsequent cannot affect past performance; No, a contractual promise cannot be illusory; No, an ambiguous contract cannot be read in a way that plainly conflicts with its stated purpose; and No, a court cannot send the parties to arbitration on arguments no one presented. The problem, as we've detailed in depth in this Order, is that, when we apply each of these settled legal principles *to the facts of our case*, we find that they're all completely inapposite: inapposite because our Order didn't purport to absolve FCC of any *past* duty to perform; inapposite because our Order never suggested that FCC's waiver was in any way

---

[14] And, again, since the Plaintiffs elected never to advance this argument in their Motion to Compel briefing, the Eleventh Circuit would have rejected it out of hand. *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances.").

illusory; inapposite because we agree with the Plaintiffs that the Notice wasn't at all ambiguous, *see* Motion to Compel Response at 3; and inapposite because we resolved the case on arguments both sides advanced.

And, since we don't disagree about the settled legal question—indeed, since our disagreement arises from the "appli[cation of] settled law to the facts or evidence of [our] particular case"—these four questions (again) are "[t]he antithesis of a proper § 1292(b) appeal[.]" *McFarlin*, 381 F.3d at 1259. As the Eleventh Circuit has said, these are all just "classic example[s] of [ ] questions arising from the application of well-accepted law to the particular facts of a pleading in a specific case." *Id.* at 1262.

*   *   *

The Plaintiffs have failed to identify a "controlling question of law" about which there is "substantial ground for difference of opinion"—the first two elements of § 1292(b). Because the statute's standard is "conjunctive," we needn't reach the third element—whether an immediate appeal would materially advance the ultimate termination of the litigation. *Havana Docks*, 2022 WL 1522007, at *2; *see also* SCALIA & GARNER at 116 ("*And* joins a conjunctive list . . . with the conjunctive list, all three things are required."). Since the Plaintiffs have thus failed to meet their "high burden under section 1292(b)," *Flaum*, 2016 WL 8677304, at *2, their Motion to Certify is **DENIED**.[15]

---

[15] As an alternative form of relief, the Plaintiffs ask us to lift the stay and dismiss their case so they can appeal our Order. Under the FAA, when a district court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration . . . [the court] *shall* on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3 (emphasis added). In other words, "[t]he language of § 3 indicates that a stay is mandatory only when a party moves for one." *Olsher Metals Corp. v. Olsher*, 2003 WL 25600635, at *9 (S.D. Fla. Mar. 26, 2003) (Jordan, J.). Although some courts in our District have dismissed cases where all the claims were subject to arbitration, "the Eleventh Circuit has indicated that a stay, rather than dismissal, is preferred where a stay is requested." *Valiente v. Holiday CVS, LLC*, 2020 WL 2404701, at *2 (S.D. Fla. May 12, 2020) (Bloom, J.) (cleaned up) (collecting cases); *see also Branch v. Ottinger*, 477 F. App'x 718, 721 (11th Cir. 2012) ("A district court is required to stay a pending suit when it is satisfied that only arbitrable issues remain."). Because the Plaintiffs' claims are subject to arbitration—and since FCC *has* requested a stay, *see* Motion to Certify Response at 12—we decline the Plaintiffs' invitation to dismiss this case.

CONCLUSION

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Plaintiffs' Motion for Reconsideration [ECF No. 144] is **DENIED**.

2. The Plaintiffs' Motion to Certify the Order Compelling Arbitration [ECF No. 145] is **DENIED**.

3. This case shall remain **STAYED** and **CLOSED** pending arbitration.

4. Every **90 days** from the date of this Order, the parties shall jointly file a report on the status of their arbitration proceedings.

5. Within **15 days** of the arbitration's conclusion, the parties shall jointly file a notice briefly describing the outcome of that arbitration.

**DONE AND ORDERED** in the Southern District of Florida, this 16th day of August 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record